```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SKYLINE STEEL, LLC,

 4                   Plaintiff,

 5            v.                          13 CV 8171 (JMF)

 6
     PILEPRO, LLC,
 7                                        Trial

 8                   Defendant.

 9   ------------------------------x
                                          New York, N.Y.
10                                        November 29, 2016
                                          9:18 a.m.
11
     Before:
12
                        HON. JESSE M. FURMAN,
13
                                          District Judge
14
                            APPEARANCES
15
     WINSTON & STRAWN LLP
16        Attorneys for Plaintiff
     BY:  ALDO A. BADINI
17        MERRITT D. WESTCOTT
          FRANK S. RESTAGNO
18
     JULIO J. RAMOS
19        Attorney for Defendant
          – and –
20   CONLEY ROSE, PC
     BY:  DARLENE F. GHAVAMI
21        – and –
     THE BROWN FIRM LLC
22   BY:  ANDREW BROWN

23

24

25
```

1          (Case called)

2          MR. BANDINI:  Good morning, your Honor.  Aldo Badini

3     for Skyline Steel LLC.

4          MS. WESTCOTT:  Merritt Wescott for Skyline Steel.

5          MR. RESTAGNO:  Good morning, your Honor.  Frank

6     Restagno for Skyline Steel.

7          MR. DeMEY:  Good morning.  Laurent De Mey for Skyline

8     Steel.

9          THE COURT:  All right.

10         MR. RAMOS:  Julio Ramos for the PilePro defendants.

11    Good morning.

12         MS. GHAVIMI:  Darlene Ghavimi for PilePro LLC.

13         MR. BROWN:  Andy Brown for PilePro.

14         THE COURT:  Good morning to all of you.  Welcome

15    Ms. Ghavimi and Mr. Brown to New York.

16         There are a couple of deposition designation

17    objections that I had reserved judgment on pending discussion

18    with you.  In particular, some relevance objections that at

19    this point I have an inadequate basis to sort of understand

20    where the relevant testimony fits in or doesn't, as the case

21    may be.

22         So that is on my agenda.  Is there anything else that

23    we need to discuss?  I think I've resolved all of -- other than

24    the ones that I explicitly reserved on, I resolved all the

25    objections in the first four depositions that Skyline had

1   submitted.  I didn't realize until I went through it this

2   morning there were no objections in the Wheeler, L.B. Foster

3   depositions.  I don't think there are any issues there.

4           So we'll turn to the relevance objections that I had

5   reserved on in a moment.  Anything else?  Ms. Ghavimi seems to

6   be popping up and down.

7           MS. GHAVIMI:  Yes, your Honor.  There was one issue

8   with respect to the Madonna transcript.  This was discovered

9   last night during the parties' meet and confer.  It regards

10  PilePro's counterdesignations.  When PilePro --

11          THE COURT:  Could you move the microphone.  The

12  acoustics in here are quite poor, so you really need to make

13  sure that you speak into the microphone.  Go ahead.

14          MS. GHAVIMI:  When PilePro made its

15  counterdesignations, I was making those counterdesignations.  I

16  was using a text version of the transcript.  And when Skyline

17  interpreted those, they used a condensed version of the

18  transcript; and, therefore, the actual testimony that was

19  designated was incorrect.  We only discovered this last night.

20  However, we're at an impasse as to what to do about it.

21  Therefore, the objections that they made were not really the

22  testimony that was actually designated two months ago.

23          I have a highlighted version of the transcript with

24  the actual counterdesignations that were made two months ago

25  for your review, and I sent this to Skyline's counsel this

```
1    morning for them to review as well.

2          THE COURT:  I don't understand what this issue --

3    where this issue comes from?  You designated these things on

4    September 30, and it's now November 29.  The notion that you

5    would discover this the night before we're scheduled to start

6    trial, I don't understand, and I don't understand what you mean

7    by condensed version versus text version.  The whole point of

8    having page numbers and line numbers is so everybody is working

9    on the same page and can actually be talking about the same

10   testimony.  So I don't understand even what you're talking

11   about.

12         MS. GHAVIMI:  Your Honor, I absolutely agree.

13   Unfortunately, we didn't -- this was an honest mistake.  The

14   parties didn't realize it.  Nobody reached out earlier to

15   either -- to anybody to discover this.  And the point is that

16   what Skyline thought that PilePro designated was not what was

17   actually designated because we were using a different version,

18   a text version that is a rough version.  That was the only copy

19   that I had.  I had just started coming onto the case only two

20   days earlier.  I was rushing to get this done.  I used what I

21   had.  And what they objected to was not what I actually

22   designated two months ago in submission with the pretrial

23   order.

24         THE COURT:  Well, I can tell you that what is not

25   going to fly is "I'm new to the case and that should excuse my
```

 1   mistake."  Your client has been through, if my memory serves

 2   me, three or four different lawyers in this case.  The fact

 3   that they chose to bring on a new lawyer at the last minute is

 4   not going to justify your failing to deal with whatever you

 5   should have dealt with.

 6            So now that's a general comment.  Mr. Badini or

 7   someone at the front table want to tell me your thoughts or

 8   what the issues are here.

 9            MR. BANDINI:  Your Honor, my colleague, Mr. Restagno,

10   will address this motion in detail.  I will make one comment,

11   though, which is that it is not true that we did not reach out

12   and point out that there were problems.  And Mr. Restagno can

13   address the issue.

14            MR. RESTAGNO:  Your Honor, good morning.

15            THE COURT:  Microphone, please.

16            MR. RESTAGNO:  Yes.  Skyline most certainly made clear

17   the problems with PilePro's designations in the pretrial order

18   by objecting very clearly each time on the specific grounds of

19   incomplete designation or, in some cases, improper

20   counterdesignation.  We created those designations specifically

21   to highlight the fact that there were some incoherent citations

22   to the transcript.  PilePro has been on notice of this for two

23   months, since the filing of the pretrial order with those

24   objections.

25            And furthermore, your Honor, for PilePro now to argue

1  that they were -- that this was the only copy that they had is

2  inconsistent with the fact that their primary designations on

3  the very same testimony that counsel is talking about are

4  correct.  They line up.  She's talking only about their

5  counterdesignations, which for some reason was based on some

6  other transcript that we knew nothing about until -- which we

7  did not see until this morning.

8        MS. GHAVIMI:  Your Honor, if I may just address those

9  points.  The counter -- the initial primary designations were

10  correct.  As I explained to counsel last night when we

11  discussed this issue, were made by Mr. Ramos.  He was working

12  from a Word -- a paper copy, which had the correct -- which was

13  different from the copy that I had.  And they made objections

14  to my -- to the counterdesignations of PilePro, yes, and the

15  parties attempted to meet and confer on both parties'

16  deposition designations, counterdesignations, and objections,

17  but we were told on multiple occasions by Ms. Wescott that we

18  would delay this meet and confer because Skyline was in the

19  process of paring down its deposition designations.  And

20  therefore, we waited, and the issue was tabled until last

21  night.

22        THE COURT:  Well, I think in a moment we should talk

23  about what is specifically at stake here, but I do have a

24  question.  I'm looking at the original counterdesignations and

25  objections that were filed with the joint pretrial order on

1    September 30, and there is, for example, a counterdesignation

2    on page 17 -- excuse me, page -- actually, forget that.

3          Why don't you tell me what's specifically at stake

4    here.  I have to tell you, I'm -- you have an uphill battle

5    here because I'm looking at the original counterdesignations

6    and objections, and they correspond with exactly what was

7    submitted last night.  You had two months to raise that.  Your

8    letter last night is another example of where one lawyer says

9    something, and you come in and you say something else.  That's

10   not going to fly here.  You speak on behalf of your client.

11         He's hired multiple lawyers.  That's fine by me if

12   you're all on the same page.  What I'm not going to allow you

13   to do is let one lawyer stand up to say:  This is not issue,

14   Judge, and we consent this, and another lawyer to come in at

15   the 11th hour, the night before we scheduled for trial and say

16   we're going to re-argue this point.  That's not happening in

17   this courtroom, all right.  And this seems like another

18   instance of that.

19         Now, if you want to talk about specifics, let's talk

20   about specifics, but you have an uphill battle here.  Go ahead.

21         MS. GHAVIMI:  Your Honor, I'm not trying to retract

22   the counterdesignations that were made two months ago.

23         THE COURT:  No, but you are trying to change the

24   landscape of your counterdesignations.  I have ruled on the

25   objections with respect to your counterdesignations and

1    sustained any number of those objections because, frankly, the

2    counterdesignations were incoherent.  They were incomplete.  To

3    pick an example, on page 17 the counterdesignation starts on

4    the second line of a two-line question, and that includes a

5    question but not the answer.  They're obviously patently

6    problematic, no pun intended.

7              You've had two months to realize that and to look at

8    it, and I don't know if that's on you or if that's on

9    Mr. Ramos.  But what you can't do is come to me the morning

10   trial is supposed to start and say:  Oops, we messed up.  One

11   of us didn't look at it.  That's just not the way this process

12   works.  It's not fair to Skyline, it's not fair to me, and it's

13   not the way the process works.

14             MS. GHAVIMI:  Your Honor, if I may submit a copy of

15   the actual testimony that was supposed to be designated, and I

16   can explain to you specifics?

17             THE COURT:  You may.  Do you have a copy for Skyline?

18             MS. GHAVIMI:  I do.  For example --

19             THE COURT:  Hold on.  All right.  You may proceed.

20             MS. GHAVIMI:  If you go to page -- the bottom says

21   page 16, but that's not the actual page of the transcript.  The

22   page of the transcript are the numbers that are on the

23   right-hand side.

24             THE COURT:  Yes.

25             MS. GHAVIMI:  So in the middle of the page you see 19

1   on the right-hand side above it.

2            THE COURT:  Yes.

3            MS. GHAVIMI:  The actual designations for page 18 was

4   line 18 to 21:  "Question:  Did Skyline Steel furnish this

5   indemnification to" --

6            THE COURT:  You need to read more slowly so the court

7   reporter can take your -- take down what you're saying.  But I

8   can also read, so you don't need to read.

9            MS. GHAVIMI:  Okay.  I will not read it into the

10  record.  However, this was the intended designation, not an

11  incomplete, nonsensical designation.  For example, another

12  example, turning to the next page --

13           THE COURT:  Where does this correspond to the actual

14  transcript that was submitted to me last night?

15           MS. GHAVIMI:  It is the same page number and line

16  number, 19 -- well --

17           THE COURT:  No, it's not, because that's --

18           MS. GHAVIMI:  Where does it correspond?  I apologize.

19  I have not done that correspondence.  I can find it.

20           THE COURT:  Seems to be page 23, lines 7 through 10,

21  which I don't know what to tell you.  Not to mention it seems

22  to be designated, if I'm not mistaken, by Skyline.

23           MS. GHAVIMI:  This is how this mistake occurred.  And

24  what we're just asking is, yes, this section is already

25  designated by Skyline, but other counterdesignations are not.

```
 1    And we --

 2              THE COURT:  All right.  Why don't you pick your

 3    battles and tell me which ones are absolutely critical to you,

 4    because right now I'm not allowing you to redo any of this

 5    because it's on you.  The fact that Mr. Ramos correctly

 6    designated your affirmative designations makes abundantly clear

 7    that PilePro had the correct transcript.  You could have worked

 8    off it.  You could have corresponded with one another and made

 9    sure you were on the same page.  And the fact that you didn't

10    and didn't realize it until last night is your fault, not my

11    fault.

12              What can't happen is at the 12th hour at this point to

13    basically shift the sands of the foundations of the way this

14    process works and start over.  It's just not going to happen.

15    So if you want to pick your one or two that you are most

16    concerned about, I'll look at them and I'll consider it, but

17    right now it's not going to fly.

18              MS. GHAVIMI:  Your Honor, the one we're most concerned

19    about is page 51 in this text document.

20              THE COURT:  Meaning at the bottom it says page 51?

21              MS. GHAVIMI:  Yes.  Yes, at the bottom page 51.

22              THE COURT:  And the entire portion that's highlighted

23    in blue?

24              MS. GHAVIMI:  Yes.  And I see that that's been

25    designated by Skyline.
```

GBT7SKY2

1          THE COURT:  Yes, this entire part is already in.

2          All right.  We're done with this.  Let's move on to

3     the next issue.  Is there anything beyond the relevance

4     objections that I reserved judgment on?

5          All right.  Then let's deal with those.  I'm told that

6     we should have a jury pool in a matter of minutes, so we'll

7     continue until we have the jury here, at which point we will

8     obviously begin with voir dire.

9          Let's start with the McShane deposition transcript,

10    the March 12 deposition testimony.  First is page 40.  Well,

11    looks like we have a jury pool here, so we will table this

12    until another time.

13          MS. WESTCOTT:  Your Honor, at some point we do need to

14    talk about some objections to demonstratives used in opening.

15          THE COURT:  We'll have an opportunity to do that

16    before openings.

17          MS. WESTCOTT:  Okay.

18          THE COURT:  I did ask if there was anything else, and

19    nobody said anything.  But in any event, we will proceed with

20    jury selection and then take those up at a break.

21          (Jury selection ensued)

22          (Continued on next page)

23

24

25

```
 1              (In open court)

 2              (A jury of 8 people were chosen and sworn)

 3              THE COURT:  You may be seated.  So, when you come back

 4    in the jury room after our break, I think it would make sense

 5    for you to sit in the first row and then jurors number 7 and 8

 6    in the second row.  If you could remember who is to your left

 7    or right or essentially what number juror you are, if you line

 8    up in that order as you come out, it will just make it easier,

 9    and Ms. Johnson can just fill in the first row and everybody

10    else down to seat number six, and then jurors numbers 7 and 8

11    can just find seats in the second row.

12              Now, good morning.  It's still morning.  This case is

13    now officially on trial.  As stated earlier, the trial is

14    scheduled to last no more than two weeks, but I hope that it

15    may end even sooner than that.  We will begin tomorrow and

16    additional days thereafter at 9 o'clock, and to help ensure

17    that we can start on time, please be in the jury room no later

18    than a few minutes before nine.  I will actually deal with

19    issues with the lawyers at nine, but shortly after nine, at

20    9:15 I hope each day we will be able to start promptly with the

21    portion of the case that involves you.  But to do that you need

22    to be here on time.  We can't begin until all eight of you are

23    here.  So, I will ask you and remind you as we break today make

24    sure you are here on time tomorrow so that we can begin without

25    delay.  As an enticement for you to begin on time, I have
```

1    arranged to get some breakfast and coffee for you in the jury

2    room.  As I told you, we will, beginning tomorrow, take one and

3    only one break and a relatively short one at that, about 30

4    minutes, so you should, number one, really given how short the

5    break is, plan to remain in the jury room during the break, but

6    you may want to bring some food or small snack or even a small

7    lunch to tide you over until the end of the day, and we will

8    finish each day at 2:30 as I mentioned.

9          Now, the food that we get you for the morning may also

10   be enough to get you through the day, but in any event, I will

11   leave that to you.

12         Now that you have been sworn, let me give you some

13   instructions about your duties as jurors.  At the end of the

14   trial I will give you more detailed instructions, and those

15   instructions will control our deliberations in this case.  But

16   for now let me explain how the trial will proceed.

17         The first step in the trial will be the opening

18   statements.  First, the plaintiff's lawyer will make an opening

19   statement, and then the defendant's lawyer will make an opening

20   statement.

21         Opening statements are neither evidence nor argument;

22   they are simply outlines to help you understand the evidence as

23   it is presented.  After opening statements the plaintiff will

24   present its evidence.  The plaintiff's evidence will consist of

25   the testimony of witnesses as well as documents and exhibits.

1    And witnesses will be testifying live here in person in the

2    witness box.  You will also see some witness testimony through

3    what are known as depositions, which are essentially videotaped

4    examinations of the witness, and I will explain that to you

5    more fully at the time.

6         So, the plaintiff's evidence will consist, as I said,

7    of the testimony of witnesses, as well as documents and

8    exhibits.  Plaintiff's lawyer will examine the witnesses, and

9    the defendant's lawyer may cross-examine them.  Following the

10   plaintiff's case, the defendant may present a case, and if it

11   does, the plaintiff's lawyer will have an opportunity to

12   cross-examine any witnesses testifying for the defendant.

13        After the presentation of evidence is completed, the

14   lawyers will deliver their closing arguments to summarize and

15   interpret the evidence.  Just as the lawyers' opening

16   statements are not evidence, their closing arguments are not

17   evidence either.  Following closing arguments, I will instruct

18   you on the law.  Then you will retire to deliberate on your

19   verdict which must be based solely on the evidence presented at

20   trial.  All of you must agree on any verdict.  And while that

21   verdict will obviously be public, your deliberations are

22   secret.  You will never have to explain your verdict to anyone.

23        It is important to remember that this is a civil case.

24   You may have heard of the "beyond a reasonable doubt" standard

25   that applies in criminal cases.  That requirement does not

1      apply in a civil case, and you should put it entirely out of

2      your mind.  In civil cases, the burden is different, and it is

3      called proof by a preponderance of the evidence.  To establish

4      facts by a preponderance of the evidence means to prove that

5      the fact are more likely are true than not true.  I will,

6      however, instruct you fully on the burden of proof after all of

7      the evidence has been received.

8              Now let me explain the jobs that you and I are to

9      perform during the trial.  I will decide which rules of law

10     apply to the case.  I will decide that by making legal rulings

11     during the presentation of the evidence and, also, as I told

12     you, in giving the final instructions to you at the close of

13     the evidence and the closing arguments of the lawyers.

14             In order to do my job, I may have to interrupt the

15     proceedings from time to time to confer with the lawyers about

16     the rules of law that should apply here.  Sometimes we may talk

17     here at the bench, at the side bar, as we did during some of

18     jury selection, out of your hearing, but some of the

19     conferences may take more time than others, and as a

20     convenience to you, I may excuse you from the courtroom.  I

21     assure you that I will try to keep any such interruptions to an

22     absolute minimum, and indeed will hope to avoid them

23     altogether.  But please be patient and understand that these

24     conferences are necessary to ensure the fairness of the trial

25     and that ultimately they do serve to make the trial move

1   faster.  While I decide the law that applies to the case, you,

2   the members of the jury, are the triers of fact.  You will

3   weigh the evidence presented and decide whether the plaintiff

4   has proved by a preponderance of the evidence that the

5   defendant is liable to it.  You must pay close attention to all

6   of the evidence presented, and you must base your decision only

7   on the evidence in the case and my instructions on the law.

8           What then is evidence?  Evidence consists only of the

9   testimony of witnesses, documents and other things admitted as

10  evidence, or stipulations agreed to by the parties.  Some of

11  you probably have heard the terms circumstantial evidence and

12  direct evidence.  Do not be concerned with these terms for now.

13  You are to consider all the given in this trial.  Certain

14  things are not evidence and must not be considered by you.  The

15  following is a list of what is not evidence.

16          First, arguments, statements and questions by the

17  lawyers are not evidence, nor are statements that I make or

18  questions that I ask of a witness.

19          Second, objections to questions are not evidence.

20  Lawyers have an obligation to make an objection if they believe

21  that evidence being offered is improper under the rules of

22  evidence.  You should not be influenced by the objection or by

23  my rulings on any objection.  If an objection is sustained,

24  ignore the question and any answer that may have been given.

25  If an objection is overruled, you should treat the answer like

1   any other.  If you are instructed that some item of evidence is

2   received for a limited purpose only, you must follow that

3   instruction as you do all my instructions.

4         Third, testimony that I have excluded or told you to

5   disregard is not evidence and must not be considered.

6         Fourth, anything that you have seen or heard outside

7   the courtroom is not evidence and must be disregarded.  You are

8   to decide the case solely on the evidence presented here in the

9   courtroom.  There is no formula to evaluate testimony or

10   exhibits.  For now, suffice it to say, that you bring with you

11   into this courtroom all of experience and background of your

12   lives.  Do not leave your common sense outside the courtroom.

13   The same types of tests that you use in your everyday dealings

14   are the tests that you should apply in deciding how much

15   weight, if any, to give to the evidence in this case.  The law

16   does not require you to accept all of the evidence admitted at

17   trial.  In determining what evidence you accept, you must make

18   your own evaluation of the testimony from each of the witnesses

19   and the exhibits that are received in evidence.

20         It is essential, however, that you keep an open mind

21   until you have heard all of the evidence in the case.  A case

22   can be presented only step by step, witness by witness, before

23   all the evidence is before you.  As you know from experience,

24   you can hear one person give his or her version of an event and

25   think it sounds very impressive or even compelling and yet upon

1   hearing another version of the same event, or even the same

2   person cross-examined with respect to the event, things may

3   seem very different.  In other words, there may be another side

4   to any witness's story.  You should use your common sense and

5   good judgment to evaluate each witness's testimony based on all

6   of the circumstances.  Again, I cannot emphasize too strongly

7   that you must keep an open mind until the trial is over.  You

8   should not reach any conclusions until you have all the

9   evidence before you.

10          Finally, let me caution you about certain rules and

11  principles governing your conduct as jurors in this case.

12  First, you must not talk to each other about this case or about

13  anyone who has anything to do with the case until the end of

14  the case when you go to the jury room to decide on your

15  verdict.  The reason for this requirement is that you must not

16  reach any conclusion on the claims or defenses until all of the

17  evidence is in and you have heard my instructions.  As I have

18  said, keep an open mind until you start your deliberations at

19  the end of the case.

20          Second, do not communicate with anyone else about this

21  case or with anyone who has anything to do with it, until the

22  trial has ended and you have been excused or discharged as

23  jurors.  "Anyone else" includes members of your family and

24  friends, and "no communicating" about the case means no

25  communicating in any way, shape or form, in person, by e-mail,

1    by telephone, by text, on Facebook, Twitter, Google, blogs or

2    whatever, at all.  You may tell your family and your friends,

3    as well as your employer, that you have been selected as a

4    juror in a civil case, but, please, do not tell them anything

5    else about the case until you have been discharged by me.  You

6    may think that tweeting something or posting something on

7    Facebook is harmless, but I can assure you that it isn't.  And

8    if you do anything like that, that is, tweet or post anything

9    about the trial or about the participants in the trial, it will

10   be major inconvenience to everyone involved in the trial,

11   including and maybe especially to you, so don't do it.

12          Third, do not let anyone talk to you about the case or

13   about anyone who has anything to do with it.  If any person

14   should attempt to communicate with you about this case at any

15   time throughout the trial, either in or out of the courthouse,

16   you must immediately report that to my deputy, Ms. Smallman,

17   and to no one else.  When I say report that communication to no

18   one else, I mean that you should not tell anyone, including

19   your fellow jurors.

20          To minimize the probability of any such improper

21   communication, it is important that you go straight to the jury

22   room when you come in in the morning and that you remain in the

23   jury room for the duration of the trial day other than when you

24   are in the courtroom.

25          Ms. Smallman, after I excuse you, will show you where

1    the jury room is and also show you where the door is to the

2    jury room.  That is to say after you are excused, you should

3    not come into the main door of the courtroom.  There may be

4    other proceedings going on, or I may be discussing things with

5    the lawyers.  You should go directly into the jury room using

6    the designated door that Ms. Smallman will show you.  In

7    addition, you should use the bathrooms in the hallway right

8    outside the jury room rather than the bathrooms that are in the

9    lobby of this floor or elsewhere in the courthouse.  As you

10   were probably already told, you should not use the courthouse

11   cafeteria.  I apologize for that on such a rainy or dreary day,

12   but you should get food or refreshments outside the courthouse

13   rather than in the cafeteria.  And you should not linger in the

14   public areas of the courthouse on this floor or elsewhere.

15          Now, given that beginning tomorrow we will be taking

16   only one break, it is, as I mentioned earlier, best that you

17   remain in the jury room if you can.

18          Fourth, do not do any research or investigation about

19   the case, or about anyone who has anything to do with the case

20   on your own.  Don't go visit anyplace described in the trial.

21   Don't read, or listen to, or watch any news reports about the

22   case.  Don't go on the Internet or use whatever digital or

23   communications device it is that you use to see what you can

24   learn to inform yourself about this matter.  That is because

25   your decision in this case must be made solely on the evidence

1    presented at the trial.  In other words, all that you need to

2    know to decide this case will be presented here in open court

3    by the parties.  I expect you to inform me through Ms. Smallman

4    if you become aware of another juror's violation of these

5    instructions.

6            Finally, each of you will be given a notebook and a

7    pen.  I think what I will do is during the break we will

8    actually put them on the seats in the jury box -- no, Ms.

9    Smallman is shaking her head.  Excuse me, they are already in

10   the jury room.  So, when you go to the jury room, Ms. Smallman

11   can point them out to you, and you bring those with you when

12   you come back after the break.

13           Now, this is because I permit jurors to take notes,

14   but you do not have to take notes.  Notes are just an aid to

15   your own recollection.  The court reporters in this case -- the

16   gentleman sitting right next to Ms. Smallman, and the woman who

17   was here earlier -- record everything that is said in the

18   courtroom, and any portion of the testimony that you hear can

19   be read back to you during your deliberations.

20           If you do take notes, be aware that note taking can

21   distract you from something important that is happening here on

22   the witness stand.  And whether or not you take notes, you

23   should rely on your own recollections and don't be influenced

24   by the fact that another juror has taken notes.  If you do take

25   notes, all notes must be left each day in the jury room.  We

1    will make sure that they are secure there.

2          From this point until the time that you retire to

3    deliberate, it is your duty not to discuss this case and not to

4    remain in the presence of other people who may be discussing

5    this case.  In that regard, please understand that the parties

6    and the lawyers in the case have been instructed to have no

7    contact with any of you.  So, if you happen to see any of them

8    outside the courtroom and they do not acknowledge you, say

9    hello to you, make small talk, hold the door for you, or

10   anything of that sort, please do not take offense.  They are

11   not being rude, I assure you.  They are simply following my

12   instructions to ensure that both parties get a fair trial in

13   this case.

14          That concludes my preliminary instructions to you.  As

15   I said, what we're going to do now is break for an early lunch.

16   It's 11:31.  To ensure that you have enough time, that the

17   lawyers have enough time, and that we can take care of a few

18   remaining loose ends, I'm actually going to give you until one

19   o'clock today.  I am normally not going to give you that much

20   time for a break, but today we will begin again at one o'clock.

21   So, please be back in the jury room let's say at five or ten

22   minutes to one.  And again, Ms. Smallman will show you how to

23   enter the jury room to ensure that you don't come into the

24   courtroom before the appointed time.

25          A couple of reminders before I excuse you.  Number

1     one, do not discuss the case with one another or with anyone

2     else, with your friends, your family or your employers.  As I

3     mentioned, you may tell them that you have been selected to

4     serve as a juror in a civil case, but you should tell them

5     nothing else about the case.  You should not discuss the case

6     with one another.  You will have your time when it comes time

7     to deliberate, but until then it's important that you keep an

8     open mind and that you not discuss the case with each other.

9     Do not communicate about the case with anyone in person, by

10    e-mail, by phone or any means, and keep an open mind.

11         You obviously haven't heard the lawyers' opening

12    statements.  You haven't heard any of the evidence in the case.

13    Really the case has not yet begun, so you don't know anything

14    about the case, and you haven't heard a lick of evidence, so

15    it's important that you keep an open mind.

16         Lastly, Mr. Woods, I know you had the appointments

17    that you mentioned to me earlier.  If you could during the

18    break see if you can change those to the afternoon, after 2:30,

19    when we will be ending each day.  That would be great.  And if

20    you need my assistance in arranging that, you can let Ms.

21    Smallman know, and I will do what I can to help make sure that

22    that is not a problem for you.

23         With that, you are excused.  Again, please be back in

24    the jury room, let's say, by ten to one, so that we can start

25    promptly at one o'clock, and I thank you for your attention,

1    and enjoy your lunches.  Thank you.  You can leave the

2    questionnaires on your chairs.

3           (Jury not present)

4           THE COURT:  All right.  Let's deal with the issues

5    that we need to address before openings.  We will see how long

6    that takes.  And then maybe we can go over other ground, but

7    otherwise we will take a break, let you guys get a bite as well

8    and prepare for openings, and then we will proceed directly to

9    the evidence after openings.

10          So tell me, there were some issues with respect to

11   demonstratives and other issues that you mentioned.

12          MS. WESTCOTT:  Yes, your Honor.  Last night the

13   parties exchanged the slides or exhibits that they were

14   intending to use in opening.  Last night PilePro had some

15   objections to several of our slides which contain certain

16   statements of fact.  I think that that was probably addressed

17   in your order of last night.

18          THE COURT:  You mean statements of fact from the

19   stipulations?

20          MS. WESTCOTT:  Yes, sir.

21          THE COURT:  All right.  Well, if they are on the

22   stipulations, then I think that is settled by my order of last

23   night.

24          MS. GHAVIMI:  Your Honor, I would just like for

25   preservation of the record to renew our objection to those

1    particular identify statement of facts.

2            THE COURT:  All right.  So preserved, but I don't

3    think there is much to preserve there anyway.  Next.

4            MS. WESTCOTT:  Relatedly we had prepared a stipulation

5    of those statements of fact, and I think it has been signed by

6    both parties at this time, and we would like to admit it on

7    stipulation.

8            THE COURT:  Let's do that after openings when the

9    evidentiary portion of the case begins.  You can certainly

10   offer it at that time.  But since openings are the first step,

11   we will wait until then.

12           MR. BADINI:  Just so we understand the mechanics then,

13   before we call our first witness we should just offer it as an

14   exhibit?

15           THE COURT:  I presume it's a stipulation between the

16   parties.  We offer exhibit whatever it is, you know, which is

17   the stipulation of facts agreed to by the parties, yes.

18           MR. BADINI:  Thank you, your Honor.

19           MS. WESTCOTT:  With respect to PilePro's exhibits to

20   be used in opening, they propose to use two different videos.

21   Skyline objects to these videos.

22           The first video -- and I think that we have them

23   available if your Honor would like to see them, but I can

24   explain our objection -- the first video is of Mr. Wendt

25   explaining his ideas for a new company.  I don't know that it's

1    a member of the  PilePro group, either called Origami Steel,

2    that relates different patent and a method of making sheet

3    piles using lasers.  So we think that the video is irrelevant,

4    first of all.  Secondly, the beginning of the video makes

5    statements such as "America used to be good at making things,

6    and today we import everything."  "These day American builders

7    are forced to buy low quality steel from abroad and wait a long

8    time for the orders."  We believe this type of thing is

9    prejudicial under 403, particularly given the fact that this

10   case is about imported product from Europe.

11            THE COURT:  And is this video on the exhibit list?

12            MS. WESTCOTT:  No.

13            THE COURT:  So I don't even understand on what basis

14   it would be shown at all.  What's the second video, before I

15   hear from defense counsel?

16            MS. WESTCOTT:  The second video, also not on the

17   exhibit list, appears to be a presentation made at least four

18   years ago about how the isheetpile website works.  It's not

19   exactly a walk-through of the isheetpile website, but it's more

20   a PowerPoint presentation showing a mixed media of pages from

21   catalogs and a person clicking through the website.  So our

22   objection to this would be of course we discussed using the

23   live website in court.  It was decided not to do that.

24   Mr. Ramos objected to us doing the live website.  It seems kind

25   of like an end-around in trying to get the website up, not to

1    mention the fact that it's four years old; it's not even the

2    same website; it doesn't even appear the same.

3           THE COURT:  The threshold objection I assume is it's

4    not on the exhibit list and therefore it won't be in evidence.

5           MS. WESTCOTT:  Yes.

6           THE COURT:  OK.  Mr. Ramos or Ms. Ghavimi, on what

7    possible basis should be you be allowed to show this to the

8    jury if it's not coming into evidence?

9           MS. GHAVIMI:  Your Honor, these are demonstratives.

10   We are not intending to offer these into evidence, so of course

11   they would not appear on our exhibit list.  Skyline's opening

12   statement has pictures in its PowerPoint presentation that are

13   not on their exhibit list.  And from what I understand they are

14   not intending to offer those into evidence either.

15          The point of the -- let me take these first things

16   first -- the point of the Origami Steel video is a company

17   started and founded by Mr. Wendt.  We are intending to show it

18   to demonstrate Mr. Wendt as a business owner, an innovator, the

19   fact that he has patents, he works in the steel business.  The

20   statement that Ms. Westcott stated was prejudicial does not

21   mention Skyline or ArcelorMittal at all.  It is referring to

22   the industry as a whole.  And it was created not in connection

23   with this litigation; its a marketing video.  It is intended to

24   describe and exemplify the owner of PilePro and his business

25   and describe him as an innovator in the industry.  We are

1   certainly permitted to present our client in a positive light

2   as a counterpoint to Skyline's opening presentation which

3   highlights numerous holdings of this court that present our

4   client in a negative light, for instance, the court has held

5   that the Madonna letter was signed in bad faith.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GBTHSKY3

1          THE COURT:  All right.  You're not going to show that

2     video.  What about the second one?

3          MS. GHAVIMI:  The second one is a tutorial of the

4     iSheet Web site that was also created about four years ago.  It

5     just goes through how one would walk through the Web site were

6     one to use it.  It doesn't mention --

7          THE COURT:  But also not on the exhibit list?

8          MS. GHAVIMI:  It's not intended to be introduced into

9     evidence.  It's a demonstrative.  It's intended to explain to

10    the jury -- have them have a visual of the Web site.  We're not

11    intending to offer it into evidence.

12         THE COURT:  But were you intending to show it to the

13    jury?

14         MS. GHAVIMI:  Yes.

15         THE COURT:  On what basis and through whom?

16         MS. GHAVIMI:  Intending to show it in the opening, and

17    that's it.

18         THE COURT:  Not happening.  You don't get to show the

19    jury things just for the sake of showing the jury things and,

20    you know, persuading them -- making arguments to the jury.  You

21    show the jury evidence.  The jury can base its views and

22    deliberations on the evidence.  And if there is evidence, you

23    can perhaps show it to the jury if it is appropriate to do, but

24    you can't get up and show them things that aren't going to come

25    into evidence.  On top of which, four years ago is not within

GBTHSKY3

1    the time frame of this case, as far as I'm aware.  Given that,

2    I don't think it would be appropriate.  There's no foundation,

3    and it's not relevant.  So not happening.

4              Anything else that we need to resolve with respect to

5    openings?

6              MS. WESTCOTT:  No, your Honor, not with respect to

7    openings.

8              THE COURT:  All right.  I have the relevance issues

9    and the depositions that we can start to go through.  Anything

10   else aside from that?

11             MS. WESTCOTT:  Your Honor, our first live witness will

12   be Mr. De Mey.  They have an objection to one of the exhibits

13   we intend to use with him on direct.  That objection is to

14   Exhibit, Plaintiff's, 20, which is a copy of the ArcelorMittal

15   patent that is prior art --

16             THE COURT:  You've got to keep your voice up.  Say

17   again.

18             MS. WESTCOTT:  I'm sorry.  They're objecting to

19   Plaintiff's Exhibit 20.  This is the U.S. patent to

20   ArcelorMittal that we are contending is prior art to PilePro's

21   patent in this case.

22             THE COURT:  Okay.

23             MS. WESTCOTT:  Their objection -- I'm sorry, your

24   Honor.  Their objection is relevance.  They don't believe it's

25   relevant to the case anymore.

GBTHSKY3

1          THE COURT:  Why do you think this is relevant since

2     infringement and invalidity are not, at least directly, at

3     issue?

4          MS. WESTCOTT:  The jury will not be asked to determine

5     the question of whether the patent is valid; however, if a

6     person accuses someone of infringing a patent that it knows to

7     be or should know to be invalid, that is also bad faith.

8          THE COURT:  All right.  Ms. Ghavimi.

9          MS. GHAVIMI:  Your Honor, it's our position that

10    Mr. De Mey's belief about the validity or invalidity of the

11    '543 patent is completely irrelevant to Mr. Wendt's belief

12    about the validity of a patent and his --

13         THE COURT:  Hold on.  I didn't hear anyone suggesting

14    that Mr. De Mey was going to be testifying, sharing his belief,

15    about the validity of the patent.  I agree with you.  I don't

16    know what relevance that would have.  The sole issue is just

17    whether the patent itself is admitted into evidence, as I

18    understand it.

19         MS. GHAVIMI:  I can't see what other purpose they

20    would be asking questions of Mr. De Mey and this patent.  He is

21    not the inventor.  He's not any patent attorney who worked on

22    the patent.  He has no knowledge.  I don't see how he can --

23    how they could lay a foundation or he could authenticate it.

24         THE COURT:  All right.  I'll reserve judgment on that,

25    see if proper foundation is laid.  If it is, I'll give you my

GBTHSKY3

1    ruling at the time.

2            Anything else aside from the deposition designations?

3            MS. GHAVIMI:  No, your Honor.

4            MS. WESTCOTT:  No, your Honor.

5            THE COURT:  All right.  So let's talk about those,

6    since we have a little bit of time now.  Again, I think I was

7    starting with the March 12 deposition of Mr. McShane, page 40.

8    There is a relevance objection.  And, again, just at this point

9    in time, without having heard your openings or much evidence

10   and notwithstanding my lengthy involvement in this case, I just

11   am having a hard time evaluating the relevance objections.  So

12   it would be helpful to hear from you.  If we can do this

13   briefly one by one, that would be helpful.

14           I guess it's Skyline's objection, so why don't I hear

15   first from Skyline.

16           MR. BANDINI:  Your Honor, Mr. Restagno will be

17   addressing this.

18           MR. RESTAGNO:  Thank you, your Honor.

19           THE COURT:  This is page 40 and 41?

20           MR. RESTAGNO:  Yes, that's right, your Honor.  Our

21   objections to this testimony are grounded in relevance,

22   nonresponsiveness, and narration.  But to focus on relevance,

23   if the Court doesn't mind, we believe that this line of

24   questioning is about -- it's about McShane's involvement in

25   Skyline's exploration into connector manufacturing.  And so

GBTHSKY3

1    it's not quite responsive to the question posed, which was --

2    the question was his involvement in manufacturing.  And the

3    answer gets into the relative size of Skyline, saying that

4    Skyline was on a growth campaign through acquisitions and

5    organic growth to expand it to a billion-dollar-a-year

6    operation.  It also goes into the acquisition of PilePro.

7            So we think that this runs counter to the Court's

8    ruling in the motion in limine pertaining to the relative size

9    of the companies.  It's an irrelevant topic, and we think it

10   could distract the jury.  Furthermore, this implicates facts

11   that underlie the 2011 settlement agreement which would run

12   afoul of the Court's motion in limine two barring evidence on

13   prior litigations between the parties.

14           THE COURT:  It doesn't mention the settlement.

15           All right.  Ms. Ghavimi, Mr. Ramos, relevance?

16           MR. RAMOS:  Your Honor, I think it's highly relevant.

17   This is an unfair practices case, and the specific business

18   conduct and comport of PilePro is at issue.  This only provides

19   the jury with understanding with respect to the prior and

20   preexisting and, to some extent, continuing business

21   relationship between Skyline and PilePro.  It is highly

22   relevant information, at least on the issue of background

23   between the parties, how the parties got to the position that

24   they're currently in in this litigation.  And I think it's an

25   issue that is highly relevant, and it is responsive to

GBTHSKY3

1    understanding PilePro's market position and its competitive

2    posture vis-a-vis Skyline.

3            MR. RESTAGNO:  Well, your Honor, I just don't see how

4    this is relevant to PilePro's accusations against Skyline

5    vis-a-vis the HZM system and the '543 patent.  This testimony

6    is -- it really just seems to emphasize the relative size of

7    the companies, which is just an irrelevant factor.

8            THE COURT:  All right.  I'll sustain the objection.

9            Next is page 203.  Again Skyline objection, so 203,

10   line 24 to 204, line 14.

11           MR. RESTAGNO:  Yes.  Thank you, your Honor.  We object

12   on grounds of nonresponsiveness.  The question posed was where

13   did -- essentially asked for where Mr. Wendt obtained his

14   information on lead times.  And McShane's testimony toward the

15   end, beginning particularly at line 12, that the O-Pile system

16   was a short delivery and HZM was a product from Europe with

17   very, very long lead times is nonresponsive to the question of

18   where Mr. Wendt obtained that information.  It's more of his

19   opinion, and we object on those grounds.

20           THE COURT:  All right.  Mr. Ramos.

21           MR. RAMOS:  On that one, your Honor, it's pretty clear

22   on page 204, line 2 through lines 9, Mr. Wendt's response --

23   I'm sorry, Mr. McShane's response there in answering the

24   question specifically addresses how Mr. Wendt obtained the

25   information on lead times; how he had contacts with people in

GBTHSKY3

Europe, with the mills there; how he had contact with L.B.
Foster; how he was able to deduce the figures on lead times
based on that information.  And I thought that this case was
partially an issue of the lead times and whether those were
confusing the market participants.

          MR. RESTAGNO:  Your Honor, if I may?

          THE COURT:  Hold on, please.

          MR. RESTAGNO:  Of course.

          THE COURT:  All right.  I'm going to sustain the
objection with respect to line 3, page 204, line 3 through 14,
beginning with the word "but."  I will allow the first portion
of the answer:  "I am sure we did discuss it.  I don't recall
the actual discussions."  The rest will be omitted.

          Next is page 219, lines 9 through 25.  Skyline
objection, so Mr. Restagno.

          MR. RESTAGNO:  Yes.  Thank you, your Honor.  Once
again, we had testimony that implicates the settlement
agreement between the parties, and it's an end run around your
Honor's decision on motion in limine two disallowing evidence
of prior litigations.  Specifically, the questioning:  "Did you
ever complain to Skyline, anyone at Skyline, that Skyline was
not, to your satisfaction, displaying the PilePro connectors on
its marketing materials?"  That was a duty that pertained to
settlement agreement between the parties in a prior litigation.

          THE COURT:  Mr. Ramos.

GBTHSKY3

1          MR. RAMOS:  Just one second, your Honor.

2          I don't see, your Honor, how this has anything to do

3    with the settlement agreement.  It has no issue with respect to

4    that.  It's just a question and answer with respect to

5    PilePro's contacts with Mr. Borger prior to the complaint being

6    on file.

7          THE COURT:  This references PilePro's -- that Skyline

8    was not displaying PilePro connectors in its marketing

9    materials satisfactorily.  What does that have to do with this

10   case which concerns PilePro's representations and advertising?

11         MR. RAMOS:  Your Honor, I think it's important to

12   understand what the business relationship was between the

13   parties, how they were engaged in commerce, how the issue of

14   competition has to be understood in that context with respect

15   to their prior arrangement and prior course of dealings.  I

16   think the jury should understand that and should hear that type

17   of testimony.

18         THE COURT:  All right.  Objection's sustained.

19         The next one is page 221, line 16 to 25.

20   Mr. Restagno.

21         MR. RESTAGNO:  Yes, your Honor.  Thank you.  This

22   appears to be just a continuation of the testimony that we were

23   discussing before.  It implicates the duties under --

24         THE COURT:  Can you move the microphone a little

25   closer, please.

1          MR. RESTAGNO:  My apologies.  This touches on the same

2     issue that we just dealt with.  This is, in effect, a

3     continuation of the testimony that we had just addressed that

4     implicated duties under the settlement agreement.  It, in

5     effect, asks what Skyline's response was to the inappropriate

6     question asked before.

7          THE COURT:  All right.  Mr. Ramos.

8          MR. RAMOS:  Again, your Honor, I would say that, in

9     defense of this line of questioning, it pertains to the market

10    conduct between PilePro and Skyline and the fact that Skyline

11    was using harsh and sharp tactics vis-a-vis PilePro.  And I

12    believe the jury should understand the context of those

13    business dealings as well.

14         THE COURT:  Objection's sustained.  That, I think,

15    covers all disputes, objections, in the March 12 transcript.

16    If I missed any, I'm sure you'll bring them to my attention.

17         Let's turn to the March 13 transcript beginning, I

18    think, on page 40 as well.  Can you give me one moment.

19         Page 40 to 41, again, it's Skyline's objection.

20    Mr. Restagno.

21         MR. RESTAGNO:  Thank you, your Honor.  Once again, we

22    had testimony that calls into question the relative sizes of

23    the two parties, and we believe inappropriately runs afoul of

24    motion in limine three.  Specifically, testimony concerning

25    Skyline's possible acquisition of PilePro, which would

GBTHSKY3

1    implicate a relative size relationship that we feel is

2    inappropriate.

3              THE COURT:  All right.  Mr. Ramos.

4              MR. RAMOS:  Once again, your Honor, this is showing

5    the specific employee, Mr. McShane, and his understanding of

6    where the market relationship was between PilePro and Skyline

7    and the fact that that relationship was of material

8    significance to Skyline to the degree that it was contemplating

9    acquisition of PilePro.

10             THE COURT:  And what relevance does that have to the

11   claims in --

12             MR. RAMOS:  Again, I think this is a market conduct

13   case, and it should be presented to the jury with respect to

14   what the issues were at the beginning and of the decline in the

15   relationship.

16             THE COURT:  That objection is sustained as well.

17             Next is pages 62 to 63.  Mr. Restagno.

18             MR. RESTAGNO:  Thank you, your Honor.  Calling the

19   Court's attention to page 62, line 17:

20   "Q.  It says that during your employment as a corporate officer

21   at Skyline, you were personally involved in detailed

22   discussions with counsel for Skyline regarding the litigation

23   between Skyline and PilePro."

24             This has no relevance to the issues at hand.  If your

25   Honor will direct his attention to line 11 of the same page,

1    this testimony's based on a letter dated 2011.  This is clearly

2    testimony related to a prior litigation and improper.

3              THE COURT:  Mr. Ramos.

4              MR. RAMOS:  We believe that the jury should understand

5    Mr. McShane's prior employment with Skyline and also the fact

6    that by virtue of his prior employment, that there was

7    basically breach of duty by Mr. McShane at PilePro in that he

8    had divided loyalties between Skyline and PilePro and that his

9    information at that particular point in time during the period

10   of time when he was employed by PilePro, that that information

11   should be provided to the jury in order to understand the

12   credibility of Mr. McShane's testimony.

13             THE COURT:  How does this inform the jury's evaluation

14   of Mr. McShane's credibility?

15             MR. RAMOS:  Well, it's our position, your Honor, that

16   he was a disloyal employee of PilePro and that as a result of

17   acts that he undertook, there was a market deterioration in

18   PilePro's relationship with Skyline because he was there

19   basically to undermine PilePro's ability to penetrate market

20   sectors that Skyline was dominating.

21             THE COURT:  But all this is, is concerning a letter,

22   if I'm mistaken, from ArcelorMittal advising him of his

23   obligations of confidentiality to Skyline, notwithstanding the

24   fact that he was then working at a competitor, not to mention

25   it's before the time period relevant to this case.

GBTHSKY3

1          MR. RAMOS:  I think it shows the depth of his

2     relationship and that he had a lot of market information with

3     respect to Skyline that -- that shows in this particular

4     context of Mr. McShane's testimony that he had divided

5     loyalties, your Honor.  He had a lot of information about

6     Skyline.

7          THE COURT:  Mr. Restagno, is there other testimony

8     concerning the fact that Mr. McShane previously worked at

9     Skyline that has been designated?

10          MR. RESTAGNO:  Yes, your Honor.

11          THE COURT:  All right.  So I'll sustain the objection

12     on relevance and 403 grounds.

13          Now, I think there may be one more page, 71.  I think

14     I understand the objection.  Mr. Ramos, you want to tell me why

15     this is relevant and not confusing and prejudicial, given the

16     reference to the settlement agreement.

17          MR. RAMOS:  Your Honor, just one second here, your

18     Honor.  I would withdraw the designations that had anything to

19     do with the settlement agreement, given the Court's prior

20     ruling, but the remainder of the designated transcript we

21     believe is relevant to the issue of showing what type of sales

22     figures and market penetration PilePro had.

23          THE COURT:  And what relevance does that have?

24          MR. RAMOS:  Well, I think that -- isn't this case

25     about business competition and how the parties are relating to

GBTHSKY3

1   each other and how Skyline is basically trying to establish in

2   the eyes of the jury that it, in fact, has been damaged by

3   PilePro's acts?  And I think the case law does show that, in

4   this context, the ability of the fact-finder to determine

5   damages can be established by sales figures by the competitor

6   as well.  So these are sales figures that show or at least an

7   attempt to show by the witness the type of volume of sales that

8   PilePro was undertaking on a year-to-year basis.

9           THE COURT:  All right.  You keep on saying this case

10  is about the business relationship between the two entities.

11  It's really not.  It's about the claims that the plaintiff has

12  brought against your client, and I don't think that -- to some

13  limited extent the background and the relationship between the

14  two entities may well inform that, but fundamentally, it's not

15  about who treated who well; it's about whether they can sustain

16  their burden of proof with respect to the specific claims that

17  are brought.

18          In any event, in the absence, first of all, there's no

19  explanation of what the settlement agreement is, let alone what

20  time period we're talking.  And in the absence of that

21  testimony which you've withdrawn, there's absolutely no

22  reference to when this testimony concerns.  So I fail to see

23  what relevance the size of PilePro has, really, at any time.

24  And given the absence of any time frame for that, I will

25  sustain that objection.

GBTHSKY3

1          That does -- McShane -- yes, Mr. Restagno.

2          MR. RESTAGNO:  Your Honor, if I may, and apologies for

3     interrupting.  We made, when we sent you the transcripts last

4     night, an inadvertent omission to our objection annotations in

5     this particular transcript.  This is an objection that we made

6     in our pretrial order filed with the Court.  In fact, I

7     could -- if I might direct your Honor to docket 503-4, page 10,

8     you'll find our objection lodged there.  It's to the testimony

9     that PilePro designated as page 103 of this transcript.

10          THE COURT:  Designated or counter designated?

11          MR. RESTAGNO:  Designated, your Honor.  So you'll see

12    when you turn to page 103 of the transcript that we submitted

13    last night, there's nothing there, but Skyline did lodge an

14    objection to that testimony in its pretrial order.  It was a

15    clerical error that kept it off this particular transcript that

16    we e-mailed you last night.

17          For your Honor's convenience, if the Court hasn't

18    found its way to the pretrial order yet --

19          THE COURT:  I have.

20          MR. RESTAGNO:  Oh, okay.  You will note our objections

21    are based on foundation, relevance, and speculation.

22          THE COURT:  This is for only the portion on page 103

23    or also 104?

24          MR. RESTAGNO:  It is on 103 and 104, that entire line

25    of questioning.  It's a little complex here, but I could walk

1    the Court through our objection.

2              THE COURT:  What is the letter that's being discussed

3    here?

4              MR. RESTAGNO:  Precisely.  That is unknown based on

5    the designation.  And if the Court were to read into the

6    non-designated testimony, it would learn that it's from a

7    letter that was sent to Parametrix, a letter that is not

8    germane to this case.  And what's particularly dangerous about

9    this testimony is that it lacks that necessary background and

10   could lead the jury to conclude or perhaps confuse them into

11   thinking that this is testimony about the Madonna letter which

12   is at issue in this case.

13             THE COURT:  All right.  Mr. Ramos.

14             MR. RAMOS:  Your Honor, that Parametrix letter, we had

15   discussed this at the pretrial conference, and the Court at

16   that particular point in time did address the issue of these

17   additional letters.  And the Court reserved judgment on the

18   issue but did signify that if these were part to show a

19   campaign by PilePro with respect to protecting its patents,

20   then it could be admissible on that basis.

21             THE COURT:  Are you offering the Parametrix letter?

22             MR. RAMOS:  Your Honor, at this point in time, we

23   don't know what the testimony will hold or what the case in

24   chief is with respect to that.

25             THE COURT:  Can you address Mr. Restagno's point that

GBTHSKY3

1    in the absence of context, the jury won't have any idea what

2    letter this testimony is even referring to.

3            MR. RAMOS:  Well, in our case in chief, your Honor,

4    Mr. Wendt will describe the background related to the letters

5    that were going out by PilePro.

6            THE COURT:  That's not my concern, and Mr. Wendt may

7    well be permitted to do that.  But if Mr. McShane's testimony

8    is played to the jury and there's a discussion of this letter

9    being signed by him, not Mr. Mitchell, and a description and a

10   discussion about what's in the letter but no context or

11   explanation of what letter is even being discussed, let alone

12   shown to the jury, how are they to understand the relevance of

13   this, and how is that not going to confuse them?

14           MR. RAMOS:  I believe that the designation did

15   specifically address identifying Exhibit 34 and that this was

16   the letter that was sent by you to Parametrix.  So it's not

17   that it would be a confusing issue for the jury to understand

18   that there was another letter sent to another entity by PilePro

19   and that that one was part of their campaign of protecting what

20   they in good faith believed was their rights to the '543

21   patent.

22           THE COURT:  All right.  That portion of the testimony

23   is not actually designated.

24           MR. RAMOS:  But it leads -- but it's actually

25   mentioned in 104, lines 14 and 15:

1          Did Robert receive the letter to Parametrix?

2          I'm sure he did.

3          Do you recall?

4          Well, I recall some circulation.  In fact, I think I

5     did.  I don't know if he did or did not, right sitting here.  I

6     don't know without being able to check.

7          So that Parametrix is specifically identified in that

8     letter is relevant to the letter-writing campaign that PilePro

9     had undertaken.

10          THE COURT:  How does the discussion of the content of

11     this letter, how is that relevant to the claims that are

12     actually being tried?

13          MR. RAMOS:  Well, it's going -- it's describing that

14     this letter was not being sent out in a vacuum or that PilePro

15     had some intent to harm Skyline willy-nilly.  It said it

16     occurred as a result of their counsel, Doug Mitchell, approving

17     changes to the letter.

18          THE COURT:  But I think that does run afoul of what I

19     said the other day, which is that you can't introduce evidence

20     of other letters to suggest that other letters were sent in

21     good faith.  Whether the other letters were sent in good faith

22     or not is not relevant to the good faith, lack thereof, or

23     damages with respect to the Madonna letter.

24          I said to the extent that there was limited testimony

25     concerning the fact that this was part of a larger, you know,

GBTHSKY3

1  campaign, that that would be one thing.  But you can't

2  essentially introduce good conduct as an effort to rebut their

3  allegations with respect to bad conduct.

4       So, Ms. Ghavimi, you can say what you want to say, but

5  I'm about to sustain the objection.  Go ahead.

6       MS. GHAVIMI:  Your Honor, they're introducing the fact

7  that Boies, Schiller refused to sign the letter as evidence of

8  bad faith, and so I think it's only in fairness that we can

9  highlight this section to say -- we're not using it to

10  establish good faith of this letter.  We're using it to say

11  that the lawyer reviewed the letter, and it was sent out.

12       THE COURT:  Mr. Restagno.

13       MR. RESTAGNO:  Your Honor, there's a bit of sleight of

14  hand going on here.  What I think counsel for PilePro is saying

15  is that we are offering evidence of PilePro's counsel's refusal

16  to sign the Madonna letter as evidence of bad faith regarding

17  the Madonna letter.  That's completely apart from your Honor's

18  ruling last week, which is that a lawyer's opinion of a letter

19  that's not the Madonna letter has no bearing on the good or bad

20  faith attendant to the Madonna letter.

21       MS. GHAVIMI:  I would disagree, your Honor, when it's

22  the same lawyer and this same letter with minor changes in the

23  wording.  And the emphasis is going to be on the fact that that

24  lawyer did not have -- that my client did not have an

25  infringement, official infringement opinion, and that that

GBTHSKY3

1   lawyer refused to -- it's a slide in their opening argument

2   that that lawyer refused to sign the Madonna letter.  I think

3   that it's only equitable that we can introduce testimony from

4   somebody other than our client who states that this letter was

5   reviewed, and it was approved by Mr. Mitchell.

6          THE COURT:  I would certainly agree as to the Madonna

7   letter.  Is there testimony from Mr. Mitchell, or otherwise,

8   with respect to why he didn't sign the Madonna letter?

9          MS. GHAVIMI:  There is, but there's -- but I don't

10  think that your Honor's order in the pretrial conference

11  preventing evidence about -- your order in good faith of the

12  other letters excludes altogether all testimony about

13  Mr. Mitchell's opinions on the other letters and whether he

14  reviewed them or not and the process by which the campaign of

15  letters was sent out, especially considering the fact that --

16         THE COURT:  But my question is what's the nexus

17  between Mr. Mitchell's decision not to sign this letter and

18  discussions he may have had concerning this letter and the

19  Madonna letter, which is what the claim in this case relates

20  to?

21         MS. GHAVIMI:  Because all of those letters were sent

22  out contemporaneously in time.  The discussions about sending

23  letters all are involved in all of the same evidence and

24  exhibits.  There are many e-mails.  Conversations all occurred

25  about the same topic, whether to send a letter or not, who to

GBTHSKY3

```
 1    send them to.  Mr. McShane discusses that.  He decided it
 2    didn't matter.  In this section he decided that it was -- he
 3    was to send the letter to Parametrix, but it didn't matter.
 4              The jury's going -- the different individuals signed
 5    the letter.  Skyline has another slide in their opening
 6    argument that Mr. Wendt signed the letter to Madonna.  Well,
 7    also what's going to come into evidence is the letter to
 8    Skyline.  Your Honor, from what I understand, correct me if I'm
 9    wrong, said that that was permissible evidence because the two
10    were connected, indisputably connected.  That letter was signed
11    by Mr. Mitchell; and, therefore --
12              THE COURT:  To Skyline?
13              MS. GHAVIMI:  To Skyline.
14              THE COURT:  To Skyline?  I don't recall any discussion
15    of a letter to Skyline.
16              MS. GHAVIMI:  There was an infringement warning letter
17    to Skyline signed by Doug Mitchell from Boies, Schiller on
18    October 23, 2014, and then there was a November 1 letter sent
19    to John Madonna that was signed by Mr. Wendt.
20              THE COURT:  Okay.
21              MS. GHAVIMI:  And the witnesses discussed both of them
22    inextricably, and Mr. Bandini mentioned during the pretrial
23    conference that it may be impossible to separate the testimony
24    of the two.
25              THE COURT:  I think, if I remember correctly --
```

GBTHSKY3

1    Mr. Bandini can correct me -- I thought he was referring to a

2    letter that was sent, if I remember correctly, to the Army

3    Corps of Engineers or some other entity involved in the Madonna

4    project.

5              MR. BANDINI:  That's correct, your Honor.  That was

6    the U.S. Army Corps of Engineers letter relating to the Madonna

7    project.

8              THE COURT:  I don't think those two are --

9              MS. GHAVIMI:  Okay.  Then that was my mistake.  But in

10   Mr. Mitchell's testimony, which I don't know yet if Skyline

11   intends to offer in chief.  They have not told us.  They've --

12             THE COURT:  He's certainly on the joint pretrial

13   order.

14             MS. GHAVIMI:  I know, but they have dropped some of

15   their deposition testimony that they -- that was on the

16   pretrial order, so it's possible.

17             However, in some of that testimony he talks about

18   other letters and the decision surrounding whether to send the

19   letters and the campaign of sending the letters and whether he

20   reviewed it, and it certainly goes to the decision to place the

21   infringement warning up on the Web site and what Mr. Wendt

22   understood in terms of discussions with his attorneys.  And

23   Mr. McShane was an integral part of those discussions.  He

24   participated in them at the time.

25             THE COURT:  And I have no doubt that if you -- if

GBTHSKY3

 1   there were testimony from Mr. McShane regarding Mr. Mitchell's

 2   decision not to sign the Madonna letter, that that would

 3   obviously be directly relevant and presumably admissible.  My

 4   question is what bearing does this have on the lawyer's

 5   decision not to sign the Madonna letter?

 6        MS. GHAVIMI:  Because he's explaining -- we believe

 7   that Mr. McShane as a participant in the discussions of the

 8   campaign gives context to the decision to send out the letters

 9   and the decision as to who reviewed them and why and, in

10   particular, in rebuttal to certain facts that Skyline is going

11   to present regarding the Madonna letter.

12        THE COURT:  All right.  I think this is a little bit

13   of a close call, but I'm actually going to overrule the

14   objection as long as page 102, lines 21 to 24, is included so

15   that it's clear what letter is being discussed here.  I think,

16   given that page 103 does -- the answer says:  "If we are going

17   to send these out to a lot of people, it doesn't make any

18   difference who sends them."

19        I think that does have some bearing on who signed and

20   sent the letter with respect to Madonna, and in that regard

21   goes to -- sounds like it may rebut or at least bear on an

22   argument that Skyline is making.  So I will overrule that

23   objection, again, as long as the testimony on the prior page

24   framing it and putting it in context is included.

25        Now, I think that covers all of McShane.  I know we

GBTHSKY3

1    still have Maake, a handful of objections that I reserved

2    judgment on.  It's now 12:15, so I'm going to defer those until

3    a later break so that you can get your own lunches, so I can

4    get my own lunch, and we can be ready go at 1:00.

5            Anything else that must be raised or discussed before

6    openings?  This is your moment.

7            MR. BANDINI:  No, your Honor.

8            MR. RAMOS:  No, your Honor.

9            THE COURT:  Please be back here at five minutes to

10   1:00.  If you'd like, you can move the podium to the front of

11   the jury box so that you're directly facing the jury, and at

12   1:00 o'clock we'll bring the jury out and start with openings.

13   Enjoy your lunch.

14           MR. BANDINI:  Thank you, your Honor.

15           (Lunch recess)

16

17

18

19

20

21

22

23

24

25

GBT7SKY4

```
1                 A F T E R N O O N   S E S S I O N

2                          1:00 p.m.

3            (Jury not present)

4            THE COURT:  My deputy tells me you have an issue.

5    What's the issue?

6            MR. BADINI:  Your Honor, earlier this morning after

7    your ruling on the statement of undisputed facts, we asked

8    whether they would sign the stipulation in the form preferred

9    by the court which we had prepared as Plaintiff's Exhibit 585.

10   Counsel informed Ms. Westcott that they would.  Coming back

11   from lunch we are now informed by counsel for PilePro that none

12   of them have authority to sign such a stipulation.

13           I don't know why, given how smoothly everything has

14   gone in this case, but we expected a possible problem, so we

15   prepared an alternative version which we shared with counsel I

16   think at the pretrial conference, which does not have the

17   caption and the signature page, but the court may simply tell

18   the jury that it's stipulated to.  So, I don't know how your

19   Honor wants to proceed.  We can use the alternative version

20   which is marked as Exhibit 584, or we can inquire as to why

21   they will not sign the exhibit.

22           THE COURT:  Mr. Ramos, explain to me how on earth

23   counsel cannot have authority to sign a stipulation in a legal

24   proceeding in federal court.

25           MR. RAMOS:  Because, your Honor, there is a clear --
```

GBT7SKY4

1    and I'm stating it for the record -- a clear factual error.

2                THE COURT:  I don't want you to restate for the

3    record.  Last Wednesday you had an opportunity to raise these

4    issues, and you yourself sitting in that chair over there said

5    you had no objection to introduction of this joint stipulation,

6    a stipulation that you entered over two months ago --

7                MR. RAMOS:  Your Honor --

8                THE COURT:  Hold on.  Mr. Ramos, if I'm speaking, you

9    do not speak.  OK?  You waived any opportunity to raise an

10   argument.  And it was last night at almost 11 p.m. that your

11   cocounsel -- having never appeared in this court before --

12   wrote a letter to me changing your position 100 percent.  That

13   is not going to happen, and it's not going to fly, and it's not

14   going to be countenanced in this court.  All right?

15               So you can either sign it, because you are counsel in

16   this case and have authority to sign it, and you are stuck with

17   those stipulations, and I don't care if they are true or not at

18   this point, or I will admit the one that is not signed by you.

19   It is your choice.

20               MR. RAMOS:  I'm not going to sign it, your Honor.

21               THE COURT:  Good.  Then the other one will be

22   admitted.  Let's get the jury.

23               To be clear, I will also instruct the jury that these

24   are joint stipulations of the parties, that both sides have

25   agreed to them, and they are to treat those facts as true.

1          (Jury present)

2          THE COURT:  Welcome back.  I hope you had a pleasant

3  break and a pleasant lunch.  As I mentioned before we left, the

4  first stage of the trial is the opening statements by the

5  lawyers.  As I mentioned, this is their opportunity to tell you

6  what they expect the evidence in this case will be.  Their

7  opening statements -- in fact anything they say throughout the

8  trial -- is not actually evidence, but this is just to give you

9  a preview and sort of context for the evidence that you will

10 hear thereafter.

11         We will begin with the plaintiff's opening statement

12 and then proceed to the defendants.  Just to give you a sense

13 again, tomorrow we will start our regular schedule of 9 to

14 2:30.  Today we are going to go to 5 p.m. and finish a regular

15 day.  Then we will take a break at some point this afternoon

16 just to take a break.

17         with that, I would ask you to give your attention to

18 plaintiff's counsel, Ms. Westcott.

19         Ms. Westcott, you may proceed.

20         MS. WESTCOTT:  Thank you, your Honor.  Good afternoon.

21 My name is Merritt Westcott.  I am one of the attorneys for

22 Skyline Steel in this case.  With me in the courtroom here

23 today is the president of Skyline Steel, Mr. Laurent DeMey, and

24 my colleagues Mr. Aldo Badini, Mr. Jay Lazar, Mr. Frank

25 Restagno.  They also represent Skyline in this case.

GBT7SKY4                        Opening – Ms. Westcott

1          Ladies and gentlemen, this is a case about false

2   accusations and the damage those false accusations caused.

3   Here the false accusations were made by the defendant in this

4   case, PilePro, and against products sold by my client Skyline

5   Steel.

6          Now, the court has already determined that PilePro's

7   accusations were not true, and you will hear how PilePro worked

8   with one of Skyline's biggest competitors, a steel distributor

9   called L.B. Foster, to spread these false accusations and make

10  certain they reached as many potential Skyline customers as

11  possible.

12         What Skyline will show during this trial is that

13  PilePro made these false accusations in bad faith.  You will

14  hear that PilePro's own lawyers told it not to make these

15  accusations.  Its own lawyers told PilePro there was no basis

16  for making them.  But PilePro decided to ignore its lawyers'

17  advice and made them anyway.

18         Before I get to the specifics of the accusations, let

19  me back up and tell you a bit about the parties in this case

20  and the products that they sell.

21         My client, Skyline Steel –– and you should have a

22  slide show up in front of you –– is a United States company;

23  it's headquartered a short distance from here, in Parsippany,

24  New Jersey, and has locations across the United States.

25  PilePro sells construction solutions to contractors, including

1   what are called sheet piles and sheet pile walls.  You likely

2   pass by sheet piling all the time.  Sheet pile walls are

3   sometimes used to hold back dirt when someone is digging a

4   building foundation.  They can be used to make retaining walls.

5   In this slide one of Skyline's sheet pile walls is being used

6   to form the wall of an underground parking garage in

7   Hicksville, New York, and here it is being used along the

8   Rockaway MTA rail line.  Here it is being used as a retaining

9   wall alongside a waterway.  If you zoom in, you can see that

10  these walls are made of shaped steel sheets that connect

11  together.  The ends of these sheet piles are especially shaped

12  so they can connect with each other.  These shaped ends are

13  sometimes called interlocks.

14          In some cases where more stability or strength is

15  needed, I-shaped beams, called king piles or large pipes, are

16  also used in the wall and are driven far into the ground along

17  with the sheet piles.  In those cases, when the I beams or

18  pipes are used, the wall is commonly referred to as a combi

19  wall because it combines sheet piles with these other products.

20  Here is a picture of a combi wall that includes round pipes and

21  sheet piles.  And here is an example of a combi wall that

22  combines the I beams called king piles with sheet piles to

23  increase stability.

24          Sometimes separate connector products are used in

25  these combi wall to connect these different pieces together.

GBT7SKY4                    Opening - Ms. Westcott

1    The products at issue in this case are the ones you just saw.

2    Those that make up Skyline's combi wall called the HZM system.

3            Skyline sells all of these types of products and is

4    indirectly owned by another U.S. company called Nucor.  Nucor

5    makes many different steel products at its steel mills that are

6    located throughout the U.S. by turning scrap metal mostly from

7    scrap automobiles into new steel products.  You will hear from

8    Skyline's president, Mr. DeMey, who is also a Nucor executive,

9    that Skyline sells the sheet piling made by Nucor and it also

10   sells sheet piling products made by a company in Europe called

11   ArcelorMIttal.  My client Skyline Steel is the plaintiff in

12   this case.

13           The defendant in this case is PilePro LLC, which is

14   headquartered in Texas.  PilePro LLC is a patent holding

15   company, meaning it is a company that owns patents but it does

16   not make or sell any products.  PilePro LLC is a group of

17   companies run by Mr. Roberto Wendt, sometimes referred to as

18   the PilePro group.  One of the PilePro companies sells steel

19   connectors, as you will see on this slide here, and these

20   connectors are used to connect sheet pile walls together.

21   PilePro's connectors are used with a variety of sheet pile

22   products, including the sheet pile products sold by Skyline's

23   competitors.

24           Now, all of the lawyers in this case I'm sure

25   appreciate the time and the effort you are going to spend here.

1   In that regard I wanted to let you know that there is some good

2   news, and the good news is this:  A number of things in this

3   case have already been decided either because they have been

4   agreed to by the parties, or because they have already been

5   decided by the court.

6        Skyline and PilePro have put together a list,

7   something called the joint undisputed statements of law and

8   fact.  This list contains things that Skyline and PilePro have

9   agreed to or that the court has already decided, so you don't

10  have to decide the things on this list.  The parties have

11  marked this list as Plaintiff's Exhibit 584, and you will get a

12  copy of this list to take back with you to the jury room and to

13  review at the end of the trial.

14       As I speak to you this morning, and throughout the

15  course of this trial, you may see slides that look like this

16  where we present one of these undisputed statements of law and

17  fact.  So, why am I showing you these facts?  Because even

18  though you don't have to decide the facts that will show up on

19  this screen, these facts are important to the issues that you

20  will have to decide in this case.

21       Now on to the specifics of this case.  As I said, this

22  is a case about false accusations and statements that PilePro

23  made about Skyline's products.  The first false accusation that

24  Skyline would like you to focus on involves a letter that

25  PilePro sent to one of Skyline's customers, a construction

GBT7SKY4                          Opening - Ms. Westcott

1   contractor named Madonna Construction.  In order to explain

2   that letter better, however, I have to give you some

3   background.

4           Several years ago, in October of 2013, PilePro

5   obtained a U.S. patent.  This is a copy of the front page of

6   that patent.  As you can see, the patent number there at the

7   top right 8,556,543(b)(2).  For purposes of this case though it

8   will mostly be called by its last three digits, the '543

9   patent.

10          Right below the patent number you will see the date

11  that the patent issued:  October 15, 2013.  The issue date is

12  the date the patent becomes effective.  PilePro's patent covers

13  a method or a process of making a sheet pile component.

14          So, PilePro got this patent on October 15, 2013, and

15  you will hear that only days later PilePro started sending

16  letters to Skyline's customers accusing those customers of

17  infringing this patent if they bought or used Skyline's

18  products called the HZM system.  I will tell you a bit more

19  about the HZM products in a moment, but one important point

20  here is that the evidence will show that PilePro sent these

21  letters accusing Skyline's products of infringement without any

22  legal opinion that they actually infringed.

23          You will learn from PilePro's former in-house lawyer

24  as general counsel, Mr. Dwight Williams, that about two weeks

25  after PilePro got this patent, it heard that an order of HZM

1    products was being delivered to Mr. Madonna of Madonna

2    Construction in California.  Madonna had already ordered the

3    HZM products from Skyline, and the evidence will show that

4    PilePro knew it.  In fact, PilePro knew it because it found out

5    about it from one of Skyline's biggest competitors L.B. Foster.

6    You will hear that L.B. Foster sells a combi wall that directly

7    competes with the HZM system and that combi wall uses PilePro's

8    connectors.

9              You will hear that PilePro knew that Madonna was

10   considering both the L.B. Foster product and Skyline's product

11   for his project.  So, PilePro wanted to send a letter to

12   Madonna accusing the HZM system of infringement.  You will hear

13   the videotaped testimony of PilePro's own lawyer Doug Mitchell

14   who works at a lawyer firm called Boies Schiller.  Mr. Mitchell

15   will tell you that he is not a patent attorney, that he had not

16   even looked into whether Skyline's HZM products infringed when

17   PilePro wanted to send these letters, and he will tell you that

18   no one else at his firm had looked at it either.

19             Mr. Mitchell, PilePro's lawyer from Boies Schiller,

20   will tell you that his firm refused to sign a letter accusing

21   Madonna of infringement.  Joint undisputed statement of fact

22   154, Boies Schiller refused to sign the infringement accusation

23   letter sent to John Madonna Construction Company dated November

24   1, 2013.

25             So, when PilePro's lawyers refused to sign this letter

1    to Madonna, what did PilePro do?  Instead of listening to its

2    lawyers' advice, Mr. Wendt, who is the head of PilePro, put the

3    letter on his own letterhead and sent it anyway.  And what did

4    Mr. Wendt's letter say?  Here is Mr. Wendt's letter.  You can

5    see it's on PilePro's letterhead to Madonna Construction,

6    signed by Mr. Wendt.  And PilePro's letter accused Madonna and

7    Skyline of infringement, in other words of selling and using a

8    product made by the patented method.  PilePro threatened to

9    hold Mr. Madonna liable for using the system.  But PilePro told

10   Mr. Madonna that he could avoid this legal problem if he would

11   have just instead buy the combi wall that included PilePro's

12   connectors.

13           You will learn that Mr. Madonna was very upset about

14   receiving this letter and that he contacted Skyline asking

15   Skyline to take care of this problem.  He wanted Skyline to

16   protect him from any lawsuit by PilePro, in other words to

17   indemnify him, and he also wanted Skyline to pay his legal

18   fees.

19           Now, here is something that the court has already

20   determined in this case.  The court has already determined that

21   when PilePro sent the letter to Madonna on November 1, 2013,

22   accusing Madonna of infringing the '543 patent by virtue of its

23   use of the HZM system, PilePro acted in bad faith, both

24   objectively and subjectively.

25           The court has already found that the letter sent to

1    Madonna was sent in bad faith.  That is an undisputed statement

2    of law and fact, and you will not be asked to decide that.

3    With regard to this letter to Madonna, you will only be asked

4    to decide if Skyline was damaged and, if so, how much.

5          Skyline believes that the evidence in this trial will

6    show that it was damaged by this letter, that it did agree to

7    indemnify Madonna, and that it did pay Mr. Madonna's legal

8    fees.

9          So, I have been talking about an infringement warning

10   letter that PilePro sent to Mr. Madonna, and I would like to

11   shift gears to talk about accusations and statements that

12   PilePro made on its website.

13         You will hear that PilePro created a website so that

14   engineers designing construction products with sheet piling

15   could look at and could compare a variety of products from

16   different companies, including Skyline's products.  This

17   website is still up today, and it's called isheetpile.com.  In

18   fact, you will get to see screenshots from this website during

19   the trial.

20         This case also involves false accusations and

21   misleading statements that PilePro made on this website about

22   Skyline's products.

23         First, similar to its letter to Madonna, PilePro

24   posted an accusation on its website that Skyline's HZM products

25   infringed the patent.  You will hear that about a week after

1    PilePro sent the letter to Madonna, it also decided to post an

2    infringement accusation on every page of the website that

3    showed a product used in the HZM system.  Here is what the

4    accusation said.  "Warning:  This product infringes a U.S.

5    patent owned by PilePro LLC.  Click here to view the patent.

6    If you would like more details and to use this patented system,

7    please e-mail info at PilePro.com or call 866-666-7483."

8            In order for you to understand why Skyline believes

9    that this accusation was false and was made in bad faith, I

10   will have to tell you a bit more as promised about Skyline's

11   HZM system products and PilePro's patent.

12           As I said, this is a picture of the HZM system as

13   installed.  Mr. DeMey, Skyline's president, will explain the

14   system to you in more detail, but as you can see here the

15   system is made of three different products.  There are I-shaped

16   king piles shown here in blue.  There are sheet piles called AZ

17   sheet piles shown here in green, and there are connectors that

18   connect the two shown, here in yellow.  Skyline buys these

19   products from their manufacturer, a company called

20   ArcelorMittal.

21           Now, in addition to those three products being sold

22   together as the HZM system, each of these three components can

23   be sold separately.  For example, the AZ piles are mostly sold

24   by Skyline to make AZ pile walls.  This is a picture of an AZ

25   pile wall.  You will note it doesn't include the king piles or

1    the connectors.  If a contractor just wants an AZ pile wall, it

2    doesn't need to buy the other two products.  Skyline has been

3    selling the three products of the HZM system together branded

4    as HZM since 2009, but the AZ piles and connectors have been

5    sold by Skyline since the early 2000s.

6           The infringement accusation that I just read to you,

7    the one that said "Warning this product infringes a U.S. patent

8    owned by PilePro," it was posted on every web page that

9    displayed any product which was a component of the HZM system,

10   including the AZ intermediary pile products and the connector

11   products.

12          PilePro admits that the website accused the king piles

13   of the HZM system of infringing.  PilePro admits that the

14   website accused the AZ intermediary piles of infringing.  And

15   PilePro admits that the website accused the HZM connector

16   products of infringing.

17          Now, Mr. Mitchell, the Boies Schiller lawyer who

18   refused to sign the Madonna letter, he also did not agree with

19   PilePro posting this infringement accusation on the website.

20   You will hear Mr. Mitchell testify that he clearly told PilePro

21   not to post that warning.  His firm told PilePro don't do it.

22   In fact, both of PilePro's attorneys, Mr. Mitchell and

23   Mr. Williams, the in-house attorney, will testify that when

24   PilePro decided to post this warning Mr. Mitchell's firm hadn't

25   even begun to investigate whether or not there was any

GBT7SKY4                    Opening – Ms. Westcott

1   infringement.

2          So, given that advice from his attorneys, what did

3   PilePro do?  Posted the warning anyway.  Mr. Wendt, the head of

4   PilePro, posted the warning on the website, and that warning

5   stayed posted for more than two months, and on every page that

6   showed any Skyline product used in the HZM system, and it even

7   stayed posted after Skyline brought this lawsuit.

8          So, the evidence will show that PilePro ignored its

9   lawyers' advice not once but twice:  First, about sending the

10  Madonna letter; second, about posting this infringement warning

11  on the website.

12         But PilePro didn't just post the warning and leave it

13  at that.  You will hear that PilePro told L.B. Foster, one of

14  Skyline's biggest competitors, about the infringement

15  accusation on the website, and L.B. Foster employees will

16  testify that they told numerous potential customers of

17  Skyline's about this accusation, and they would tell them about

18  PilePro's patent.  You will hear about how PilePro and L.B.

19  Foster worked together to spread the news of this infringement

20  accusation throughout the industry.

21         Now, one thing we do know about the accusation against

22  the HZM products is that the accusation was false.  Let me

23  repeat that because it's important.  PilePro's infringement

24  accusations against the HZM system products was false.  This

25  court has already determined that none of the HZM system

1    products infringe the '543 patent.  The king piles do not

2    infringe.  The AZ intermediary piles do not infringe, and the

3    connectors do not infringe.  Therefore, you don't need to

4    determine whether or not PilePro's infringement accusations

5    were true or false.  They were false.

6              What you do need to determine, however, is whether

7    PilePro posted these accusations on the website in bad faith.

8    We will show that it did.

9              First, as I already explained, these were posted

10   against the clear advice of their attorneys and before any

11   analysis of infringement had been completed.  But not only

12   that, the evidence will show that PilePro knew when it made the

13   accusations that the AZ piles and connectors could not possibly

14   infringe its patent.  In other words, PilePro not only was

15   wrong about infringement; it knew that some of the products

16   couldn't infringe.  Why do I say that?  Let's take a closer

17   look at the patent in this case.

18             This is the claim of PilePro's patent.  I know there

19   are lots of words on this screen, and you will be able to take

20   this claim back to the jury room with you and read it, but I

21   just want to point out two things.

22             First, this is a patent that covers a method of

23   manufacturing a sheet pile wall component.  OK?  And this

24   method requires a step of shape-cutting the component.  And

25   specifically it requires that the interlock -- you recall the

slide with the two hands that connected the sheet piles

together -- it requires that the interlock be shape cut.  I

don't think you will hear any disagreement that the patent

requires that during this trial.

So, the problem is that it is undisputed that the AZ

piles and the connectors were not made by shape-cutting.  As

Mr. DeMey will explain, the interlocks of those two components

were manufactured by a hot rolling process and had been for

years before PilePro got this patent.  And significantly you

don't even have to take Skyline's view for it.  PilePro agrees.

It was common knowledge in the industry that the AZ

intermediary pile products are made by hot rolling, and it is

common knowledge in the industry that the connector products

used with the HZM system are made with hot rolling.

So, PilePro posted its accusations on the website

pages, and the pages that include the AZ piles and connectors,

knowing that these products weren't shape cut as required by

the patent.

Skyline believes that because PilePro knew its

allegations were false, and because it posted the accusation

against the advice of its own attorneys, and with no opinion

that any of the three products infringed, these accusations

were posted in bad faith.

Skyline will also show during these trials that these

accusations -- which were posted on the website for engineers

GBT7SKY4                     Opening - Ms. Westcott

1    and customers to see -- hurt Skyline's business.  You recall

2    this website is designed for engineers who are looking to

3    compare and to select sheet piling products for upcoming

4    construction projects.  You will hear that at the time PilePro

5    posted this accusation its website was getting thousands of

6    hits per month.

7           Mr. David Persampieri, who will appear in the

8    courtroom, and is an expert in the steel industry, will offer

9    an opinion about how this website infringement accusation

10   affected the user's choice of products shown on the website and

11   how it cost Skyline over a million dollars in profits and lost

12   business.

13          Recall I told you this case dealt with several false

14   or misleading statements on PilePro's website.  The

15   infringement accusation I told you about was one, but there are

16   two more that Skyline will show during this trial were

17   misleading to users.

18          One will be referred to as the lead times, and the

19   other as the request-a-quote feature.

20          You will hear that in the construction business the

21   amount of time it takes between ordering a product and when it

22   gets delivered to the job site is an important factor, and it

23   affects the product selection for a job.  Now, keeping that in

24   mind, PilePro's website posted supposed lead times for delivery

25   times for the products that it displays, including Skyline's

1  products.

2          Mr. Wendt from PilePro determines what lead times will

3  be posted, and the evidence will show that the lead times

4  posted for Skyline's products are artificially inflated, in

5  other words are made to appear longer than they actually are.

6  Because of this, Skyline has asked PilePro to take the lead

7  times for Skyline's products off its website, but PilePro has

8  refused.

9          The second website feature you will hear about is

10  something called request-a-quote.  Request-a-quote is a button

11  on PilePro's website, and it appears next to Skyline's products

12  on the website.  It appears on this button -- which is labeled

13  Request a Quote -- that the user can push the button and

14  request a quote or a price for Skyline's product through the

15  website.  But when the user pushes this button, he or she does

16  not get a quote or a price for Skyline's products, and in fact

17  PilePro has never had the authority to sell any of Skyline's

18  products.

19          So, what happens when the user pushes the Request a

20  Quote button?  You will hear on video testimony one of

21  PilePro's former employees, Mr. Gerry McShane, who was in

22  charge of the website.  He will testify that when someone used

23  this button, that request came to him at PilePro, and that he

24  was instructed by Mr. Wendt to talk them out of using a Skyline

25  product and into using a competitor product.  Actually, he will

GBT7SKY4                          Opening - Ms. Westcott

1   testify that he would tell them that the Skyline product was

2   not available and that he would try interesting them in

3   something else.

4          Mr. McShane will testify that he thought this Request

5   a Quote feature was a bait and switch to the users of the

6   website, because the user thought they were going to get

7   pricing or information about a Skyline product, and instead

8   they got steered into buying products from other companies

9   including PilePro.  Mr. McShane will tell you he had many

10  disagreements with Mr. Wendt about this feature on the website.

11         Skyline believes that these two features of the

12  website -- the lead times postings and the Request a Quote

13  feature -- are false or misleading to website users.  And

14  Skyline wants PilePro to stop listing its lead times and to

15  stop using their Request a Quote feature with Skyline's

16  products.

17         Over the next few days you will hear from a variety of

18  witnesses, both by live testimony and on video, and you will

19  see a lot of documents.  You will hear from Skyline's

20  president, Mr. DeMey.  You will also see and hear from its

21  chief financial officer, Ms. Gorog.  And you will hear video

22  testimony from one of Skyline's customers, Mr. Madonna, who got

23  the infringement letter from PilePro.  You will also hear from

24  Mr. Wendt of PilePro, PilePro's former attorneys Mr. Williams

25  and Mr. Mitchell, and PilePro's former employee Mr. McShane.

GBT7SKY4                    Opening - Mr. Ramos

1   You will also hear from two employers of L.B. Foster, Skyline's

2   competitor, Mr. Wheeler and Mr. Whitworth.

3           Once you have heard all the testimony, and seen all

4   the documents, we believe that all of this evidence will show,

5   first, that Skyline was damaged when PilePro sent the

6   infringement letter to Madonna in bad faith; two, that

7   PilePro's false infringement accusations against each of the

8   products of the HZM system on its website were made in bad

9   faith because PilePro knew they were false and because it acted

10  directly contrary to the advice of its own lawyers; and, third,

11  we believe the evidence will show that the lead times PilePro

12  posts for Skyline's products are false and misleading, and that

13  the Request a Quote feature misleads users into believing that

14  PilePro's website is a source for Skyline's products.

15          At the end of all of this evidence we believe one

16  thing will be clear:  PilePro, controlled by Mr. Wendt, made

17  false accusations against Skyline's products in bad faith and

18  used its isheetpile website to mislead users, steering them

19  away from buying Skyline's products while promoting its own.

20  Skyline sincerely thanks you in advance for your attention and

21  your service, and submits that at the end of all of this

22  evidence, a verdict in Skyline's favor will be appropriate.

23  Thank you very much.

24          THE COURT:  Thank you, Ms. Westcott.

25          All right, ladies and gentlemen, I would ask you to

1  give your attention now to defense counsel for the defendant's

2  opening.

3          MR. RAMOS:  Thank you, your Honor.

4          May it please the court.  Good afternoon, ladies and

5  gentlemen of the jury.  My name is Julio Ramos.  I am an

6  attorney for PilePro, the defendant in this action.  Over on

7  this table, the defense table, we have Mr. Robert Wendt, the

8  managing partner of PilePro, who is here and will be here

9  during the duration of the trial.  We also have Andy Brown,

10  cocounsel in this matter, Darlene Ghavimi, also cocounsel in

11  this matter.

12          Ladies and gentlemen, this case I feel is very much

13  like a sporting event, a boxing match, so to speak.  You have

14  the champ in one corner, Skyline, very well established

15  company, reputable, important to the economy of this nation;

16  it's involved in the steel industry.  It impacts our lives

17  daily.  Everything that we feel basically is part of the steel

18  process, from automobiles to where we live.  It's an important

19  industry.  PilePro, it's a 21st century company.  It has

20  entered the steel industry in its own unique way.  The facts

21  here will show that it has a website, and on this website the

22  consumer of these steel products can access information that

23  relates to the projects and project building, as explained by

24  opposing counsel, all over this country:  Damns, bridges,

25  public works projects of all shapes and sizes.

1          Now, PilePro, they are involved in a little segment of

2     that called the connector business in large measure.  They

3     produce connectors.  They fabricate connectors, and they do

4     that domestically here in the United States.  Their

5     headquarters are in Austin, Texas.  Mr. Wendt is the primary

6     person responsible for the management of the company.  Now, he

7     is not the only person there.  He has other persons that he has

8     delegated various tasks and functions to.  And you will hear

9     from some of them during the course of this case.  But the real

10    issue here -- and I believe that it's fundamental, and the

11    evidence will show -- is there are no damages.  The evidence in

12    this case with respect to damages is minimal.  I would say

13    absent.  I would say it doesn't exist in this case.

14         For instance, as opposing counsel stated, false

15    accusations.  False accusations.  The court has already decided

16    the issues against us, but the court did not decide the issue

17    of damages.  And you have that responsibility to determine that

18    issue about damages.

19         Now, in this case the evidence will show that the

20    damages amount, or at least alleged by Skyline, is no more than

21    $5,000 with respect to that Madonna letter that was so

22    prominently displayed in the opening by the plaintiff.  And

23    what happened there was that Skyline agreed that it would pay

24    the attorney fees for this particular vendor in the event it

25    was sued in this case.  And they had so-called an

1    indemnification agreement to that effect, which from all

2    evidence was only signed by one party: Skyline.  Mr. Madonna

3    never signed that letter, that indemnification agreement.  He

4    never did.  In fact, when he was supposedly paid for his

5    attorney fees, there was no issue there, because the contractor

6    had already paid all the costs due on the project.  And after

7    that payment had been made is when Skyline made the payment

8    allegedly of a little less than $5,000 to the attorney for

9    Mr. Madonna and the John Madonna Construction Company.

10           Now, we argue -- and I think the evidence will show --

11   clearly that those payments were in relation to other disputes,

12   that is to say, other problems that Mr. Madonna had with

13   Skyline.  Because the project that we're talking about, and the

14   specifics in this case relate to a project in California

15   sponsored by the U.S. Army Corps of Engineers.  And that's a

16   public process; that's a taxpayer-paying process.  That's a

17   process that provides important public benefit to the

18   community.

19           So, Mr. Madonna had problems with that and wrote

20   e-mails to Skyline saying, you know what, I have a problem with

21   X, and I have a problem with Y and, you know what, I have a

22   problem with these attorney fees because I received this letter

23   from PilePro and I am afraid, or so he says.  But the truth of

24   the matter is, ladies and gentlemen, that those $5,000 -- a

25   little less than $5,000 that were paid for attorney fees --

GBT7SKY4                    Opening - Mr. Ramos

 1    were not a problem associated with the letter from PilePro to

 2    the John Madonna Construction Company.  They're not.  They're

 3    not.  Those are peripheral.  Other issues were in play, and we

 4    will show you that evidence.

 5          So I should say, when the plaintiff says false

 6    accusations, the accusations in this particular case with

 7    respect to John Madonna did not amount to damages to the degree

 8    that merits any further consideration with respect to how they,

 9    meaning Skyline, presents its case, as it has already in its

10    opening statement said indemnification and attorney fees.  But

11    other elements of damages were not discussed because they just

12    simply don't exist in this case.

13          Now turning to the Internet and the website.  Maybe go

14    back a little bit and show what PilePro is about.  If I can,

15    cocounsel, if you could put on the screen the brochure from

16    2015 of PilePro.  We will go briefly into the PilePro group.

17    The first page is the PilePro group.  That is a marketing

18    brochure that it has there.  As you can see, it has statements,

19    and on page 2 it provides an outline of what the company is and

20    how it portrays itself as an innovator.  But I think if we go

21    to page 3, it has a table of contents there, and it shows the

22    products at issue by PilePro and what it does and what it does

23    produce and the contributions it makes to this society.

24          But if we look at page 16 of the brochure, there it

25    specifically identifies the iSheetPile system and the

1   iSheetPile search tool that is at issue in this case.

2          Now, let's be clear, the court did find bad faith with

3   respect to the sending of the letter to the Madonna contractor.

4   It did.  The court has never found the damages.  That's for you

5   to decide.  Now let's distinguish that Madonna case from what

6   is happening here in the iSheetPile allegation.

7          There has never been determined by this court up to

8   this instance that there was bad faith with respect to the

9   accusations and the print that was placed on the website.  The

10  court hasn't done that.  So with respect to the iSheetPile

11  website you will make that determination both as to bad faith

12  and as to damages.

13         Now, turning to the iSheetPile website, there is a

14  quick summary that is there on page 16 of the brochure, and it

15  lays out -- and I think it does say in the first paragraph

16  there what the iSheetPile website is.  It's a ground breaking

17  on-line tool that compare and configure from hundreds of

18  thousands of sheet pile combinations.  That's the first

19  paragraph.  That's the essence of what this marketing tool is

20  with respect to PilePro.  Skyline doesn't have it.  Skyline

21  does not like it.  Skyline does not like it because it

22  aggregates, it collects all the information that is publicly

23  available for engineers.  We're not talking here about let's

24  call it the retail customer from Old Navy, or Amazon book

25  purchases, or Apple iTunes 99 cent purchases.  We're not.  Yet

1     the reason I raise that is because the expert for Skyline that

2     will testify here in this case, he uses that information to

3     make some of his assumptions.  The information I'm referring to

4     is online retail sales from Old Navy, online retail sales from

5     Amazon, Barnes & Noble.  He has looked at that, and from that

6     he has made statements with respect to a totally different

7     universe of customer, because one of the things that you are

8     going to have to decide is is the sophistication of the

9     customer base here.  And by sophistication I mean engineers are

10    the most highly educated people in this nation -- next to

11    lawyers, of course, and doctors.  But engineers, they are a

12    specialized group, a specialized breed of individual, and for

13    that they have training and have accumulated knowledge, which

14    is not the regular par-for-the-course knowledge with respect to

15    assuming things and taking them at face value, which is what

16    Skyline is trying to say, that people may have looked at this,

17    or that people have referenced this tool, or have complained

18    about this tool.  That evidence I will go no further in that

19    respect, but I will say that you must look at it with the eyes

20    of what an engineer would bring to the table in analyzing the

21    website.  What would an engineer say when they are confronted

22    with an infringement warning?

23          Now, an engineer has a special duty to the public,

24    right?  The engineer knows that what he fabricates and what he

25    produces, and what he authorizes impacts potentially millions

 1    of people, not rarely or randomly but every day.  So think

 2    about it.

 3            So, think about it.  Would an engineer take an

 4    infringement warning and make his decisions on fundamental

 5    works projects based on one, one infringement warning, that the

 6    evidence will show was only in existence for 66 days before

 7    PilePro took it down?  And I wish I could say that the 66 days

 8    were in the middle of all the commercial activity available

 9    during the 2014 to 2013 and 2015 period, when the expert

10    acknowledges that the infringement warning was up on the

11    website, that it was in the let's say busy season of May

12    through June before school gets out.  In fact those warnings,

13    the 66 days of warnings, were in the November, December and

14    January period of time, Thanksgiving, Christmas, New Year's,

15    Martin Luther King Day.  All of these days the expert doesn't

16    factor into as what the volume of page views are and how many

17    people looked at this, nor does he differentiate between

18    computer programs that visit websites on a daily basis in order

19    to ascertain the content as any website provider would do.

20            So, what we are facing here in this case are

21    allegations of falsehood on behalf of PilePro, but I must say

22    to say in this case that there were no legal opinions rendered

23    is incorrect, because the evidence will show that Mr. Wendt not

24    only spoke to attorneys here in the United States but spoke to

25    attorneys in Europe as well with respect to this patent, and

 1    that he spoke to a lot -- when I say a lot, I mean more than

 2    three or four.  I think we're up to five or six from my last

 3    count -- he spoke to attorneys with respect to what he could do

 4    legally to preserve his '543 patent.

 5            Now, they made a big hay about the fact that an

 6    attorney from Boies Schiller refused to sign the letters.  In

 7    fact he did find some letters, but he gave input continuously

 8    with respect to the content of those letters.  He looked at

 9    them.  He blessed those letters, and the evidence will show

10    that based on those communications with their attorney PilePro

11    sent out these letters.

12            So, when we look at this case, this case is a case of

13    innovation versus tradition.  This case is about the 21st

14    Century vis-a-vis the early 20th Century with respect to the

15    marketing of products and the utilization of information, how

16    you use that information and how the marketplace reacts to that

17    information.

18            Opposing counsel spoke about a couple of issues, and I

19    do want to address them briefly, and that is with respect to we

20    talked about the infringement accusation on the website, but

21    lead times.

22            Now, lead times, as far as I can gather as a

23    nonengineer, means the date from when an order is placed until

24    it finally gets to its final destination.  Now, the evidence

25    will show that there is testimony that lead times at issue in

GBT7SKY4                        Opening – Mr. Ramos

1    this case for this particular product, the HZM product, could

2    range from 12 to 16 weeks.  In fact, the evidence will show

3    that the contracts that Skyline utilizes to sell the HZM system

4    states specifically that amount of time, up to 16 weeks.  It's

5    in their fine print.  It is there for everyone to see.

6            Now, they come back and they say, well, the lead times

7    on the website are incorrect.  But if I look, we'll show you

8    their products manual from 2013 has multiple references to the

9    PilePro website.  They knew that PilePro was making assertions

10   of lead times and making assertions with respect to the quotes

11   necessary to fulfill a purchase order, an order that an

12   engineer may have for a particular project.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

GBTHSKY5                        Opening – Mr. Ramos

1              MR. RAMOS:  Because they had worked together

2     beforehand.  They had contracts, and they were such engaged in

3     commerce together that at one point in time preceding these

4     accusations and this case, Skyline had the PilePro Web site

5     address affixed prominently in multiple pages of their catalog.

6     That's true.  That's in the evidence.

7              So this case is not about false accusations.  This

8     case is about you, the jury, making the findings whether or not

9     Skyline was hurt by what PilePro did.  And we will show in this

10    case, with our evidence, with our cross-examination, that there

11    are no damages here and that you will render a verdict in favor

12    of PilePro.

13             Thank you, ladies and gentlemen.

14             THE COURT:  Thank you, Mr. Ramos.

15             All right.  We will proceed to the evidentiary portion

16    of the case and --

17             MR. BANDINI:  Your Honor, may we have a sidebar,

18    please?

19             THE COURT:  Not now.  We'll take it up at the break.

20    Please call your first witness.

21             MR. BANDINI:  Thank you, your Honor.  With respect to

22    the evidence, before our first witness, we would like to offer

23    into evidence as Exhibit 584 a document entitled "Joint

24    Undisputed Statements of Fact And law."  We have supplied a

25    copy to the other side, and we'd be pleased to hand one up to

GBTHSKY5                          De Mey - Direct

1   the Court.

2            THE COURT:  All right.  Thank you.  That document is

3   admitted.

4            (Plaintiff's Exhibit 584 received in evidence)

5            THE COURT:  Ladies and gentlemen, a stipulation is

6   sort of a fancy lawyer's term for an agreement between the

7   parties.  And the bottom line is these are stipulations, or

8   agreements, between the parties that certain facts or

9   statements are true, and you must regard such agreed facts as

10  true.  So Exhibit 584, Plaintiff's Exhibit 584, is in evidence.

11           Please call your first witness.

12           MR. BANDINI:  Thank you, your Honor.  Skyline Steel

13  calls as its first witness Laurent De Mey.

14           THE DEPUTY CLERK:  Please raise your right hand.

15   LAURENT DE MEY,

16       called as a witness by the Plaintiff,

17       having been duly sworn, testified as follows:

18           THE COURT:  You may be seated.  Start by spelling your

19  name, please.

20           THE WITNESS:  My name is Laurent De Mey.  Spelled

21  L-a-u-r-e-n-t, De Mey, two words, D-e, M-e-y.

22  DIRECT EXAMINATION

23  BY MR. BANDINI:

24  Q.  Good afternoon, Mr. De Mey.

25  A.  Good afternoon.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q.   Who is your employer?

2   A.   My employer is Skyline Steel.

3   Q.   I detect somewhat of an accent.  It's very important that

4   you speak slowly and clearly so the court reporter here can get

5   everything you say and, most importantly, so the jury can

6   understand everything you say.

7   A.   Sure.  Yes.

8   Q.   Where are you from, Mr. De Mey?

9   A.   Yeah, I do have an accent.  I'm not from the Deep South.

10  I'm from overseas.  I'm from Belgium, born and raised in

11  Belgium, but became an American citizen recently.

12  Q.   What is your position at Skyline Steel?

13  A.   I'm the president and CEO of the company.

14  Q.   CEO meaning?

15  A.   Chief executive officer.  I'm in charge of the company.

16  Q.   I'm sorry?

17  A.   I'm in charge of the company.

18  Q.   What does Skyline Steel do?

19  A.   Skyline Steel sells steel that goes vertically in the

20  ground to support heavy structures.  It's called steel

21  foundation parts.  So we sell big pipe, big beams, sheet piles,

22  those things you saw on those pictures before.  They all go

23  vertically in the ground.  They're pushed with big machines to

24  support bridges, highways, high-rise buildings, these kinds of

25  things.

1  Q.  We'll get into the details of your business more in just a

2  minute.  Can you tell us a little bit about your educational

3  background.

4  A.  Yeah.  I have a bachelor's degree and a master's degree

5  from the Free University of Brussels in combination with

6  university in Spain as well.  So I have a business degree.  I'm

7  also a musician.  I play a musical instrument.  I play the

8  viola, which I both studied in Brussels and in Madrid as well,

9  in Spain.  I have a bachelor's degree for that too.  And then I

10  kind of studied in several universities afterwards, in business

11  school in Paris, at Duke University, and I'm actually finishing

12  a global executive leadership program at Yale University in

13  Connecticut.

14  Q.  Very good.  If I may, please try to speak slowly.

15  A.  Yeah, yeah, yeah.  Okay.

16  Q.  What was your first job after your education?

17  A.  First started working for a small consultancy firm focused

18  on strategy and overall project management.

19  Q.  What did you do after that?

20  A.  So one of those projects I worked for the small consultancy

21  firm was actually advising a newly created company which was

22  called Arcelor, and Arcelor was the merger of a number of steel

23  companies back in Europe.  And I started working -- after my

24  stint at this consultancy firm, I started working for Arcelor.

25  They hired me.

GBTHSKY5                        De Mey - Direct

1  Q.  What did you do at Arcelor?

2  A.  I worked in the business development function helping to

3  buy companies and build new ventures and open new offices

4  around the world.

5  Q.  What relationship, if any, does Arcelor have to this

6  company we've heard about called ArcelorMittal?

7  A.  So ArcelorMittal, which was created early in the 2002

8  timing, merged into another company called ArcelorMittal back

9  in 2006.  And, yeah, I continued working for Arcelor and then

10  ArcelorMittal over time.

11  Q.  Okay.  So after the merger, you worked for ArcelorMittal?

12  A.  Yeah, I continued working for them.  And then, of course,

13  Arcelor became ArcelorMittal, and I stayed on with the company.

14  Q.  When did you first come to work for Skyline Steel?

15  A.  So ArcelorMittal was the owner of Skyline Steel until four

16  years ago.  So, actually, it's ArcelorMittal who sent me over

17  here to work for Skyline.

18  Q.  So you were working for Skyline when it was owned by

19  ArcelorMittal?

20  A.  Exactly, yes.  I came here as being in charge of the

21  operations and running the operations we have, yeah.

22          THE COURT:  What year was that?

23          THE WITNESS:  It was in 2009.  And year and a half

24  later, I became in charge of the company.

25  Q.  When you say you came here, what specific geographic --

GBTHSKY5                        De Mey - Direct

1   A.  Yeah, New Jersey.  I live in New Jersey.

2   Q.  Is Skyline in New Jersey as well?

3   A.  Yeah, we're based in New Jersey.  We have operations across

4   the country.

5            THE COURT:  Hang on one second.  Mr. De Mey, in

6   addition to speaking slowly, make sure you wait for Mr. Bandini

7   to finish his question even if you know or have a sense of what

8   the question is going to be.  It makes the court reporter's job

9   very hard unless you wait till he's actually done.

10           THE WITNESS:  Understood.

11           THE COURT:  Go ahead.

12  Q.  What part of New Jersey is Skyline based in?

13  A.  In Northern New Jersey, in Morris County.

14  Q.  What town?

15  A.  Parsippany.

16  Q.  And does it have a national presence?

17  A.  Yes.  We have, as I said, a number of facilities throughout

18  the country.  We operate in -- we have ten different facilities

19  throughout the country.  We have a number of sales offices as

20  well, 17 sales offices, and then a number of places where we

21  store material throughout the nation to be able to deliver them

22  on a quick notice.

23  Q.  Does Skyline produce its own products?

24  A.  We don't produce steel.  Steel is produced in a very

25  complex, big steel-making facility.  We actually process steel.

GBTHSKY5                          De Mey - Direct

1    So we will buy steel from big steel mills, whether it's

2    ArcelorMittal or Nucor, another company we heard about today,

3    or some other ones.  I would say most of it is domestic steel

4    bought in the U.S. and produced in the United States.  We will

5    process that and make it ready for shipment to our customers.

6    Q.  So when you went to Skyline at ArcelorMittal's request,

7    what was your position there?

8    A.  I was COO, chief operating officer.

9    Q.  Did your position change at some point?

10   A.  Yes.  So January 1, 2011, I became president and CEO, chief

11   executive officer, of the company.

12   Q.  As president, what are your current responsibilities,

13   president and CEO?

14   A.  Yes, it's still my responsibility, yes.

15   Q.  What are they?  What are your responsibilities as president

16   and CEO?

17   A.  Right.  As I said, I run the company, which means I'm in

18   charge of going from human resources to I.T. to sales to

19   operations, finance, the whole -- everything.  Strategy.

20   Everything they do.

21   Q.  Do you currently have positions with any other company?

22   A.  Yes.  I'm also vice president within the Nucor Corporation.

23   They are our mother ship.

24            THE COURT:  They are what?

25            THE WITNESS:  Our mother company.  We belong to --

1   Skyline is a subsidiary of Nucor, and I'm a VP at Nucor.

2   Q.  Did you say mother ship?

3   A.  Yes, I said mother ship.  That's the word.

4   Q.  Just for the benefit of everybody, how do you spell Nucor?

5   A.  N-u-c-o-r.

6   Q.  Okay.  What does Nucor do?

7   A.  Nucor is a steel company.  Yeah, steel company.

8   Q.  Where is it located?

9   A.  It's located, headquarters, in Charlotte, North Carolina.

10  Q.  Are you familiar, based on your position with them, as to

11  how it produces steel?

12  A.  Yes.  Nucor is a company that produces steel in multiple

13  locations in the United States and has introduced multiple

14  decades ago a revolutionary way of making steel converting

15  scrap -- so your old fridge, washing machine, your old car --

16  into steel again and be able to recycle it and make new types

17  of steel.  And Nucor makes all types of steels you can imagine

18  based out of scrap that they recycle.

19  Q.  Is that the traditional way of making steel?

20  A.  No.  The old traditional way, which was described before,

21  back 100 years ago was -- and there's still some locations

22  where that is done -- is you take iron ore.  You mine locations

23  like Brazil, Australia or the United States or Africa.  And you

24  use iron ore, something called coking coal, and you put all

25  this together in a big blast furnace, so make a lot of

1    pollution, and you make liquid steel from that.  The old

2    traditional way is called integrated route.  What we do is

3    called the scrap route, which is a more efficient and much less

4    polluting way of making steel.

5    Q.  A few questions ago -- or a few answers ago, I should say,

6    you referred to Nucor as the mother ship.  What did you mean by

7    that?

8    A.  Nucor bought Skyline Steel four years ago, four and a half

9    years ago, in 2012 from ArcelorMittal, and we became a

10   subsidiary of the Nucor Corporation.

11   Q.  What kind of steel products does Nucor make?

12   A.  So it makes everything from a beam.  As soon as you walk

13   outside, you will see some steel somewhere.  We probably have a

14   part of that steel.  Goes from beam, rebar, flat sheets,

15   everything you can imagine that's used in daily consumption,

16   yeah.

17   Q.  Does Nucor and Skyline -- I'm sorry, do Nucor and Skyline

18   sell the same types of products?

19   A.  I would say Skyline sells a number of products that Nucor

20   makes, but Nucor makes many more products that Skyline doesn't

21   buy or sell.

22   Q.  Are you familiar with the concept of a retaining wall?

23   A.  Yes.

24   Q.  Does Skyline sell any products that enable customers to

25   make retaining walls?

GBTHSKY5                          De Mey - Direct

1    A.   Absolutely.

2    Q.   Can you explain to the jury the concept of a retaining wall

3    and have you prepared a demonstrative to aid the jury in

4    understanding that?

5    A.   Yeah, I think we have a little drawing we got right here.

6    Q.   So we've put on the screen a drawing.  Did you -- was this

7    prepared at your direction?

8    A.   Yeah, yeah.

9    Q.   Can you explain to the jury what this shows.

10   A.   Absolutely.  So the retaining wall --

11             THE COURT:  It's not actually on the jury's screen.

12             MR. BANDINI:  Sorry about that.

13             THE COURT:  You have to ask to do that.  We control

14   who sees it.

15             MR. BANDINI:  Your Honor, this is a demonstrative

16   that, my understanding, there's no objection, but they can

17   speak for themselves.

18             THE COURT:  They can indeed.

19             MS. GHAVIMI:  No objection.

20             THE COURT:  It may be published to the jury.

21             MR. BANDINI:  I apologize.

22             THE COURT:  Ladies and gentlemen, just to be clear, as

23   I understand it, this is not being offered into evidence; is

24   that correct?

25             MR. BANDINI:  Not into evidence.  It's just a

GBTHSKY5                          De Mey - Direct

1     demonstrative.

2               THE COURT:  So this is being offered or used as what

3     is known as a demonstrative exhibit.  That is just,

4     essentially, to help you understand the witness' testimony.

5     It's not actually evidence in itself.  You should consider it

6     just with respect to the testimony, and hopefully it will help

7     you understand that.

8               Go ahead.

9               MR. BANDINI:  Thank you, your Honor.

10    Q.  So let me repeat the question, Mr. De Mey.  Can you explain

11    to the jury what is shown in this demonstrative that was

12    prepared at your direction.

13    A.  Yes.  So on the top left corner, you see a gentleman

14    standing next to something that we call the retaining wall.  So

15    the dark gray vertical piece there is called a retaining wall

16    because it retains the earth from falling into the water.  That

17    is what a retaining wall is.

18    Q.  And what have you depicted in the lower left?

19    A.  The lower half describes why there could be different types

20    of retaining walls.  A retaining wall that only needs to carry

21    the weight of this one gentleman would not be the same type of

22    retaining wall that would be used to carry a full load.  When

23    you see the truck and the car standing up there, their weight

24    pushes down to the ground and from pushing down will actually

25    put pressure on the retaining wall and possibly fall over into

GBTHSKY5                         De Mey - Direct

1   the water.  So the function of the weight, or the load it's

2   called, the function of the load that this wall is retaining,

3   you will use different combinations or different types of

4   solutions to get the same results, if you like.

5   Q.  So in your answer you said there were different types of

6   solutions depending on what type of retaining wall?

7   A.  Exactly.

8   Q.  Is that what you have depicted on the right side?

9   A.  Yes.

10  Q.  Hold on, Mr. De Mey.  I know the Court will advise you of

11  this if I don't.  Please let me finish my question so there's a

12  clean record.

13          Are the different solutions what you've depicted on

14  the right side of the screen?

15  A.  Yes, these are different solutions.

16  Q.  Please explain those to us.

17  A.  So the first one on top you see is called a sheet pile

18  wall.  As it continues, wall of sections that we call sheet

19  piles.  Once the weight or the load they have to retain from

20  not falling from one side to the other becomes heavier and

21  heavier, you need a bigger and a stronger solution.  Those

22  sheet piles have different types of solutions.  But once they

23  get out of their reach, you have to add other piles that are

24  stronger.  In this case, the second, third are two types of

25  combi walls, the third word on the screen.

1   Q.   When you say combi, that's c-o-m-b-i?

2   A.   C-o-m-b-i.  Combination wall or combi wall.

3   Q.   Thank you.

4   A.   One uses a beam as a king pile.  It's called the HZM wall.

5   The other one uses a pipe as a king pile.  It's called the

6   Pipe-Z combi wall.  If the loads are even heavier and even

7   stronger, you could in some cases go to something which is

8   called an O-Pile wall or a pipe pile wall.  So the heavier the

9   load or the function of the load, you will use one or the other

10  variation, variations of combination.

11  Q.   All right.  Thank you, Mr. De Mey.  I think we can take

12  that off the screen.

13          So one of the walls on that screen and something you

14  heard about during opening, since you were sitting here, is the

15  HZM system.  You heard that term?

16  A.   I did.

17  Q.   Is that a system that Skyline sells?

18  A.   Yes, sir.

19  Q.   Can you tell us what it is.

20  A.   So as explained before, HZM system is one way of building a

21  retaining wall.  And it uses a king pile and special shaped

22  beam, one special type interlock that connects a sheet pile,

23  which is the intermediate piece, to another beam.  So you have

24  beam, interlock, sheet pile, interlock, beam, and so forth.

25  Q.   Have you also obtained some demonstrative pictures of the

GBTHSKY5                        De Mey - Direct

1  HZM system to help the jury visualize what we're talking about?

2  A.  Yes.

3         MR. BANDINI:  So I'm putting up D1.  With the Court's

4  permission, we would like to display this to the jury.

5         THE COURT:  Any objection?

6         MR. RAMOS:  No objection, your Honor.

7         THE COURT:  All right.  You may.

8  BY MR. BANDINI:

9  Q.  Mr. De Mey, do you see what we've put up on the screen?

10 A.  Yes, what we see here --

11 Q.  Hold on.  I have to ask you a question.  I did ask you a

12 question, I'm sorry, but you answered it.

13        What are we seeing here on the screen?

14 A.  We see a sheet pile being driven in the ground with a

15 variable hammer.  The green thing on the top is pushing this

16 sheet pile, intermediate piece of steel, into the ground.

17 Between those beams that you see on the right side of the

18 picture, you see some pieces of steel are sticking out already.

19 Those are the king piles.  They are already in the ground.  And

20 that's done in the first phase.  In the second phase, the

21 actual intermediate piece, which is this sheet pile here, is

22 being driven between the sheet, sheet piles.

23        MR. BANDINI:  If we can display D2, and I would

24 request that we can show that to the jury as well.

25        THE COURT:  Any objection?

1              MR. RAMOS:  I haven't seen it.

2              MS. GHAVIMI:  No objection, your Honor.

3    BY MR. BANDINI:

4    Q.  Mr. De Mey, what does this picture show?

5    A.  This picture shows the same thing except it's finished now.

6    So you see the full combined wall finished, HZM solutions in

7    the ground.

8    Q.  Is this wall that we're looking at made out of one large

9    piece of steel?

10   A.  No.

11   Q.  What is it made out of?

12   A.  It's made out of multiple components.

13   Q.  Do those multiple components all look the same?

14   A.  No.

15   Q.  Does Skyline have brochures or manuals that show the

16   different shapes of these components?

17   A.  They do.

18   Q.  All right.  Let me show you what we have premarked as

19   Plaintiff's Exhibit 306 and ask you if you recognize this

20   document.

21   A.  I do.

22   Q.  What is it, for the record?

23   A.  It's our Technical Product Manual, edition 2014.

24   Q.  Did Skyline use this document in the regular course of its

25   business?

GBTHSKY5                        De Mey - Direct

 1   A.  Yes, we do.

 2   Q.  How is it used?

 3   A.  It's being distributed to the -- to our customers, to the

 4   engineering community, to anybody else who would be involved in

 5   any type of construction job that needs foundation material to

 6   support any other structure on top of it.

 7             MR. BANDINI:  At this time plaintiff moves Exhibit 306

 8   into evidence and asks that it be displayed to the jury.

 9             THE COURT:  Any objection?

10             MR. RAMOS:  No objection, your Honor.

11             THE COURT:  Admitted.  You may display it.

12             (Plaintiff's Exhibit 306 received in evidence)

13             MR. BANDINI:  Thank you, your Honor.

14   Q.  Now that we're looking at 306, I guess the cover page is

15   being displayed to the jury, what is displayed in that big

16   picture in the center of that cover page?

17   A.  In the center of the Technical Product Manual you see a

18   picture of a construction pit where you see sheet piles are

19   being used to retain the side walls and have the workers be

20   able to work safely at a level.

21   Q.  Take a look at the page with the numbers 5916 at the lower

22   right.  Can you tell us what's shown on that page.

23   A.  Yes.  That's an HZM solution.

24   Q.  Is the HZM name a registered trademark?

25   A.  Yes, it is.

GBTHSKY5                          De Mey - Direct

1   Q.  Do you know who owns that trademark?

2   A.  Yes, I do.

3   Q.  Who owns that trademark?

4   A.  ArcelorMittal.

5   Q.  Is Skyline permitted to use that trademark by

6   ArcelorMittal?

7   A.  Yes.

8   Q.  How do you know that?

9   A.  It's part of our contract.

10  Q.  Looking at this document, do you know whether there's

11  anything in the document that -- Exhibit 306, that is -- that

12  references the trademark?

13  A.  Yes, I know there is.

14  Q.  Take a look at the back page.  Does the back page of the

15  Technical Product Manual reference the trademark?

16  A.  Yes, it does.

17  Q.  Can you please read that into the record.

18  A.  It says:  HZM and AMLoCor are registered trademarks of

19  ArcelorMittal.

20          THE COURT:  Can I just ask a quick question.  On the

21  very bottom of that page, you can see that it says on the left

22  "confidential," and then on the right there's a letter and

23  number combination that ends in 5964.  I assume those were not

24  on the original version of the document; is that correct?

25          THE WITNESS:  No, your Honor.

GBTHSKY5                          De Mey - Direct

1          THE COURT:  All right.  Ladies and gentlemen, let me

2     just explain, you'll see on some documents -- well, you see on

3     this one, and I imagine you'll see on other documents, markings

4     like that.  Those are markings that are put on papers, on

5     documents, as part of the litigation process.  They're

6     essentially known as Bates stamps.  It just allows the parties

7     in a case like this to keep track of documents that have been

8     exchanged and make sure everybody's literally on the same page

9     when it comes to referring to documents.

10          So you'll see that, you.  Should basically ignore

11     those markings, as well as the statement that says

12     "confidential."  That allows parties to exchange things that,

13     at least in advance of trial, can be kept sort of confidential

14     and just between them.  It's just a legal -- part of the

15     process, and you shouldn't consider it with respect to

16     either -- any of the decisions you have to make or hold it

17     against either side.

18          Okay.  You may proceed.

19          MR. BANDINI:  Thank you, your Honor.

20     Q.  When did Skyline start selling the HZM system?

21     A.  It's a while ago.  Ten --

22     Q.  Approximately?

23     A.  Ten years ago.  Ten, 15 years ago, I think.

24     Q.  HZM?

25     A.  HZM.  As soon as HZM became available, we started selling

1   it.

2   Q.  Okay.  Does Skyline have competitors that sell sheet pile

3   walls?

4   A.  Yes, sir.

5   Q.  Do any of them refer to their walls as HZM walls?

6   A.  No, they don't.

7   Q.  How about the Skyline name?  Are you aware of any other

8   sheet piling company in the U.S. that goes by Skyline?

9   A.  No.

10  Q.  Now, staying with 306, I believe I wanted to ask you

11  something.

12          Michael, I'm sorry, can you go back to page 5916.

13          When you said that this was the HZM system, I wanted

14  you to take us through the components.  Can you explain what

15  those components are.

16  A.  Yeah.

17  Q.  So now we've highlighted something in blue.  What is that?

18  A.  The blue is what we call the king pile.

19  Q.  Did you say king pile?

20  A.  King pile, yes.

21  Q.  Okay.

22          THE COURT:  Just for the record, the blue is the sort

23  of I-shaped items on the left and the right of the diagram; is

24  that correct?

25          THE WITNESS:  Yes.

GBTHSKY5                          De Mey - Direct

1           THE COURT:  All right.  Go ahead.

2     Q.  Now we've highlighted some things in yellow.  What are

3     those?

4     A.  Those are called connectors.  They connect or they make it

5     possible for the sheet pile to connect to that I-shaped beam.

6     Q.  Okay.  Now let's highlight the next piece.  We've

7     highlighted something in green.  What is that?

8     A.  That's called intermediate sheet pile, or an AZ sheet pile

9     in this case.

10    Q.  For the record, what is the shape of what we just

11    highlighted in green?

12    A.  This is called an AZ sheet pile.  It's produced by

13    ArcelorMittal.

14    Q.  And it's sort of a --

15    A.  It's like a Z shape, yeah.

16    Q.  Now, is the HZM system the first combi wall system that

17    used beams and sheet piles sold by Skyline?

18    A.  No.

19    Q.  What did you sell before the HZM system?

20    A.  Before it was simply called HZ system.

21    Q.  So no "M."  It was just "H" and "Z"?

22    A.  No "M."

23    Q.  What is the HZ system?

24    A.  It's a very similar product except the beam is slightly

25    different.

GBTHSKY5                         De Mey - Direct

1   Q.  When you say "the beam," was that that I-shaped --

2   A.  Yeah, I -- we call it the beam.  The I-shaped piece of

3   steel was slightly different.

4   Q.  All right.  Let's put in front of you Plaintiff's

5   Exhibit 308, which is a document.  Can you identify it for the

6   record.

7   A.  Yes.  That's a document which is called HZ Steel Wall

8   System, edition 2000- -- that's not very visible -- I think '3

9   or '1.  And it's from a company called Profil ARBED.

10  Q.  Was this a document that was used in the ordinary course of

11  business to sell the HZ wall system?

12  A.  Yes.

13          MR. BANDINI:  At this point plaintiffs would move to

14  admit Exhibit 308 and publish it to the jury.

15          THE COURT:  Any objection?

16          MR. RAMOS:  Objection, your Honor.

17          THE COURT:  Basis?

18          MR. RAMOS:  Your Honor --

19          THE COURT:  Just one-word basis.

20          MR. RAMOS:  Foundation.

21          THE COURT:  All right.  Sustained.

22          Mr. Bandini, why don't you lay a little bit more of a

23  foundation.

24  BY MR. BANDINI:

25  Q.  Mr. De Mey, was this a document that was used by Skyline to

1    sell the HZ steel wall system?

2    A.  Yes.

3    Q.  How was it used?

4    A.  Same principle.  It's used as a document that explains the

5    product solution that's used and distributed to technical

6    people, engineers, customers.  Same principle.

7              MR. BANDINI:  Same motion, your Honor.

8              THE COURT:  Any objection?

9              MR. RAMOS:  Same objection.  Lacks foundation.

10             THE COURT:  Overruled.  It's admitted.

11             (Plaintiff's Exhibit 308 received in evidence)

12             MR. BANDINI:  Thank you, your Honor.  May we publish

13   it to the jury?

14             THE COURT:  You may.

15   BY MR. BANDINI:

16   Q.  Take a look at the front page, Mr. De Mey.

17   A.  Yes.

18   Q.  There is a picture and then on top of the picture there's

19   something that looks like a drawing.  Do you see that?

20   A.  Yep.

21   Q.  What does that drawing show?

22   A.  It shows a zoomed-in picture of what we described before a

23   little bit with a sheet pile on top, the interlock special

24   shaped steel, and the lower part is a fraction of the king

25   pile, or the I-beam.

GBTHSKY5                          De Mey - Direct

1    Q.   Now, do you see at the upper left of the front page it says

2    "edition 2001"?

3    A.   I see that, yes.

4    Q.   Did Skyline sell this HZ steel wall system in the United

5    States in 2001?

6    A.   Yes.

7    Q.   Does Skyline still sell that system?

8    A.   Not anymore.

9    Q.   Why is that?

10   A.   Because today it's called the HZM system.

11   Q.   Okay.  Now, if you stay with that document, let's look at

12   the picture on page 6002 on the bottom -- actually, it's on the

13   center, the right-hand side of the page, which I think is up on

14   the screen now.

15        Can you tell us what that shows.

16   A.   It's the same thing.  It's -- actually should see it now in

17   the actual product, in steel.  On the left-hand side, you see

18   the intermediate sheet pile.  The middle strange-shaped element

19   is the interlock, or the connector.  And on the right-hand

20   side, you see a part of the king pile, or the I-beam.

21   Q.   The king pile, or I-beam, is the part on the right side of

22   the picture; is that right?

23   A.   Yes.

24   Q.   Is that the part that was different in the HZM system?

25   A.   Yes.  Yes, that changed.

GBTHSKY5                          De Mey - Direct

1    Q.  Now, in the course of your work for Skyline, have you seen

2    any drawings of what the new HZM king pile looks like?

3    A.  Yes.

4    Q.  All right.  Let me show you what we've premarked as

5    Plaintiff's Exhibit 20 and direct you to figure 7 of that

6    document.  Can you identify what that drawing depicts.

7    A.  That is the -- yes, I can.

8    Q.  What does it depict?

9    A.  That is the king pile of the HZM solution with, on the

10   right-hand side, one connector added to it.

11   Q.  So that's the new type of king pile that you sell?

12   A.  Yes, it is.

13   Q.  As for the document as a whole, can you identify the

14   document for the record.

15            THE COURT:  Why don't you go to the first --

16            MR. BANDINI:  I'm sorry.

17            MR. RAMOS:  Objection.  Ambiguous.

18            MR. BANDINI:  I'll rephrase the question.

19   Q.  Have you seen this document before?

20   A.  Yes, I have.

21   Q.  What is it?

22   A.  It's a U.S. patent.

23   Q.  Have you seen it before this case?

24   A.  No.  I got involved, and I saw it since the case.

25   Q.  Have you had occasion to discuss this patent with anyone at

1   ArcelorMittal?

2   A.  Yes.

3   Q.  In what regard?

4   A.  Linked to this case.

5   Q.  I'm sorry?

6   A.  Linked to this case.  Since this case began.

7          MR. BANDINI:  Okay.  Move to admit Exhibit 20.

8          MS. GHAVIMI:  Objection.  Foundation and relevance.

9          THE COURT:  Sustained.

10         MR. BANDINI:  All right.  Let's turn to -- let's put

11  that aside for a second.  Let's turn to Plaintiff's Exhibit 11.

12  Q.  Do you recognize this document?

13  A.  Yes.

14  Q.  What is it?

15  A.  It's a brochure about the HZM steel wall system, edition

16  2013.

17  Q.  Is this a document that Skyline keeps and distributes in

18  the ordinary course of its business?

19  A.  It did.

20  Q.  I should rephrase.  Did Skyline keep and distribute this

21  document on or about the year 2013 in the ordinary course of

22  its business?

23  A.  Yes.

24  Q.  Are the products indicated in this brochure the products

25  that Skyline was selling in 2013?

GBTHSKY5                          De Mey - Direct

 1   A.  Yes.

 2              MR. BANDINI:  Move to admit and publish Plaintiff's

 3   Exhibit 11.

 4              THE COURT:  Any objection?

 5              MS. GHAVIMI:  No objection.

 6              THE COURT:  Admitted.

 7              (Plaintiff's Exhibit 11 received in evidence)

 8   BY MR. BANDINI:

 9   Q.  Now, Mr. De Mey, can you look at the cover page of

10   Plaintiff's Exhibit 11 and tell us what that shows.  And in

11   particular, I know there's a picture.  What does that drawing

12   on top of the picture depict?

13   A.  So the drawing on top is again the same thing, except this

14   time it describes HZM solution.  So it shows the king pile beam

15   on top, then the connector, and then the sheet pile on the

16   lower half.

17   Q.  Again, if you could remind us of what was different between

18   this and the HZ system.

19   A.  So the difference here is the king pile has a slightly

20   different shape in the HZM system compared to the HZ system.

21   Q.  What's the difference, if you could describe it in the

22   shape?

23   A.  The difference is that there would be an accumulation of

24   steel towards the end of the sides of the beam in the old

25   system, and here, it's done slightly differently.

GBTHSKY5                          De Mey - Direct

1   Q.  Now take a look at page 88 of that document.  And there's a

2   picture on the lower right which we'll blow up for you.  What

3   does that depict?

4   A.  It shows the king pile of the HZM system with two

5   interlocks, two connectors.

6   Q.  Okay.  Is that the king pile design that Skyline has been

7   selling as part of the HZM system?

8   A.  Yes.

9   Q.  I asked you to take a look at figure 7 of Exhibit 20 which

10  you directed me to earlier.  Have you ever compared the HZM

11  sold by Skyline with the one depicted on figure 7 of

12  Exhibit 20?

13  A.  Can you repeat the question.  Make sure I understand it

14  right.

15  Q.  Sure.  Sure.  We just looked at the catalog picture of

16  Exhibit 11, and I think you just told me that page 88 showed

17  the HZ king pile sold by Skyline?

18  A.  Uh-huh.

19  Q.  Is that correct?

20  A.  Yes.

21  Q.  That's right on the screen.  Have you ever compared that

22  with the picture shown in figure 7 of Exhibit 20?

23  A.  Yeah, yeah.  Okay.  Yes.

24  Q.  We could put it on the witness --

25  A.  That would probably be easier.

1            MS. GHAVIMI:  Objection, your Honor.  Lacks foundation

2     and knowledge of the document, Exhibit 20.

3            THE COURT:  You're objecting to the question?

4            MS. GHAVIMI:  Eliciting testimony about Exhibit 20.

5            THE COURT:  Just yes or no.

6            MS. GHAVIMI:  Yes.

7            THE COURT:  All right.  Sustained.

8            MR. BANDINI:  All right.  I'll move on.

9     Q.  Let's take a look at the other components of the HZ system,

10    the older system.  Staying with 308, back to Exhibit 308, let's

11    look at page 5986 of that catalog.  And if we could -- this is

12    in evidence, I believe.  If you could look at that page, we've

13    blown up the pictures to make them easier to see.

14           What is depicted on the top part of that page?

15    A.  That is called an AZ intermediate sheet pile.

16    Q.  What is depicted on the bottom of the page?

17    A.  These are three types of connectors.

18    Q.  Now, these, of the piles and the connectors, were sold with

19    the old system; correct?

20    A.  Yes.

21    Q.  How do these products, the AZ intermediary piles and the

22    connectors sold with the old HZ system, differ, if at all, from

23    the AZ piles and connectors sold with the new HZM system?

24           MR. RAMOS:  Objection, your Honor.

25           THE COURT:  Overruled.

1   A.  Not at all.  No change.

2   Q.  Not at all.

3           And how long has Skyline been selling these AZ piles

4   and connectors in this form?

5   A.  As long as they've been made.

6   Q.  Okay.  Now, you should have in front of you an envelope.

7   A.  Yes.

8   Q.  I believe if you look inside, can you tell us what's inside

9   the envelope.

10  A.  I can.

11  Q.  What is inside the envelope?

12  A.  These are small plastic examples of what a sheet pile combi

13  wall could look like.

14  Q.  Do you --

15          THE COURT:  Just leave them there for now, please.

16  Q.  Yes.  Leave them down for a second.

17          Where did you obtain them from?

18  A.  We received those from ArcelorMittal.

19  Q.  When?

20  A.  Probably 15 years ago.

21  Q.  Fifteen years ago?

22  A.  Fifteen years ago, yeah.

23  Q.  So those were not created for purposes of this case?

24  A.  No, no, not at all.

25  Q.  When you say we received them from ArcelorMittal, you mean

GBTHSKY5                         De Mey – Direct

1    Skyline?

2    A.   Yes, Skyline, yeah.

3    Q.   So were they at Skyline's offices?

4    A.   Yes, they were.

5    Q.   What are they used for, if anything?

6    A.   Well, so we have those little plastic examples to show to

7    customers or engineering firms or universities to show or make

8    it visible, really tangible, what we really make or what we

9    sell.

10            MR. BANDINI:  Your Honor, at this point I would offer

11   the witness' testimony with respect to these models to

12   demonstrate how the system works, subject to any objection.

13            THE COURT:  Meaning you want to use the models as a

14   demonstrative or you're offering the models an as exhibit?

15            MR. BANDINI:  I want to use the models as a

16   demonstrative.

17            THE COURT:  Any objection?

18            MS. GHAVIMI:  No objection.

19            THE COURT:  All right.  You may proceed.

20            MR. BANDINI:  So I'm not sure what's the simplest,

21   your Honor, whether he can put them on the shelf next to the

22   witness stand or whether he should perch on this bar.  Whatever

23   the Court prefers.

24            THE COURT:  I'm going to go with the witness stand

25   bar, and hopefully jurors can see.

De Mey - Direct

 1              And jurors at the end of the first row, if you want to

 2      move around closer, you're welcome to, but I would hope that

 3      you could see from there anyway.

 4      BY MR. BANDINI:

 5      Q.  All right.  So my question, sir, first is if you could take

 6      us through the individual pieces of the model and what they

 7      are, and then we'll move on from there.

 8      A.  Yes, I can.  So do I start?

 9      Q.  Yes, you may start.

10      A.  This, as you've seen, is called a beam.  That's the king

11      pile, these elements.  They go vertically in the ground like

12      this, as you saw in the picture, one by one by one, advance.

13      Q.  Hold on.  Let me stop you right there.  When they're in

14      real life, are they that long or longer?

15      A.  No.  These could be up to over 100 feet long.

16      Q.  One hundred feet long into the ground?

17      A.  Yes.

18              THE COURT:  These are the sort of I-shaped --

19              THE WITNESS:  Yes.

20              THE COURT:  -- objects?

21              THE WITNESS:  Yeah.

22              THE COURT:  And they go into the ground?

23              THE WITNESS:  And they go vertically like this.  So

24      imagine one long piece of -- of beam like 100 foot long,

25      60 feet long, 70 feet long.

1          THE COURT:  But if you were looking at them from the

2     sky, they would essentially appear to be a letter "I"; is that

3     a fair statement?

4          THE WITNESS:  If you look up, you would see an "I,"

5     yes.

6          THE COURT:  Okay.  Go ahead.

7     BY MR. BANDINI:

8     Q.  What are the other pieces?

9     A.  So as you see here, we have something on here which is

10    called a connector, which is a piece of steel which has the

11    same length as a sheet pile, not necessarily as the beam, but

12    as the sheet pile, which will be attached also vertically in

13    there like this.  Okay.  As you see, it's the same special

14    shape that is attached in the factory in Luxembourg.  It's slid

15    in there and then attached by a small welding at notable

16    points.

17         THE COURT:  That's just a small connecting piece --

18         THE WITNESS:  Yes.

19         THE COURT:  You need to wait for me to finish.

20         THE WITNESS:  Sorry.

21         MR. BANDINI:  It's very bad to interrupt the judge,

22    which I just did.

23         THE COURT:  Bad to interrupt anyone because it makes

24    that woman's job too difficult.  But it's a little different

25    than speaking in the normal world.

1            Now, the connector just slides onto this sort of end

2    of the top and the bottom of the "I," if you will, the ends of

3    those pieces; is that a fair statement?

4            THE WITNESS:  Yes, your Honor.

5            THE COURT:  Okay.  Go ahead.

6            THE WITNESS:  So here I have an example here of two

7    beams, all right, to make it simple.  Each side gets one of

8    those connectors, okay.  Now, multiple beams will be driven in

9    the ground vertically.  Here, one next to the other, but not

10   exactly next to the other because you need enough room to put

11   an intermediate sheet pile, which I'll show in a second.

12           We'll put multiple of those elements as long as your

13   wall is long.  Then you need to add something like this, which

14   is a sheet pile.  A sheet pile is -- as Mr. Bandini said, it's

15   a Z-shaped piece of steel, okay.  It has something very

16   specific at the ends, both ends, that's called the interlock.

17   That is specific enough that it actually can go into each other

18   like this and create a pair of sheet piles.  Those elements as

19   well are 50, 60, 70, 80 feet long.

20           So they go vertically like this in here, and then they

21   will perfectly fit into this one element, which is not as easy,

22   and the other one.  We've now created an HZ solution.

23           THE COURT:  All right.  So you slide those into the

24   connectors, thereby connecting the two I-beam --

25           THE WITNESS:  Yes.

GBTHSKY5                    De Mey - Direct

1              THE COURT:  -- king piles, yes?

2              THE WITNESS:  Exactly.

3              THE COURT:  All right.

4              THE WITNESS:  This is on a continuous way.  So first

5     beams are driven and then the sheet piles are driven all along.

6     BY MR. BANDINI:

7     Q.  So with that thing you've just created -- can you hold it

8     up again, would that be called the combi wall?

9     A.  Yes, that is a combi wall.

10    Q.  Okay.  Why is it called a combi wall?

11    A.  Because it's combines multiple elements, combines I-beam

12    and a sheet pile connected with those connectors.

13    Q.  Now, can engineers or contractors use just the AZ

14    intermediary piles to make a wall?

15    A.  Absolutely.

16    Q.  Can you show us how that's done.

17    A.  I can.  So we have this one pair of sheet piles you can

18    drive in the ground, and you can drive another pair of sheet

19    piles in the ground, and so on and so on, as long as you need

20    be.

21    Q.  Can you hold that up so everybody can see.

22              Would that be called a combi wall?

23    A.  No, that's not a combi wall.

24    Q.  That's an AZ wall?

25    A.  That's an AZ wall.

1   Q.  Do you have -- you could put those down for now.  Do you

2   have any demonstrative pictures of a wall that's just an AZ

3   wall?

4   A.  Yes, we do.

5   Q.  Can we put in front of you what we've labeled D4 and ask

6   you to look at that.  What is this?

7   A.  This is an AZ sheet pile wall, continuous wall.

8           MR. BANDINI:  Right.  I'd ask that this be published

9   to the jury as a demonstrative.

10           THE COURT:  Any objection?

11           MS. GHAVIMI:  No objection.

12           THE COURT:  Granted.

13   BY MR. BANDINI:

14   Q.  So how does this correspond to what you were just showing

15   in the models?  Which of the models does this correspond to?

16   A.  It is exactly the same as this.

17   Q.  As that AZ?

18   A.  Yes.

19   Q.  So did Skyline sell these AZ piles to make these walls

20   before the HZM system came along?

21   A.  Yes.

22   Q.  Now, in what instances, based on your experience, would an

23   engineer choose this type of wall instead of the HZM wall?

24           MR. RAMOS:  Objection.

25           THE COURT:  Overruled.

GBTHSKY5                          De Mey - Direct

1    A.  So I think as we explained in the first page, very first

2    image we showed, a function of the load that the wall needs to

3    carry, or the weight that it needs to carry, we will use only

4    an AZ wall or go into the combi wall when the loads are

5    heavier.  Combi wall means including beams and piles.

6    Q.  As president of Skyline, are you aware of how much this

7    type of wall Skyline sells compared to how much of the combi

8    HZM wall it sells?

9              MR. RAMOS:  Objection.

10             THE COURT:  Overruled.

11   A.  About ten times more.

12   Q.  Ten times more of what?

13   A.  Of AZ sheet piles just alone as one wall compared to combi

14   walls.

15   Q.  It sells ten times more of these AZ walls?

16   A.  Yes, ten times more of this compared to solution HZM.

17   Q.  How long has that been true?

18   A.  Forever.  Since this company has been in business.

19   Q.  Do you know approximately how many dollars in sales Skyline

20   made of the AZ pile walls without the HZM system for the years

21   2013, '14, and '15?

22   A.  It's between 100- and $150 million per year in sales.

23   Q.  Now, are you familiar with how these AZ piles are made?

24   A.  Yes.

25   Q.  How are you familiar with that?

GBTHSKY5                          De Mey - Direct

1    A.  I have seen it with my own eyes.

2    Q.  You've seen them made?

3    A.  Yes, I've seen them made, yeah.

4    Q.  Where have you seen them made?

5    A.  In Luxembourg, in the steel mill where it's being made.

6    Q.  Have you prepared for the jury a demonstrative

7    demonstrating how they are made?

8    A.  Yes.

9    Q.  Let's put in front of you what we marked as D5 and ask you

10   if that is the demonstrative you're referring to?

11   A.  Yes, it is.

12           MR. BANDINI:  Permission to publish this demonstrative

13   to the jury?

14           THE COURT:  Any objection?

15           MS. GHAVIMI:  No objection.

16           THE COURT:  All right.  You may.

17   BY MR. BANDINI:

18   Q.  So I notice -- before we get into the specifics of this, I

19   notice the title says "Manufacturing by Hot-Rolling."  Do you

20   see that?

21   A.  Yes.

22   Q.  What is hot-rolling?

23   A.  Hot-rolling means that the shape of the end product is

24   obtained when the steel is almost at the liquid stage, so above

25   1,000 degrees.

GBTHSKY5                          De Mey - Direct

1   Q.  The steel is at a thousand degrees?

2   A.  The steel is at a thousand degrees, yes.

3   Q.  Now, can you take us through what you show in this

4   demonstrative to explain how hot-rolling is used to make the AZ

5   sheet piles.

6   A.  Yes.  So there's something called a steel blank on this

7   picture.  It looks like a beam.  It's not exactly a beam.  It's

8   a semifinished product.  So from liquid steel you will make a

9   beam blank, or a steel blank, which is cooled down and

10  afterwards reheated at around a thousand degrees,

11  approximately, and then passed through a number of passes,

12  which are big sets of rolls.  So the steel will roll through

13  these rolls, and these rolls come closer and closer and have a

14  more specific shape, more special shape.  And every different

15  roll that it goes through is called a pass.  And after a number

16  of passes, you end up with a product called the AZ sheet pile.

17  And here you see the stage-by-stage evolving, probably till it

18  goes to that final shape.

19  Q.  Are these AZ sheet piles shape cut at all?

20  A.  Not at all.

21  Q.  How about the connectors that are used with the HZM system?

22  Are you familiar with how they are manufactured?

23  A.  Yes, I am.

24  Q.  Are those shape cut at all?

25  A.  No.

GBTHSKY5                          De Mey - Direct

 1              THE COURT:  How are they manufactured?

 2              THE WITNESS:  There's two ways of making it.  One is

 3     rolling very similar to this.

 4     Q.  Hot-rolled.

 5     A.  Hot-rolled.  And the other one is extrusion, which is a

 6     different process.

 7              THE COURT:  What does "shape cut" mean?

 8              THE WITNESS:  "Shape cut" means that you cut it with a

 9     grinder, grinding machine, to create the shape.  It's not

10     what's done here.

11              THE COURT:  All right.

12     Q.  Again, so since you were here for the openings, you heard

13     reference to a company that was called L.B. Foster.  Have you

14     ever heard of that company before?

15     A.  Yes, I have.

16     Q.  What is L.B. Foster?

17     A.  L.B. Foster is a competitor of ours.

18     Q.  A competitors of yours?

19     A.  Yes.  They compete with us.

20     Q.  Have you prepared a demonstrative showing the steel

21     industry and competition, as you understand it, in the

22     industry?

23     A.  Yes.

24     Q.  So let's show D6 to you, the first page, and ask you if

25     this was prepared at your direction.  Was this prepared at your

1   direction?

2   A.  Yes, it was.  Sorry.

3   Q.  Does this purport to show the competitors at your level in

4   the steel industry?

5   A.  It does.

6        MR. BANDINI:  I move to display this and the remaining

7   ones in this series to the jury as a demonstrative.

8        THE COURT:  Any objection?

9        MR. RAMOS:  Yes, I do object, your Honor.

10       THE COURT:  Sustained.

11       MR. BANDINI:  All right.  We'll just talk through it.

12  Q.  Who manufactures -- let me back up.

13       Skyline competes with L.B. Foster; correct?

14  A.  Yes.

15  Q.  In what sense?  What does L.B. Foster do?

16  A.  L.B. Foster sells and distributes steel foundation

17  products.

18  Q.  Are there any other companies besides Skyline and L.B.

19  Foster that distribute and sell steel foundation parts?

20  A.  Yes.  There's a wide number of them, yeah.

21  Q.  I'm sorry?

22  A.  There's a large number of people competing with us, yes.

23  Q.  Okay.  All right.  Let's go above the level, the

24  distributor level.  Where does Skyline get the HZM product to

25  distribute?

GBTHSKY5                        De Mey - Direct

1   A.  Skyline buys its steel products from companies like

2   ArcelorMittal like we talked before, like Nucor like we

3   discussed before, and other steel mills.

4               THE COURT:  Counsel, can you take the slides down,

5   please.

6               MR. BANDINI:  Sure.  Take the slides down.

7               THE COURT:  Thank you.

8   Q.  You said it buys -- I'm sorry.  I had a problem hearing

9   you.  You say Skyline buys from ArcelorMittal?

10  A.  Yes.

11  Q.  We talked about them before.  And where are they located?

12  A.  They're located around the world, but we buy the product

13  from Luxembourg.

14  Q.  Luxembourg.

15              And where else did you say Skyline buys product from?

16  A.  From Nucor.

17  Q.  Okay.  What about your competitors?  Let's take L.B.

18  Foster.  Do you know where L.B. Foster obtains its products?

19  A.  Yes.

20  Q.  Where do they obtain its products from?

21  A.  They buy products from a company called Gerdau.

22  Q.  Can you spell that, please.

23  A.  G-e-r-d-a-u.

24  Q.  G-e-r-d-a-u?

25  A.  Yes.

GBTHSKY5                          De Mey - Direct

1   Q.  What is Gerdau?

2   A.  Gerdau is a Brazilian steel company with operations also in

3   the United States, and they buy from them, from Gerdau.

4   Q.  So what type of company is Gerdau?  Is it a distributor?

5   A.  No, it's a steel company.

6   Q.  It's a steel company like -- like ArcelorMittal?

7   A.  Like ArcelorMittal.

8   Q.  Like Nucor?

9   A.  Like Nucor.

10  Q.  Okay.  So there are steel companies and then there are

11  distributors?

12  A.  Yes.

13  Q.  Skyline's a distributor?

14  A.  Yes.

15  Q.  Now, we heard about PilePro.  Where does PilePro fit in

16  this market, if you know?

17  A.  PilePro supplies companies like L.B. Foster and its

18  competitors.

19  Q.  And what does, to your knowledge, PilePro supply?

20  A.  Mainly connectors.

21  Q.  Connectors?

22  A.  Yes.

23  Q.  Now, we've talked about the steel mills, the distributors,

24  PilePro.  Who does Skyline sell to?  Who are your customers?

25  A.  Our customers are contractors.

1    Q.  Contractors as in construction project contractors?

2    A.  Construction contractors, general contractors,

3    subcontractors.

4    Q.  In terms of who Skyline directs its business efforts to,

5    were there any particular types of individuals that you sell

6    to?

7    A.  Yeah.  We sell mainly to -- well, put it differently, our

8    product is being used in big foundation projects.  So these are

9    projects that the Department of Transportation wants to build,

10   like a new bridge or a new highway, or somebody who owns a port

11   and wants to build a new cay terminal for container vessels.

12   And we sell to the contractors that will -- that were the low

13   bidder for those jobs.  And so they need steel at some point,

14   and we will sell to those contractors.

15   Q.  What I'm getting at, you heard Mr. Ramos talk about highly

16   educated people.  You heard him talk about doctors and lawyers

17   and engineers.  Does Skyline market to doctors and lawyers?

18   A.  We do not sell to any doctor or any lawyer.

19   Q.  So you market to engineers; is that correct?

20   A.  Yeah, we sell to engineers and we -- yep.

21   Q.  Over the course of your job career, have you ever had

22   discussions with engineers about what factors they consider

23   important in deciding what combi wall system to buy?

24   A.  Absolutely, yes.

25            THE COURT:  All right.  We're actually going to take a

1    break there.

2              Ladies and gentlemen, it's 2:57.  I wanted to give

3    everybody a break, since otherwise it will be a long afternoon.

4    Why don't you go to the jury room -- you can stretch your legs,

5    use the facilities -- and be ready to go in, let's say, ten

6    minutes.

7              Couple reminders that you will hear me say over and

8    over throughout the case.  Number one, do not discuss the case.

9    You have heard only a little bit of the evidence, and, again,

10   you should not discuss the case with each other or anyone else,

11   for that matter until -- well, you shouldn't discuss it with

12   each other until your deliberations begin, and you shouldn't

13   discuss it with anyone else until after you have been

14   discharged as jurors.  So do not discuss the case.  Do not

15   communicate about the case in any way, shape, or form.  And not

16   that you could in the jury room, but don't do any research

17   about the case either.  And, finally, keep an open mind.

18             With that, please be ready to go in ten minutes, and

19   enjoy your break.  Thank you.

20             (Jury excused)

21             (Continued on next page)

22

23

24

25

1          (In open court)

2          THE COURT:  You may be seated.

3          Mr. De Mey, you may step down.

4          Now, two quick sort of housekeeping-ish or logistics

5     things.  One is I prefer that only one lawyer make objections.

6     So whichever lawyer is going to conduct the cross-examination,

7     that lawyer should make objections and only that lawyer should

8     make objections.

9          You can go around to your seat, Mr. De Mey.

10          Number two, since there's no objection, and I assume

11     both sides are going to use them, I don't have an objection in

12     principle to use of demonstratives.  I tend to be of the view

13     that it's better to actually admit exhibits, but in any event,

14     I certainly want the record to be clear as to what is being

15     used.  So I think that you may have referred to these as D and

16     then a number.  I hope, and assume, that that sort of system

17     will continue throughout the case.  I just want a record made

18     as to what you're showing so that for purposes of appeal, or

19     otherwise, it's apparent what's been shown.  So just keep that

20     in mind going forward.

21          With that, Mr. Bandini had wanted to raise an issue at

22     sidebar.  You want to raise that now or should we talk about it

23     later?

24          MR. BANDINI:  I can raise that now, your Honor.

25          (Continued on next page)

GBT7SKY6

1          MR. BADINI:  I can raise that now, your Honor.  While

2     we are on the issue of demonstratives though, I was a little

3     surprised by the objection to the corporate relationships,

4     because we met and conferred last night, and we were told there

5     was no objection.  In any event, I walked through it.

6          THE COURT:  All right.  I didn't think it was really

7     necessary in the sense that it wasn't technical testimony,

8     didn't really seem necessary to aid the jury in understanding

9     the testimony.  That was why I ruled as I did.  Had I been told

10    there was agreement to use them, I might have ruled

11    differently.  If you want to flag that in advance going

12    forward, you are welcome to do so, and then it might make

13    things go a little quicker.

14         MR. BADINI:  Sure.  But the more serious objection --

15    and I am of the view that I try not to object to openings while

16    they're happening -- but I believe that Mr. Ramos, whether

17    intentionally or not -- and I don't assume any ill will on his

18    part -- I believe walked over the line in a couple of instances

19    in violation of this court's order relating to spoliation in

20    this regard.  The court at docket 299, as you know, precluded

21    PilePro from arguing that, one --

22         THE COURT:  I know the ruling.  Tell me where you

23    think it crossed the line.

24         MR. BADINI:  Sure.  The ruling has two significant

25    parts.  One is --

GBT7SKY6

1          THE COURT:  Again, I know the ruling.  Tell me where
2     you think it crossed the line.
3          MR. BADINI:  OK.  One, he questioned whether engineers
4     would have made their decision -- or changed their decision --
5     based on the infringement warning, and the ruling of course
6     says questioning the effect.  And, two, with respect to the
7     volume of people or the number of people, he made an argument
8     relating to the Thanksgiving and Christmas period, and the
9     implication, as I took away from it, was how could many people
10    have been viewing it during that time period, which I believe
11    also crossed the line.
12         I am sorry.  One more point.  There was a reference to
13    how people were directed to the PilePro website in Skyline's
14    marketing materials, which I took as a suggestion that we were
15    implicitly encouraging people to see the lead times.
16         That reference, which was earlier on, was put on the
17    Skyline marketing materials as part of the settlement
18    agreement, and again that violated the discussion we had about
19    not referencing obligations under the settlement agreement.
20         THE COURT:  The reference in the marketing materials
21    to the website was pursuant to the former settlement agreement?
22         MR. BADINI:  The settlement agreement between Skyline
23    and PilePro said a couple of things, but in broad strokes
24    Skyline was to purchase its connectors from PilePro, and in
25    return it was to put them in its brochures in certain ways,

GBT7SKY6

1    including telling consumers how to get them.  And the way they

2    could get them was to go to the PilePro website.  So they were

3    there because we needed to give contact information to comply

4    with the settlement agreement.

5         THE COURT:  OK.  So what do you propose I do, or what

6    is the application?

7         MR. BADINI:  The application is for a curative

8    instruction.  I don't have one here, but we could draft one

9    overnight for the court's review.

10        THE COURT:  All right.  So why don't you draft one,

11   and then we can consider it in the context of a specific

12   proposal.  I think I had told you to perhaps draft one last

13   week and have it in your back pocket.

14        MR. BADINI:  Although I didn't know precisely what

15   would happen but, yes, point taken, your Honor.

16        THE COURT:  Understood.  I will decide whether it's

17   appropriate or necessary.  I certainly have the same reaction

18   in particular to the suggestion that few people would have

19   visited the website during the busy holiday period.  I thought

20   that struck me as the clearest case perhaps for crossing the

21   line of my ruling.  I think let's defer discussion until there

22   is a specific curative instruction on the table.  I may decide

23   not to give it at this point, but let this just be a little bit

24   of a warning to folks at the back table that I will certainly

25   police that ruling and make sure that it doesn't get crossed.

GBT7SKY6

1    And the jury has been told that what the lawyers say is not

2    evidence, and if evidence in later argument is not made on this

3    score, then it may just be that it's better to leave it as is,

4    but I will consider it when there is a curative instruction

5    proposed.  Anything else we have to take up?  Otherwise, I want

6    to give you a couple minutes before we resume.

7              MR. RAMOS:  Real quick, your Honor, and that is with

8    respect to objections.  I'm sorry, forgive me if I didn't catch

9    when you were giving the jury its initial instructions with

10   respect to what objections are and what their application is in

11   the case.  I don't know if the court has done that.

12             THE COURT:  I did.  I explained that to them, and if

13   you had listened, you would have heard that.  Anything else?

14   Be back in four minutes, and we will be ready to go.

15             (Recess)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Welcome back, ladies and gentlemen.  I

3    hope you had an enjoyable break.  We will continue with the

4    direct examination of Mr. De Mey.

5          Mr. De Mey, I remind you you are still under oath and

6    to speak slowly, clearly and wait for the question to finish.

7          Go ahead.

8          MR. BADINI:  Thank you, your Honor.

9    LAURENT DE MEY, resumed.

10   DIRECT EXAMINATION (Continued)

11   BY MR. BADINI:

12   Q.  Welcome back, Mr. De Mey.  I believe that the question we

13   left off on before the break, just to put you back in the

14   context, was whether in the course of your career you had

15   discussions with engineers about the factors they considered in

16   deciding which sheet pile product to purchase.  Do you remember

17   that question?

18   A.  I do.

19   Q.  And can you remind us of your answer?

20   A.  Yes, my answer was yes.

21   Q.  OK.  How many such discussions have you had?

22   A.  Multiple, tens and tens of conversations.

23   Q.  In what context were those discussions?

24   A.  In the context of selling or promoting our product to the

25   engineering community.

GBT7SKY6                            De Mey - direct

 1   Q.  OK.  And during those discussions, did you come to learn

 2   from the engineers, did they tell you, in other words, what

 3   factors they considered important in choosing a sheet pile

 4   product?

 5   A.  Yes.

 6   Q.  Which factors?

 7   A.  The main factor is availability, knowing when the material

 8   will be available.

 9            MS. GHAVIMI:  Objection.  Hearsay, your Honor.

10            THE COURT:  Overruled.

11   A.  And the second factor is obviously its technical

12   specificities, what it can do, how it is made, what the weight

13   would be, what the steel grades would be, the details of the

14   product.

15   Q.  And in those discussions when the issue of availability

16   came up, did they tell you what they meant by availability?

17   A.  Yes.

18   Q.  What did they tell you?

19   A.  When an engineer designs a technical solution to a

20   technical problem, they will want to be absolutely certain that

21   the product that is specified will be available in the market

22   when the project actually goes into execution.  They want to

23   know whether the product will be there and exists and will be

24   available for somebody to use.

25   Q.  Did they tell you why that was important to them?

1  A.  Well, of course your reputation would be a problem.  If

2  they design something that is not available, it means that they

3  don't know what the market is.

4        Second of all, it takes a lot of time and a lot of

5  money to design projects, and once a project goes into

6  execution there is not much time left to really finish a job,

7  and, therefore, they really do not want to be confronted with a

8  situation in which the material would not be there, and

9  therefore redesign would have to take place and possible

10 consequences to delay the start of the project.

11 Q.  Has Skyline ever lost a job based on availability or timing

12 issues?

13 A.  Yes, sure we have.

14 Q.  Are you familiar with the concept of lead times?

15 A.  Yes.

16 Q.  What does that mean to you?

17 A.  The lead time is the time necessary between ordering the

18 steel or signing a contract to order the steel and the actual

19 delivery to the job site.

20 Q.  And based on the size of the job and the requirements of

21 the customer, are you able to quote as a company the expected

22 lead times for the product they want?

23 A.  Yes, we are.

24 Q.  Has Skyline ever altered its lead times based on

25 extraordinary circumstances?

1    A.   Absolutely.

2    Q.   And can you think of any examples when that has happened?

3    A.   Yes.  So, everybody remembers Super Storm Sandy, in this

4    area for sure.  Well, based on examples like this, like natural

5    catastrophes, we will change any possible production schedules

6    we have, or try to accelerate production schedules with some of

7    our suppliers to be able to deliver material quickly.  We had

8    the same thing happen during the Katrina hurricane.  There has

9    been a huge need for steel, a very quick notice.  People were

10   under water and steel was necessary to kind of protect them or

11   protect existing buildings, and we changed production schedule

12   both in our own facilities as well as our upstream partners,

13   people making steel for us.

14   Q.   So, let's shift gears a little bit and talk about another

15   subject.  Did Skyline ever learn of any letters that PilePro

16   sent to Skyline customers about the HZM system?

17   A.   Yes.

18   Q.   Did you ever hear of such a letter that went to John

19   Madonna Construction Company?

20   A.   Yes.

21   Q.   What is John Madonna Construction Company?

22   A.   John Madonna is a contractor based on the West Coast, and

23   he is a customer of ours.

24   Q.   How did Skyline learn of that letter from PilePro to John

25   Madonna Construction Company?

GBT7SKY6                          De Mey - direct

1    A.  Well, Mr. Madonna sent a letter to our office that we have

2    in Sacramento complaining about the fact that he had received a

3    letter from PilePro.

4    Q.  Let me show you what we have premarked as Plaintiff's

5    Exhibit 280, two-eight-zero.  Can you identify this for the

6    record?

7    A.  Yes.

8    Q.  What is it?

9    A.  It is a letter from John Madonna to somebody called Matt

10   McLauglin who worked in our Sacramento California office.

11   Q.  When you say a letter, do you mean --

12   A.  An e-mail, and there is an attachment here too.

13   Q.  And what is the attachment?

14   A.  The attachment is a letter from the PilePro group to John

15   Madonna Construction on November 1, 2013, signed by Mr. Wendt.

16   Q.  And did you receive a copy of this cover e-mail and the

17   letter and the attachment to the letter at or about the time it

18   was sent to Skyline by Mr. Madonna on November 11, 2013?

19   A.  Yes, I did.

20           MR. BADINI:  I move to admit 280 and publish it to the

21   jury.

22           THE COURT:  Any objection?

23           MS. GHAVIMI:  No objection.

24           THE COURT:  Admitted.

25           (Plaintiff's Exhibit 280 received in evidence)

1           MR. BADINI:  Thank you, your Honor.

2    Q.  So, let's -- let's start with the -- well, let's start with

3    the cover page.  Is this the e-mail you talked about from

4    Mr. Madonna?

5    A.  Yes, I did.

6    Q.  And let's go to the attachment, and then we will circle

7    back to the e-mail.  So, let's look at the next page.  Is this

8    the PilePro letter?

9    A.  That is the PilePro letter, yes.

10   Q.  And where was it sent?

11   A.  It was sent to John Madonna Construction in California.

12   Q.  OK.  If you look at the subject line of the letter, can you

13   read that into the record, please.

14   A.  It's called Bradley Canyon Levee Extension, Santa Maria

15   River and Tributaries.

16   Q.  Do you know what that is a reference to?

17   A.  That is a reference to a job that we supplied material to

18   John Madonna.

19   Q.  Near the bottom, do you know who signed the letter on

20   behalf of PilePro?

21   A.  Yes.

22   Q.  Who signed it?

23   A.  Mr. Wendt.

24   Q.  And do you know who Rob Wendt is?

25   A.  I do.

1  Q.  OK.  So, let's look at the text of the letter.  In the

2  first paragraph, can you read that into the record, please.

3  A.  "Dear Sirs:  It has come to our attention that an imported

4  HZM wall system supplied by Skyline Steel, Inc. may be

5  contemplated for use in connection with the above referenced

6  construction project."

7  Q.  OK.  Now the second paragraph, please.

8  A.  "The United States Patent and Trademark Office has issued a

9  patent to PilePro, LLC that covers the wall system method being

10 sold by Skyline Steel and other third parties under the HZM

11 name.  For your convenience and review, I am attaching a copy

12 of our patent."

13 Q.  And the third paragraph, please.

14 A.  "We are also attaching the original specifications using

15 steel made and manufactured in the United States by Gerdau and

16 PilePro.  Should you wish to allow the supply of the originally

17 specified products, they are readily available."

18 Q.  At the time that you saw this, did you have an

19 understanding of what Mr. Wendt meant by that paragraph?

20 A.  Yes.

21 Q.  What was that understanding?

22 A.  He meant to replace the HZM products that we had supplied

23 or were supplying by another solution that he would supply.

24 Q.  OK.  Now let's look at the fourth paragraph of his letter.

25 Can you read that into the record.

GBT7SKY6                          De Mey - direct

1    A.  "This letter places you on notice of PilePro's patent

2    rights and constitutes a warning to you that PilePro will seek

3    to hold all parties participating in the project liable for any

4    damages to which it may be entitled in the event a wall system,

5    components or method that infringes PilePro's patents is

6    installed or otherwise used in this project."

7    Q.  OK.  Now let's turn back to the cover e-mail from

8    Mr. Madonna to the Skyline sales manager Mr. McLauglin.  What

9    did you understand Mr. Madonna to be asking for from Skyline?

10   A.  He is asking for indemnification of liability of a

11   potential lawsuit that may come from us using this product.

12   Q.  Now let's look in particular at the fourth paragraph.

13              Can we blow that up?

14              Can you read the first sentence, please.

15   A.  "I must add emphasis on the fact that we have delivery of

16   the steel and have been installing the combi wall."

17   Q.  Did you attach any particular significance to that

18   statement by Mr. McLauglin?

19   A.  Absolutely.

20   Q.  What significance did you attach to it?

21   A.  The fact that we already delivered material and that some

22   of it was already driven in the ground or had been installed,

23   as he says.

24   Q.  So, did you consider it a possibility that you might have

25   to pay Mr. Madonna to rip up that combi wall and pay for that?

GBT7SKY6                    De Mey - direct

1   A.   Absolutely.

2   Q.   How much would that have cost?

3   A.   Hundreds of thousands, maybe millions.

4   Q.   Of dollars?

5   A.   Of dollars, yes.

6   Q.   Certainly more than $5,000, correct?

7   A.   Definitely more than $5,000.

8          MS. GHAVIMI:  Objection, your Honor.  It assumes facts

9   not in evidence.

10         THE COURT:  Overruled.

11  Q.   So, at the time you received this letter from Mr. Madonna

12  in what you call this request for indemnification, did you know

13  whether or not you would have to rip out the combi wall?

14  A.   No, not at all, we did not know.

15  Q.   What if anything did Skyline do in response to receiving

16  this e-mail from Mr. Madonna?

17  A.   Well, he was asking to be getting an answer within 24

18  hours, of us covering his liability, which is what we did, by

19  offering him better indemnification.

20         THE COURT:  Can you explain what you mean by

21  indemnification?

22         THE WITNESS:  Well, we would indemnify him for his

23  possible lawyers fees, possible legal costs, possible rip out

24  of the material and reinstalling the wall, to all possible

25  consequences of this being a possible infringement of this

1   patent.

2           THE COURT:  By indemnification you mean an agreement

3   whereby Skyline would agree to cover any costs that are

4   connected to this matter that would otherwise have been

5   incurred by the Madonna company; is that correct?

6           THE WITNESS:  Yes, your Honor.

7           THE COURT:  OK.

8   Q.  And did you agree to give him that indemnification or

9   promise?

10  A.  We did.

11  Q.  OK.  Take a look at what we've marked as Exhibit 275.  Can

12  you identify this document for the record.

13  A.  Yes.

14  Q.  What is it?

15  A.  It's an indemnification agreement from Skyline towards John

16  Madonna Construction.

17  Q.  OK.  Are those -- is that your signature on the last page?

18  A.  That is my signature, yes.

19  Q.  And are those your initials on the first two pages?

20  A.  Yes.

21          MR. BADINI:  Move to admit Exhibit 275 and ask

22  permission to publish it to the jury.

23          THE COURT:  Any objection?

24          MS. GHAVIMI:  No objection.

25          THE COURT:  Admitted.

1              (Plaintiff's Exhibit 275 in evidence)

2    Q.  Take a look at the first page under number one,

3    indemnification.  Can you just read -- you don't have to read

4    the whole paragraph, but can you read the first few lines, "In

5    the event ... "

6    A.  "In the event any claim, suit, or cause of action alleging

7    to infringement of patents is filed against a party

8    (Indemnitee)..."

9    Q.  Let me stop you there, because it goes on for a long time.

10   Did you understand that -- what did you understand this letter

11   agreement -- let me rephrase that.  What did you understand

12   this indemnification document to obligate Skyline to do?

13   A.  It would obligate Skyline in case there would be any legal

14   action from PilePro to John Madonna Construction, that Skyline

15   would cover everything, going from legal fees, to defense fees,

16   to even possible consequences like tearing apart the entire

17   wall and starting over.

18   Q.  And did you send this indemnification agreement in this

19   form with your signature to Mr. Madonna?

20   A.  Yes, we did.

21   Q.  You will see on the last page there is no signature by

22   Mr. Madonna on this document.

23   A.  I see it.

24   Q.  Did you view that as in any way diminishing what you viewed

25   as your obligations to Mr. Madonna?

GBT7SKY6                          De Mey – direct

1   A.  No.

2   Q.  OK.  Was there anything else Mr. Madonna asked of Skyline

3   as a result of receiving PilePro's letter?  So, for example,

4   did they ask you to pay his legal fees?

5   A.  Yeah, sure, they asked us to pay their legal fees.

6   Q.  And did Skyline do so?

7   A.  We did.

8   Q.  Let's shift gears again.  Putting aside the letters or the

9   letter to Mr. Madonna, do you know whether PilePro maintains a

10  website?

11  A.  Yes, PilePro does.

12  Q.  Have you ever visited the PilePro website?

13  A.  I have.

14  Q.  Are you aware of the infringement accusation that PilePro

15  made on its website?

16  A.  I am.

17  Q.  Let me show you what we have premarked as Plaintiff's

18  Exhibit 19 and ask you whether you are familiar with this.

19  A.  Yes.

20  Q.  What is this?

21  A.  This is a page from the iSheetPile.com website, that this

22  describes a product that we called the HZM.  That describes

23  something that we sell.  But there is a warning on top here

24  that is very visible.

25  Q.  Don't read the warning.

GBT7SKY6                        De Mey - direct

1    A.  There was a warning.

2    Q.  Move to enter Exhibit 19 into evidence and publish to the

3    jury.

4            THE COURT:  Can we get a timeframe, Mr. Badini?

5            MR. BADINI:  Sure.

6    Q.  Do you know when this warning was posted by PilePro on the

7    website, approximately?

8    A.  Approximately, yeah.  At the time of our -- at the time we

9    had this discussion, two or three years ago.

10   Q.  Is this a screen shot?

11   A.  Oh, that could be wrong.

12           THE COURT:  Is this a screen shot from the website?

13           THE WITNESS:  Yes, your Honor.

14           THE COURT:  And do you know when this screen shot was

15   taken?

16           THE WITNESS:  A couple months ago, two or three months

17   ago.  I don't know.

18   Q.  Do you know -- let me rephrase.  Do you know when the

19   infringement accusation was posted by PilePro on the website?

20   A.  Yeah.  In -- sorry.  I think it's 2013 we had our original

21   discussion.

22           THE COURT:  You can't let your voice trail off,

23   because then nobody can understand the last words that you say.

24   So, you say you recall the infringement accusation being on the

25   website in 2013.

1          THE WITNESS:  I think it was, yes.

2          THE COURT:  OK, next question.

3          MR. BADINI:  Just same motion to admit and publish.

4          THE COURT:  All right.  Any objection?

5          MS. GHAVIMI:  No objection, your Honor.

6          THE COURT:  Admitted.

7          (Plaintiff's Exhibit 19 received in evidence)

8   Q.  Do you have it in front of you now Mr. De Mey?

9   A.  I do.

10  Q.  Can you please for the benefit of the jury read the warning

11  into the record.

12  A.  "Warning:  This product infringes a U.S. patent owned by

13  PilePro LLC.  Click here to view the patent.  If you would like

14  more details and to use this patented system, please e-mail

15  info at PilePro.com or call 866-666-74883."

16  Q.  Now, what products are depicted on that page?  And maybe we

17  can take off the -- yeah, thank you.  Take off the -- what

18  products are depicted on that page?

19  A.  This is the HZM system, and its individual components.

20          THE COURT:  Just again, to get the timeframe, your

21  recollection and understanding is that the infringement warning

22  was posted sometime in 2013?

23          THE WITNESS:  Yes.

24          THE COURT:  And have you been to the website since

25  2013?

GBT7SKY6                         De Mey - direct

 1                THE WITNESS:  I have.

 2                THE COURT:  And is the infringement warning still

 3     there?

 4                THE WITNESS:  No, no.

 5                THE COURT:  So this screen shot, do you know when it

 6     was created, since the infringement warning is there?

 7                THE WITNESS:  I don't know.  I don't.

 8                THE COURT:  Does this accurately reflect what the web

 9     page looked like in the period in 2013 that you are describing?

10                THE WITNESS:  Looks like it, yes.

11                THE COURT:  OK, go on.

12                MR. BADINI:  Thank you, your Honor.

13     Q.  So you said you have visited the website since then?

14     A.  Yes, I have.

15     Q.  When is the most recent time you visited the PilePro

16     website?

17     A.  Last week.

18     Q.  Last week?

19     A.  Yes.

20     Q.  In the visits to the website, have you seen whether the

21     PilePro uses the HZM trademark on its website?

22     A.  Yes, it does.

23     Q.  Does it publish what we've called lead times for HZM

24     products?

25     A.  Yes, it does.

1  Q.  Did Skyline ever provide this lead time information to

2  PilePro to publish on the website?

3  A.  No.

4  Q.  Do you know where PilePro got it?

5  A.  I have no idea.

6  Q.  Did you take a look at the precise lead times that were

7  shown for Skyline products?

8  A.  Yes, there are a couple.

9  Q.  Based on your experience were they accurate?

10 A.  No, I don't think they are.

11 Q.  Were they some sort of an average of Skyline's lead times?

12 A.  No.

13 Q.  OK.  Let's take a look at another exhibit, 573.  Can you

14 identify this for the record?

15 A.  Yes, I can.

16 Q.  And what is it?

17 A.  It is a page from iSheetPile.com.

18 Q.  And have you seen this page on your visits to the website?

19 A.  Yes.

20         MR. BADINI:  Move to admit and publish 573.

21         MS. GHAVIMI:  No objection.

22         THE COURT:  Admitted.

23         (Plaintiff's Exhibit 573 received in evidence)

24 Q.  Now that the jury is looking at it, can you tell us what is

25 shown in the middle of the page of this screen shot?

GBT7SKY6                        De Mey - direct

1    A.  In the middle of the page you see something called "or find

2    a sheet pile section."

3    Q.  And beneath that, what are those things that are listed?

4    What are those?

5    A.  So all of these names that you see, an exact VZ22 or VZ13,

6    or VZ27 and so forth, are all different types of sheet pile

7    products.

8    Q.  And do those include some of Skyline's sheet pile products?

9    A.  Yes, absolutely.

10   Q.  For example, which ones in that list?

11   A.  VZ22, ZV26, 40, and so on.  HZM also.

12   Q.  And based on your visit, do you know what happens when you

13   click on one of those links?

14   A.  So when you click on those, the page will describe in

15   detail this one solution you picked, will describe its

16   technical specifications.  It will also offer a number of

17   competing solutions to the one that you just clicked; will

18   describe the other solutions and their specificities.

19   Q.  All right.  So let's take a look at an example.  Let's look

20   at Exhibit 574.  Can you identify this for the jury.

21   A.  Yes, I can.

22   Q.  What is this?

23   A.  It is the detail page that will appear if you click on the

24   HZM 1180 solution.

25   Q.  And that's a Skyline product.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

GBT7SKY6                      De Mey – direct

1    A.  That is a Skyline product.

2              MR. BADINI:  Offer 574 and permission to publish,

3    please.

4              MS. GHAVIMI:  No objection.

5              THE COURT:  Admitted.

6              (Plaintiff's Exhibit 574 received in evidence)

7    Q.  Now take a look at the picture.  This is a Skyline product,

8    correct?

9    A.  Yes, sir.

10   Q.  Now, this exhibit has two pages because of the size of the

11   page.  If you look at the first page, at the bottom right, you

12   see that the red bar there?

13   A.  Yes.

14   Q.  Can you read what is in the top red bar?

15   A.  Yes, I can.

16   Q.  What does it say?

17   A.  Request a Quote.

18   Q.  Have you tried -- when you visited the website, did you

19   click on that button?

20   A.  Yes, I did.

21   Q.  And what happened?

22   A.  It goes to another page that describes who to contact at

23   PilePro for more information or quote or sales of this product.

24             THE COURT:  And once again can you just tell me do

25   these screen shots, Exhibit 573 and 574, does this reflect what

1    the website looked like last week when you visited it?

2             THE WITNESS:  Yes, sir.

3             THE COURT:  OK.

4    Q.  And to your knowledge, has anyone ever gotten directed to

5    Skyline by pressing Request a Quote on the PilePro website?

6    A.  Not to my knowledge.

7    Q.  OK.  Now, take a look at the second half of the page, or

8    the second page in the printout of this web page.  What appears

9    on that half of the page?

10   A.  So here on the left-hand side appears the alternative

11   solutions to the original one that we just clicked.  So again

12   if you click on one solution, on the bottom of the page will

13   appear other possible technical solutions that have equivalent

14   metrics.

15   Q.  And do you see anywhere on that list any of the Skyline HZM

16   system products?

17   A.  Yes.

18   Q.  OK.  Where are they?

19   A.  So, the yellow one, which is highlighted here, but also on

20   the actual website, shows the original solution which was

21   clicked.  So in this case it was the HZM 1180M, and it compares

22   that to the other solutions that are technically at least

23   equivalent.

24   Q.  And do you see there is a column at the top that's called

25   "available".  Do you see that?

GBT7SKY6                          De Mey - direct

 1    A.   Yes.

 2    Q.   Under that, what is listed for that Skyline product?

 3    A.   So for this particular Skyline product it says 16 weeks.

 4    Q.   And what did you understand that to mean?

 5    A.   I understand that to be the lead time, which is the

 6    delivery time needed between order and final delivery, 16 weeks

 7    in this case.

 8    Q.   And is that an accurate representation of what the lead

 9    time is for that Skyline product?

10    A.   No, it's not.

11    Q.   Based on your experience, what is the lead time for that

12    Skyline product?

13    A.   Lead sometimes vary, and we could deliver this material in

14    eight weeks, between eight and 12 weeks.  I would say it

15    depends on the specificities of the quantity, the length of the

16    material, the urgency of the job as.  As I described before,

17    for urgency matters we could do it much quicker if need be.  So

18    the timing is variable.  16 weeks is too long.

19    Q.   Let's go back to the first page.  Do you see there is some

20    fine print at the bottom of that page?

21    A.   I do.

22    Q.   Maybe we can blow it up.  Take a look in particular at the

23    third sentence beginning with the word "information".  Do you

24    see that?

25    A.   Yes.

GBT7SKY6                           De Mey - direct

1    Q.  Can you read that to the jury, please.

2    A.  "Information is taken from the latest known manufacturer

3    catalogs and websites."

4    Q.  OK.  Are you aware of any Skyline product catalogs that

5    contain lead time information?

6    A.  No.

7    Q.  Are you aware of -- does Skyline maintain a website?

8    A.  We do.

9    Q.  Are you aware of anywhere on the Skyline website where

10   Skyline lead time information is published?

11   A.  No, we don't publish lead times.

12   Q.  How about ArcelorMittal, are you aware of any ArcelorMIttal

13   catalog where lead time information is published for the HZM

14   products?

15   A.  No, ArcelorMittal does not publish lead times.

16   Q.  Does ArcelorMittal maintain a website?

17   A.  Yes.

18   Q.  Are you aware of anywhere on their website where lead time

19   information is published for their products?

20   A.  No.

21   Q.  Now let's look at another exhibit, 575.  Can you identify

22   this one for the record?

23   A.  Yes, I can.

24   Q.  What is this?

25   A.  This is the HZM 1180 MD-14 on the iSheetPile website.

GBT7SKY6                          De Mey - direct

1    Q.   That's the PilePro website?

2    A.   Yes.

3    Q.   How does this differ from the one we just looked at?

4    A.   This one has a different intermediate sheet file section,

5    so in this case it's an AZ 1470, as you can see.  And the

6    former one was AZ 19-700.  It's a different intermediate sheet

7    level.

8    Q.   And is this a screen shot of what you viewed when you

9    visited the PilePro website last week?

10   A.   Yes.

11        MR. BADINI:  Move to admit 576 and offer -- I'm

12   sorry -- and permission to publish it to the jury.

13        THE COURT:  I think it was 575.

14        MR. BADINI:  575.  I stand corrected, your Honor.

15        THE COURT:  Any objection?

16        MS. GHAVIMI:  No objection.

17        THE COURT:  Admitted.

18        (Plaintiff's Exhibit 575 received in evidence)

19   Q.   OK.  Do you see on the second page what availability is

20   published for this HZM product?

21   A.   Yes, I do.

22   Q.   What is the lead time published for that product?

23   A.   It's also 16 weeks.

24   Q.   Is it accurate for this product?

25   A.   No.

1   Q.  OK.  Now let's take a look at 576.  Sorry I was jumping

2   ahead.  Can you identify -- oh, I'm sorry.  Before we go to

3   576, staying on 575.  Does that also have the Request a Quote

4   button on that page?

5   A.  Yes, it does.

6   Q.  Now let's go to 576.  Can you identify this one for the

7   record?

8   A.  So this is another page of the iSheetPile.com website,

9   PilePro's website in which the detail of a product or a

10  solution is shown, in this case the HZM 1180 MD-24/AZ19.

11  Q.  And did you view this page in forms shown on 576 when you

12  visited last week?

13  A.  Yes.

14          MR. BADINI:  Move to admit 576, and permission to

15  publish to the jury.

16          THE COURT:  Any objection?

17          MS. GHAVIMI:  No objection.

18          THE COURT:  Admitted.

19          (Plaintiff's Exhibit 576 received in evidence)

20  Q.  And again look at the lead times published for this HZM

21  system on that page.  What is that?

22  A.  Again, 16 weeks.

23  Q.  Is that accurate?

24  A.  No.

25  Q.  All right.  Let's look at 577.  Can you identify that for

GBT7SKY6                          De Mey – direct

1    the jury.

2    A.  Yes, I can.

3    Q.  And what is that?

4    A.  It's again a page from the iSheetPile.com website

5    describing the detailed technical specifications of a product,

6    in this case HZM 1180 MD-26 and intermediate sheet pile

7    AZ26-700.

8    Q.  Did you view that page, substantially this form, when you

9    went to the website last week?

10   A.  Yes.

11            MR. BADINI:  Move to admit and publish 577.

12            MS. GHAVIMI:  No objection.

13            THE COURT:  Admitted.

14            (Plaintiff's Exhibit 577 received in evidence)

15   Q.  Now, does that show the lead times for this Skyline

16   product?

17   A.  It does.

18   Q.  And what is that?

19   A.  16 weeks.

20   Q.  Is that accurate?

21   A.  No.

22   Q.  And does that also include a Request a Quote?

23   A.  It does.

24   Q.  So I don't have to keep asking you, on every page that you

25   visited of these products, did those pages include a Request a

1   Quote button?

2   A.  Every page does or did.

3   Q.  Now let's look at Exhibit 579.  Can you identify this

4   document for the record.

5   A.  It's another page from iSheetPile.com which describes one

6   specific product and its technical details.  This product is

7   the AZ 36-7010M.

8   Q.  Is this Exhibit 579 a picture of what you saw when you

9   visited the website last week?

10  A.  Yes.

11          MR. BADINI:  Move to admit 579 and publish to the

12  jury.

13          MS. GHAVIMI:  No objection.

14          THE COURT:  Admitted.

15          (Plaintiff's Exhibit 579 received in evidence)

16  Q.  Now, if you look at the picture on the first page, how does

17  this product differ, if at all, from the products we have just

18  been looking back in terms of screen shots?

19  A.  This product is just sheet piles; it's not an HZM solution.

20  In other words, it's not a king pile, the connector and sheet

21  pile; it's only sheet piles.

22  Q.  And it's one particular kind of AZ pile, correct?

23  A.  Yes.

24  Q.  The last exhibit we looked at, 577, can you look at that

25  for a second, maybe the cover page.  If you could put that up.

GBT7SKY6                          De Mey - direct

1   Do you see where it says HZM 1180 MD-26/AZ 26-700?

2   A.  Yes.

3   Q.  Sorry.  That was a mouthful.  But let's talk about the part

4   after the slash, AZ 26-700.  Do you know what that is?

5   A.  Yes.

6   Q.  What is that?

7   A.  It's an AZ sheet pile.

8   Q.  So is that sold only as part of the HZM system?

9   A.  No.

10  Q.  Is it also sold alone?

11  A.  Yes.

12  Q.  Did you visit -- does the PilePro website have a page for

13  that sheet pile, the AZ 26-700?

14  A.  Yes.

15  Q.  Did you visit that website last week?

16  A.  Yes.

17  Q.  That web page, I meant.

18  A.  Web page, yes, on this AZ 26-700, yes.

19  Q.  What lead time did the website report for that page?

20  A.  It says four weeks.

21  Q.  Is that accurate?

22  A.  No.

23  Q.  Why not?

24  A.  Because we have them in stock right now, available right

25  here for delivery tomorrow if need be.

GBT7SKY6                        De Mey - direct

1   Q.  Did PilePro list on that page any products that were

2   competitive with the AZ 26-700?

3   A.  Yes.

4   Q.  Can you give me an example?

5   A.  The PZC 26.

6   Q.  PZC?

7   A.  Yes.

8   Q.  Who makes the PZC 26?

9   A.  The PZC 26 is a product made by Gerdau.

10  Q.  Is that that steel company you talked about earlier?

11  A.  It is the Brazilian steel company we talked about before,

12  yes.

13  Q.  What lead time did PilePro list for that product?

14  A.  Two weeks.

15  Q.  Do you have any basis to assess whether that is accurate or

16  not?

17          MS. GHAVIMI:  Objection.  Lack of knowledge.

18          THE COURT:  Overruled.  Just yes or no.

19  A.  Yes.

20  Q.  And what basis -- without telling me first whether it's

21  accurate or not, what basis do you have for assessing the

22  accuracy or inaccuracy of that statement?

23  A.  Well, that's my job.  I am in charge of a steel company

24  that sells this product every day, so I should know what our

25  competitors do on a daily basis.  I wouldn't be running the

GBT7SKY6                           De Mey - direct

1    company well.

2    Q.  Let me ask a follow-up question.  And in that connection,

3    have you gotten access to the information about your

4    competitors' availability and supply schedules?

5    A.  Yes.

6    Q.  Based on that experience, do you know whether that lead

7    time published with respect to the Gerdau product is accurate

8    or not?

9               MS. GHAVIMI:  Objection.  Lack of personal knowledge.

10              THE COURT:  Sustained.

11   Q.  Are you familiar with another Skyline product known as the

12   SKZ 31?

13   A.  Yes.

14   Q.  What is that?

15   A.  SKZ 31 is a cold formed sheetrock pile.

16   Q.  And how, if at all, does that differ from the process you

17   described as hot rolling?

18   A.  A cold rolling process is in which you take a piece of flat

19   steel and at room temperature, which we call cold rolling, you

20   will roll a piece of steel through a number of rolls and create

21   a shape, also like a Z shape, similar to the hydro sheets,

22   except the interlock is slightly different; it's not as

23   perfect.

24   Q.  Did you observe that product on the PilePro website last

25   week?

GBT7SKY6                      De Mey - direct

1   A.  Yes.

2   Q.  What lead time was listed for that product?

3   A.  Eight weeks.

4   Q.  Was that accurate?

5   A.  No.

6   Q.  Why not?

7   A.  Several reasons.  We have SKZ 31 in stock, and if somebody

8   were to need something that we don't have in stock, we have raw

9   material in stock to be able to make it on demand in a couple

10  days.

11  Q.  Are you familiar with a product that is called the

12  Shoreline MSZ 19?

13  A.  Yes.

14  Q.  What is that product?

15  A.  It's also a cold form sheet pile produced by one of our

16  competitors called Shoreline.

17  Q.  Did you observe that lead time on PilePro's website?

18          MS. GHAVIMI:  Objection, your Honor.  Relevance.

19          THE COURT:  Overruled.

20  A.  Yes.

21  Q.  What was it listed as?

22  A.  I believe it's four weeks.

23  Q.  And do you have any basis to know whether or not that is

24  accurate?

25          THE COURT:  Yes or no.

GBT7SKY6                          De Mey – direct

1    A.  I have no basis if it's accurate or not.

2              THE COURT:  Just yes or no.

3    A.  No.

4    Q.  Did you observe on the PilePro website products called O

5    pipe products?

6    A.  Yes.

7    Q.  Do you know what those are?

8    A.  Yes.

9    Q.  What kind of products are those?

10   A.  That is a pipe wall, a continuous wall of pipe that are put

11   together through a specific type of interlock.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

GBTHSKY7                          De Mey - Direct

1    BY MR. BANDINI:

2    Q.  Do you know whether PilePro promotes those O-Pile products?

3    A.  Yes, PilePro does.

4    Q.  Did you see whether the Web site published lead times for

5    those products?

6    A.  Yes.

7    Q.  Do you consider those products to be competitive with

8    Skyline's combination wall systems?

9    A.  They compete with Skyline's product, yeah.

10   Q.  Are you familiar with a particular O-Pile product known as

11   the 2307 O-Pile product?

12   A.  Yes.

13             MS. GHAVIMI:  Objection, your Honor.  Relevance.

14             THE COURT:  Overruled.

15   A.  Yes.

16   Q.  What do you know about that product?

17   A.  It's an O-Pile.  So it's a pipe combined with a special

18   interlock of a certain diameter and a certain wall thickness

19   combination.

20   Q.  Did you observe a lead time reported by PilePro for that

21   product on its Web site?

22   A.  Yes.

23   Q.  What was it?

24   A.  Four weeks.

25   Q.  Was that accurate?

1          MS. GHAVIMI:  Objection, your Honor.  Lack of personal

2    knowledge.

3          THE COURT:  Sustained.

4    Q.  Do you have any basis -- let me rephrase.

5          Do you have any basis for determining whether or not

6    that lead time is accurate?

7    A.  Yes.

8    Q.  What is your basis?

9    A.  I have -- first of all, I'm in this business every day.

10   Second of all, I have run operations that make pipe, and this

11   would require pipe to be produced, which means raw material has

12   to be bought from a steel mill, which takes time.  Then the

13   pipe has to be produced and the interlock has to be welded to

14   the pipe, all which takes much more time than four weeks.  My

15   personal experience tells me this.

16   Q.  Are lead times related to the size of the job?

17   A.  Absolutely.

18   Q.  In what way?

19   A.  You may have inventory available for smaller jobs; and,

20   therefore, the lead times can be very, very short.  For bigger

21   jobs, you may not have everything that is needed for this one

22   job; and, therefore, you may have to order from a steel mill

23   and wait.  So lead times are very dependent on the size of the

24   actual job or the volume of material you need for it.

25   Q.  Has Skyline, to your knowledge, ever complained to PilePro

GBTHSKY7                          De Mey - Direct

1   that PilePro is posting what you viewed as inaccurate lead

2   times for your products?

3   A.  Yes, we have.

4   Q.  Were you involved in any such complaints?

5   A.  Yes.  We have had several conversations with PilePro for

6   that, yeah.

7   Q.  What was said?

8   A.  Well, we asked PilePro to not post any lead times and also

9   to take out our products from this list.

10  Q.  What -- who, in particular, at PilePro were these

11  conversations with?

12  A.  With Mr. Wendt.

13  Q.  And what did PilePro do in response to that?

14  A.  Nothing.  Nothing.

15  Q.  Now, we talked a little bit about the request-to-quote

16  button.  I only have a couple more questions about that.

17          You said -- I think you read -- I'm sorry.  You didn't

18  read.  You said that something popped up with respect to

19  PilePro when you clicked on "request to quote"?

20  A.  Yes.

21  Q.  Is that right?

22  A.  Yes.

23  Q.  Was there a phone number there?

24  A.  There was a phone number, yes.

25  Q.  Was that a Skyline phone number?

1   A.   No, sir.

2   Q.   Okay.  Is PilePro authorized to quote any Skyline product?

3   A.   No.

4   Q.   Is PilePro authorized to sell any Skyline product?

5   A.   No.

6   Q.   Did Skyline ever complain to PilePro with respect to the

7   request-to-quote button?

8   A.   Yes.

9   Q.   What was the complaint?

10  A.   We asked to take it out.

11  Q.   What was PilePro's response?

12  A.   No answer.  No was the answer.

13          THE COURT:  I'm sorry.  Say that again.

14          THE WITNESS:  They said no or didn't do it.

15  Q.   Have the -- how have the posting of these lead times

16  affected Skyline?

17  A.   We believe it has, yes.

18  Q.   In what way?

19  A.   Engineers will look at those lead times to make a decision,

20  as I explained before, whether a job should be designed in one

21  product or another.  And by posting Skyline's lead time, in all

22  the examples we saw, in a negative light compared to any other

23  solution, we believe that engineers would have changed their

24  minds and therefore maybe preferred other products ahead of

25  Skyline's products.

1   Q.  Does Skyline believe that the request to quote has impacted

2   Skyline?

3   A.  Yes, we believe that because of the fact that the request

4   to quote did not divert any of these requests towards Skyline

5   but towards PilePro.  PilePro could easily talk to that

6   customer and try to convert him into using a PilePro-preferred

7   type solution, away from our solutions.

8               MR. BANDINI:  No further questions at this time.  Your

9   witness.

10              THE COURT:  Cross-examination.

11              MS. GHAVIMI:  Your Honor, may I approach the witness?

12              THE COURT:  You may.

13   CROSS-EXAMINATION

14   BY MS. GHAVIMI:

15   Q.  Good afternoon, Mr. De Mey.

16   A.  Good afternoon.

17   Q.  I'd like to start with -- I don't know if you have in front

18   of you the joint stipulated facts.  Are they in the binder from

19   the plaintiff's examination?

20   A.  I'm not sure.  No, I don't think they are.

21              MS. GHAVIMI:  If I could approach the witness, your

22   Honor?

23              THE COURT:  You may.

24   Q.  This is previously entered into evidence as

25   Plaintiff's Trial Exhibit 585.  Do you see that document in

GBTHSKY7                          De Mey - Cross

1    front of you?

2    A.  I do.

3    Q.  Okay.  Thank you.

4            THE COURT:  I think it's 584, counsel.

5            MS. GHAVIMI:  Oh, I'm sorry, 584.

6    Q.  And I apologize.  I do not have it to publish to the jury.

7    I'll just have to read it out for you.

8            THE COURT:  You're not going to read the whole thing,

9    I assume?

10           MS. GHAVIMI:  No, no, I'm just going to read a couple

11   of them.

12   Q.  If you could look on the first page for me, Mr. De Mey.

13   Look at No. 13.  Do you see where I am?  It's on the first

14   page -- I'm sorry.  Looking at the wrong one.  The second page.

15   It's in the middle of the page.

16   A.  Yes, I see that.

17   Q.  Could you read that for me.

18   A.  "HZM has been a registered trademark of ArcelorMittal in

19   the United States only since December 2, 2014."

20   Q.  Now, do you understand that this is a fact that both

21   parties have agreed to and the Court has entered as a true and

22   accurate statement?

23           THE COURT:  Sustained.

24   A.  I understand that, yes.

25           THE COURT:  No, I sustained the objection.  So don't

1    answer it.

2              THE WITNESS:  Oh, sorry.

3              THE COURT:  Thank you.  The jury will disregard that

4    last answer.

5              Next question.

6    BY MS. GHAVIMI:

7    Q.  Now, you said that -- I believe it was plaintiff's

8    Exhibit 306.  If you could turn to that.

9    A.  I'm looking.  Excuse me.  How do I find this in here?

10   Q.  It's in the plaintiff's binder that you were using with.

11             THE COURT:  Mr. De Mey, I think it's in the other

12   binder.

13             THE WITNESS:  Oh, this document here?

14   Q.  No, it's in the binder you were using with Mr. Bandini.

15   A.  Oh, sorry.

16   Q.  It's behind Tab No. 306.

17   A.  306.  Sorry.  Yes.

18   Q.  Could you please tell the jury again what this document is.

19   A.  This document is our Technical Product Manual from Skyline

20   Steel.

21   Q.  Could you read what year it's from.

22   A.  Edition 2014.

23   Q.  Okay.  Could you turn to the very last page.

24   A.  Yes.

25   Q.  If you could open up Plaintiff's Exhibit 306.

GBTHSKY7                        De Mey - Cross

1          If I have permission to publish this to the jury, your

2     Honor?

3               THE COURT:  You may.

4     Q.  If you could please go to the last page.  Right at the very

5     bottom, does it list a date for the edition?

6     A.  I believe it does.  March '14 edition, so 3/14 edition.

7     Q.  Is this before or after ArcelorMittal's HZM trademark was

8     registered?

9               MR. BANDINI:  Objection.

10              THE COURT:  Overruled.

11    A.  I don't know.

12    Q.  Is March 2014 before or after December 1, 2014?

13    A.  It would be before.

14              THE COURT:  I think we can all agree on that.

15    Q.  And I think you also testified with regard to this document

16    it was blown up -- I apologize to the jury.  On this last page,

17    it says HZM and AMLoCor are registered trademarks of

18    ArcelorMittal.  Is that accurate?

19    A.  Yes.

20    Q.  Do you see that it says HZ and then a little "R" up at the

21    top dash M?

22    A.  Uh-huh, I do.

23    Q.  Do you understand what the little "R" at the top means?

24    A.  I believe it means registered trademark.

25    Q.  Okay.  Why is it that the "R" is after the HZ?

GBTHSKY7                          De Mey - Cross

1              MR. BANDINI:  Objection.

2              THE COURT:  What's your understanding of why the "R"

3    is after the HZ?

4    A.  I have no idea.  I don't know.

5    Q.  Couldn't it be that it's HZ trademark?

6              THE COURT:  Sustained.

7    Q.  Does Skyline have a license to use the HZM trademark?

8    A.  Yes.

9    Q.  Is that license written?

10   A.  It's part of our contract, yes.

11   Q.  Does Skyline pay royalty?

12   A.  No.

13   Q.  Does Skyline have a license to use the ArcelorMittal

14   trademark?

15   A.  We -- no, no, we use -- we can trademark their products.

16   We don't -- we're not an ArcelorMittal company, so we will not

17   use the name ArcelorMittal.  We can sell an ArcelorMittal

18   product.

19   Q.  So the fact that ArcelorMittal is written here is not

20   pursuant to a license?

21   A.  That's not what I'm saying.  You asked me if we could use

22   the name ArcelorMittal in our documents.  Yes, we can, in a

23   product, but we are not an ArcelorMittal company.

24   Q.  My question is you have express permission from

25   ArcelorMittal to use their name?

GBTHSKY7                          De Mey - Cross

1   A.  Yes.

2   Q.  Is that express permission in a writing, a document?

3   A.  Yes, same agreement, same contract.

4   Q.  But you don't pay any royalty for that?

5   A.  No.

6   Q.  Is this Exhibit 306, this 2014 catalog, was this a catalog

7   in use when PilePro sent the Madonna letter?

8   A.  I believe it was, yes.  Sorry, that wouldn't be possible,

9   no.

10          THE COURT:  Sorry.  You need to --

11  A.  Okay.  I meant to say I thought it was, but this is a 2014

12  edition made in March, it cannot be because the letters were

13  sent in 2013.  So, no, the answer is no.

14  Q.  So there was a previous version?

15  A.  I assume there was, yes, and I know there is.

16  Q.  Was there a version in August of 2013 in use?

17  A.  Yes.

18  Q.  Okay.  I'd like to take that document that has the clip on

19  it.  Do you recognize that document?

20  A.  Yes.

21  Q.  If you could put up on the screen Plaintiff's Exhibit 305.

22          MR. BANDINI:  Your Honor, we were not given a copy of

23  305.

24          THE COURT:  I think it's your exhibit.

25          MS. GHAVIMI:  It's your exhibit.

GBTHSKY7                          De Mey - Cross

```
 1             MR. BANDINI:  Oh.  I apologize to defense.  Objection
 2   withdrawn.
 3   BY MS. GHAVIMI:
 4   Q.  Is this a document that was created by Skyline Steel in the
 5   ordinary course of business?
 6   A.  Yes.
 7   Q.  You recognize this document?
 8   A.  I do.
 9   Q.  Is this a true and accurate copy of the document -- of the
10   2013 catalog, as you recall?
11   A.  As I see the front page, I would assume yes.
12             MS. GHAVIMI:  Your Honor, I move Plaintiff's Exhibit,
13   I believe it's, 80 -- 803 into evidence at this time.  Request
14   permission to publish it to the jury.
15             THE COURT:  It's 305.
16             MS. GHAVIMI:  Oh, 305, sorry.
17             THE COURT:  Any objection?
18             MR. BANDINI:  No objection.
19             THE COURT:  Admitted.
20             (Plaintiff's Exhibit 305 received in evidence)
21   BY MS. GHAVIMI:
22   Q.  Could you turn to the last page of this document.
23   A.  Yes.
24             THE COURT:  You'd like it published?
25             MS. GHAVIMI:  Publish it to the jury.
```

1    Q.  If you could turn to the last page.  Oh, I guess the

2    electronic version I have does not have the --

3            THE COURT:  All right.  Why don't you proceed with

4    your question.

5    Q.  Does it have a date on the back?

6    A.  Yes.

7    Q.  What is that date?

8    A.  8/13 edition.

9    Q.  So is this -- where would Skyline have disseminated this

10   document?

11   A.  To engineers, customers.

12   Q.  Would Skyline have put this catalog on its Web site?

13   A.  Yes.

14   Q.  Would there have been another catalog also on Skyline's Web

15   site at the same time, or would this have been the only

16   version?

17   A.  Well, this is the only version of all products.  It could

18   be specific brochures for specific products, yes; but covering

19   everything, yes, it's this.

20   Q.  Okay.  So if you could turn to the first -- oh.

21           So is this the catalog that was in the public eye on

22   the date that PilePro sent the Madonna letter?

23   A.  If this is August 2013, then it's not possible, because the

24   letter was sent June 20; right?

25   Q.  The date that --

GBTHSKY7                     De Mey - Cross

A.  When was the date?  Do you mind?  Let me check this.

          THE COURT:  Mr. De Mey, you can't mumble --

          THE WITNESS:  I can't mumble.

          THE COURT:  -- because no one will understand what you

say.

          THE WITNESS:  Let me check, if you don't mind, the

dates for a second.

          Yes, it would be.

          THE COURT:  It would be what?

          THE WITNESS:  It would be, indeed, the document that

is in circulation at the time of the Madonna letter.

BY MS. GHAVIMI:

Q.  Would this be the document that is in circulation at the

time that Skyline sued PilePro in this case?

A.  I think so, yes.

Q.  Would this be the document that was in circulation at the

time the infringement warning was placed on the iSheetPile Web

site?

A.  I believe it is.

Q.  Would this be the document at the time in circulation at

the time that Skyline -- let me rephrase that.

          Would this be the document that was in circulation at

the time you viewed the infringement warnings on the iSheetPile

Web site that you testified to earlier?

A.  Yes.

GBTHSKY7                          De Mey - Cross

1    Q.  If you could turn to the first yellow flag.  I believe that

2    is page 6.

3    A.  Yes.

4    Q.  If you could look to the bottom, do you see a Web site

5    address there?

6    A.  I can see it, yes.

7    Q.  Could you read that for me.

8    A.  www.PilePro.com.

9              MR. BANDINI:  I'm sorry, counsel.  What Bates number

10   page are you on, please?  We have a different page 6, so -- is

11   this the page?

12             I'm sorry, your Honor.

13             MS. GHAVIMI:  Yes.  Could I use that one?

14             MR. BANDINI:  Okay.

15             MS. GHAVIMI:  For the record, the Bates is

16   SKYLN0006042.

17   Q.  Have you ever gone to the --

18             THE COURT:  Can you bring up that page on the screen

19   for everybody else.

20             I don't think that's the same page.  Why don't we

21   proceed without the screen since that's not working for us.  Go

22   ahead.

23             MS. GHAVIMI:  Can I -- okay.  We don't need it

24   published to the jury.

25             THE COURT:  That's good.

GBTHSKY7                        De Mey - Cross

1   Q.  Have you ever gone to the PilePro Web site?

2   A.  Yes, I have.

3   Q.  Have you seen a link to iSheetPile there?

4   A.  Yes, I have.

5   Q.  Have you clicked on that link?

6   A.  I have.

7   Q.  Do you know how many other times PilePro's Web site appears

8   in this catalog?

9   A.  I don't know.

10  Q.  We can count them.

11  A.  We could.

12  Q.  I can represent to you it's --

13          THE COURT:  Sustained.

14  Q.  Can you turn --

15          THE COURT:  Counsel, the document's in evidence, so

16  unless the witness knows, let's just leave it there for now.

17  Q.  Let's go to the last page again.  Is there another Web site

18  listed on that page?

19  A.  SkylineSteel.com.

20  Q.  So if one were to look at your catalog and see the PilePro

21  Web site, they could potentially visit your catalog and be

22  directed to the PilePro Web site?

23          MR. BANDINI:  Objection.

24          THE COURT:  Sustained as to form.

25  Q.  In your opinion, if someone were to view the PilePro --

1    were to view this catalog and see the PilePro Web site, would

2    that be an endorsement of PilePro?

3            MR. BANDINI:  Objection.

4            THE COURT:  Sustained.

5    Q.  Could you turn back to Plaintiff's Exhibit 11.

6    A.  Yes, I can.

7            MS. GHAVIMI:  Could we publish that to the jury?

8    Q.  Could you turn to the first page -- not the cover, but I

9    guess the second page.

10   A.  Yes, I can.

11   Q.  Do you see in the third column, the third full paragraph

12   down?

13   A.  Yes.

14   Q.  Could you read that for the jury.

15   A.  I can.

16           "In 2007, we launched the final research project.

17   Many technical solutions were analyzed and" --

18   Q.  I'm sorry to stop you.  I think we are on the different

19   one.  I'm looking at the ArcelorMittal HZM steel wall system,

20   2013?

21   A.  True.

22   Q.  Is that not Plaintiff's Exhibit --

23   A.  That's what I'm reading.  Right here, first page you said,

24   second column, third paragraph.

25   Q.  I'm sorry.  I said third column.

GBTHSKY7                         De Mey - Cross

1    A.  Oh, sorry.

2    Q.  Where it starts "less than one year."

3    A.  Yep.

4           Less than one year later, in 2008, ArcelorMittal was

5    proud to supply just one time the first HZM system for a huge

6    project in northern Germany, a vast challenge mastered through

7    an excellent collaboration between several departments in

8    Luxembourg, RND, the rolling mill, the technical, and the sales

9    departments.

10   Q.  Could you tell me what project in Germany that refers to?

11   A.  Yes.

12   Q.  Could you tell the jury the name of that project.

13   A.  I think it's Bremerhaven.

14   Q.  Bremerhaven?

15   A.  Yeah.

16   Q.  Are you sure that doesn't refer to the JadeWeser Port?

17   A.  JadeWeser Port, J-a-d-e-r W-e-s-e-r port.

18   Q.  Could you explain to the jury a little bit about the

19   JadeWeser project?

20   A.  Not much except it's a big project.

21   Q.  Okay.  That is an HZM system used in that project; isn't

22   that correct?

23   A.  I think it is, yes.

24   Q.  Okay.  Didn't that HZM system in the JadeWeser Port fail

25   332 times?

1              MR. BANDINI:  Objection.

2              THE COURT:  Sustained.

3              Next question, counsel.

4   Q.  Didn't the connectors in the HZM system declutch in the

5   JadeWeser Port 332 times?

6              MR. BANDINI:  Objection.

7              THE COURT:  Sustained.

8              New question, counsel.

9   Q.  Isn't it possible that engineers would not recommend the

10  HZM system because of Arcelor's reputation and not because of

11  an infringement warning on the iSheetPile Web site?

12             MR. BANDINI:  Objection.

13             THE COURT:  Sustained.

14  Q.  Do engineers talk to each other in this business?

15  A.  I don't know.  I assume yes.

16  Q.  You testified you talked to engineers; isn't that true?

17  A.  That wasn't your question.  Your question was if they talk

18  to each other.  I don't know.  We talk to them.

19  Q.  Do engineers tell you what they hear about your

20  competitors?

21  A.  They may, yeah.

22  Q.  Do engineers tell you why they select certain products over

23  others?

24  A.  Sure, yeah.

25  Q.  Is one of the reasons engineers select products the

GBTHSKY7                          De Mey - Cross

1   reputation of a company?

2   A.  Yeah, could be, yeah.

3   Q.  Isn't it true that engineers want a product to actually

4   work?

5   A.  They do.

6   Q.  Wouldn't that be a reason why engineers would select a

7   product?

8   A.  Absolutely.

9   Q.  Wouldn't that be more important than a lead time in

10  selecting a product?

11             MR. BANDINI:  Objection.

12             THE COURT:  Based on your experience and conversations

13  you testified to earlier, would engineers as part of your

14  experience -- what is your view of that?

15             THE WITNESS:  They would take reputation into

16  consideration.  I don't know and I could not weigh whether lead

17  time, reputation, availability, all these things have a certain

18  weight.  They want to have a product that is of high quality,

19  available for them.  Reputation could be something in their

20  decision-making process.  I don't know how much.

21  Q.  So you just said you don't know how much reputation would

22  take into account for lead times, but didn't you testify

23  earlier that lead times were the major reason why engineers

24  would decide on a product?

25  A.  Sure.  What I said was I don't know how much reputation

GBTHSKY7                          De Mey - Cross

1    would weigh in their final factor.  Their decision-making is a

2    quality product available for their jobs.  Whether reputation

3    of the company that sells it is important or not, it could be.

4    I don't know how much.

5    Q.  What about a reputation of a product actually working in

6    the field?

7    A.  They would want to see a product that works, yes, that's

8    right.

9    Q.  Wouldn't that be more important than a lead time in

10   determining whether to select a product?

11   A.  I don't know.  Depends what happened with -- what the

12   reputation is all about.  It's too vague.  I mean, it's too

13   vague.  The reputation could be all different directions.

14   Q.  So you're telling me it's vague as to whether a product

15   won't work or not?  That's vague to you?

16   A.  Yes, that's vague to me.

17   Q.  Okay.  Could maybe -- is there a way you could make it more

18   clearer as to what a good reputation of a product is versus a

19   bad reputation of a product?

20   A.  Sure, I can.  So an example could be is a product produced

21   by a highly prudent production process or not.  That's a

22   reputation.  Is the company mistreating its employees or not?

23   That's a reputation.  I don't know if that's a decision-making

24   process that will weigh in the engineer's mind.  It may very

25   well be.  I don't know.

GBTHSKY7                        De Mey - Cross

1    Q.  Okay.  In this catalog, how many of these products are

2    actually made in the United States?

3    A.  In this catalog that you referred to?

4    Q.  Yes.

5             MR. BANDINI:  Objection.

6             THE COURT:  Sustained.

7    Q.  You testified that lead times on iSheetPile Web site are

8    false because some of the products are in stock right now; is

9    that correct?

10   A.  I did, yes.

11   Q.  But wouldn't you agree that if a product is not made in the

12   United States, that would impact the lead time?

13   A.  It would, yes.  Also if it's made in the United States.

14   Q.  I'm sorry.  What did you say?

15   A.  Whether it's made in the United States or not, lead time is

16   impacted.  Lead time would be impacted.

17   Q.  If Skyline doesn't publish its lead times, how is anyone to

18   know what's an accurate lead time is?

19   A.  We put lead times on our quotes.

20   Q.  Did you ever provide those quotes to PilePro?

21   A.  No.

22   Q.  So you only provide those quotes to your customers?

23   A.  Sure, yes.

24   Q.  So only your customers are allowed to know what an accurate

25   lead time is?

 1              MR. BANDINI:  Objection.

 2              THE COURT:  Sustained.

 3   Q.  If you could turn to Plaintiff's Exhibit 19.  I think

 4   that's the next in your binder.

 5   A.  Yes.

 6   Q.  So could you just help the jury remember, this is an HZM

 7   product or an HZM system?  I'm sorry.  I don't recall.

 8   A.  It shows the HZM system with its individual components.

 9   Q.  So what is an HZM product?

10   A.  An HZM product -- an HZM, as known in the market, would be

11   a combination of a beam, a connector, and a sheet pile.

12   Q.  So when somebody refers to an HZM product, what do you

13   interpret that to mean?

14   A.  It would mean the entire wall of all components, including

15   all components as I described.

16   Q.  Including all components as you described?

17   A.  Yes, uh-huh.

18   Q.  So an HZM --

19              THE COURT:  You have to say yes or no.

20              THE WITNESS:  Sorry, yes.

21              THE COURT:  And, Ms. Ghavimi, do you want this, since

22   it's on the screen, published to the jury?

23              MS. GHAVIMI:  Yes.

24   BY MS. GHAVIMI:

25   Q.  So if one were to, say, use the term "an HZM product," you

1   would not think of just a connector?

2   A.  I would not think of just a connector, no.

3   Q.  And if one were to say an HZM product, you would not think

4   of just AZ 14-770, would you?

5   A.  No, I wouldn't.

6   Q.  So if you were to look at AZ 14-770 on the iSheetPile Web

7   site, you would not describe that as an HZM product, would you?

8   A.  No, I would not.

9   Q.  And if you were to view the RZD/U connector on the

10  iSheetPile Web site, you would not consider that an HZM

11  product, would you?

12  A.  Well, I would.  Yes, I would, because the product as such

13  has no other use than being used in a combi wall like this.

14  Q.  An RZD connector has no other use than being used in an HZM

15  system?

16  A.  Yes, or similar solution, yes.

17  Q.  It cannot be used with a different kind of sheet pile?

18  A.  Yeah, you're right, it could be used with a different brand

19  of sheet pile, yes.  Sorry.  That's true.  You're right.  It

20  could be used with a different brand of sheet pile, yes.

21  Q.  So my original question was you would not consider an RZD/U

22  connector, looking at it on the iSheetPile Web site, as an HZM

23  product, would you?

24          MR. BANDINI:  Objection.  Asked and answered.

25          THE COURT:  Overruled.

1    A.  Correct.

2    Q.  So you mentioned that you viewed the iSheetPile Web site

3    when the warning, infringement warning, that is shown here on

4    Exhibit 19 was placed, initially placed; is that correct?

5    A.  Yes.

6    Q.  Do you recall that?

7    A.  Yes.

8    Q.  So why did you state earlier it was up there two months

9    ago?

10   A.  Unfortunately, this process takes forever, and so we've

11   been in discussion for months and months and months, and I'm

12   sorry.  It's been a long time, a lot of documents.  I made a

13   mistake.  And it's not there anymore, which makes it even more

14   complex, when was it still there and when not anymore.

15   Q.  You don't have any copies of it as it was, do you?

16          THE COURT:  Sustained.

17   Q.  Do you recall looking through the entire Web site as it

18   existed when the infringement warning was placed?

19   A.  Page by page by page, you mean?

20   Q.  Yes.

21   A.  Not page by page by page.

22   Q.  What pages did you look at?

23   A.  I don't remember.  Pages of all -- a number of combinations

24   of products.

25   Q.  Did you look at the RZD/U connector page alone?

GBTHSKY7                          De Mey - Cross

1    A.  I don't know.

2    Q.  Did you look at the AZ 1770 page alone?

3    A.  I don't know.  I could have, yes.

4    Q.  Did you see an infringement warning?

5    A.  Yes.

6    Q.  I'm going to turn to Plaintiff's Exhibit 280.

7    A.  Yes.

8    Q.  You recall this document?

9    A.  I do.

10   Q.  Did you see this document at the time it was sent to

11   Skyline?

12   A.  Yes, it was forwarded to me.

13        THE COURT:  Can you remind us what Plaintiff's

14   Exhibit 280 is.

15        THE WITNESS:  Yes.  The Exhibit 280 from the

16   plaintiff's side is a letter from John Madonna to Matt

17   McLaughlin, who is our salesperson on the West Coast, and he

18   forwarded it to me and our CFO.

19        THE COURT:  Is that an e-mail attaching the --

20        THE WITNESS:  E-mail forwarding included attachment.

21        THE COURT:  All right.

22   BY MS. GHAVIMI:

23   Q.  Before I publish it to the jury, your Honor, do you see the

24   second sentence?

25   A.  I do.

GBTHSKY7                    De Mey - Cross

1   Q.  Was there a discussion internally about the second

2   sentence?

3               MR. BANDINI:  Objection.

4               THE COURT:  Sustained.

5               MS. GHAVIMI:  Your Honor, I'd like to publish this to

6   the jury.

7               THE COURT:  You may.

8   BY MS. GHAVIMI:

9   Q.  Now, you testified earlier that -- about the last

10  paragraph.

11  A.  Yes.

12  Q.  Just to recall for the jury that this -- and I apologize.

13  I don't recall exactly what you said.

14               THE COURT:  Ms. Ghavimi, just ask your question.

15  Q.  Yes.  This letter says:  Please respond immediately should

16  this information have any effect on the current installation of

17  Skyline --

18               THE COURT:  Ms. Ghavimi, number one, everybody's

19  looking at it.  It's on the screen.  Number two, you can't read

20  that quickly or the court reporter can't keep up.

21               MS. GHAVIMI:  I apologize.

22               THE COURT:  So just ask the question.

23  Q.  This last question caused concern at Skyline; is that

24  correct?

25  A.  It did, yes.

GBTHSKY7                        De Mey - Cross

1    Q.  And could you please remind the jury why it caused you

2    concern.

3    A.  The concern was, as explained before, was we already had

4    delivered steel, and some of the steel was already installed or

5    was being installed in the ground.

6    Q.  Isn't it true you had another delivery on the way, though?

7    A.  It's possible, yeah.

8    Q.  Did you make any effort to stop that delivery in response

9    to this letter?

10   A.  No, I don't think -- I don't believe we did.

11   Q.  So you still continued on and delivered more steel even

12   after you received this letter to John Madonna?

13   A.  We have an agreement with a customer and engagement to a

14   customer to supply steel.

15   Q.  So it didn't cause you that much concern?

16          MR. BANDINI:  Objection.

17          THE COURT:  Overruled.

18   A.  Sure, it did give us concern.  One is independent of the

19   other.

20   Q.  Did you complete the delivery of the steel for this entire

21   project to Madonna?

22   A.  I believe we did.

23   Q.  Did Madonna pay you for this project?

24   A.  Yes, they did.

25   Q.  Did they pay you in full for this project?

1   A.  Yes, late, but yes.

2   Q.  How much did they pay you in total for this project?

3   A.  I don't remember.  2 million some sort, little more.

4   Q.  Wasn't it $2.6 million?

5   A.  Possible, yes.

6              THE COURT:  Mr. De Mey, just keep your voice up, if

7   you could.

8              THE WITNESS:  Yes.

9   Q.  How much did Madonna ask you to pay for their attorney's

10  fees?

11  A.  Less than $5,000, as stated.

12  Q.  And I believe you were afraid you'd have to rip up the

13  whole project out of the ground; is that correct?

14  A.  Possibly, yes.

15  Q.  But isn't it true that that's -- let me rephrase that.

16             Have you ever had to do that on a project?

17  A.  We haven't done it, no.  That doesn't mean it's not

18  impossible.

19  Q.  Have you ever known of it to happen on a project?

20  A.  I don't recall.

21  Q.  Has Skyline received infringement letters from other people

22  in its experience as a business?

23             MR. BANDINI:  Objection.

24             THE COURT:  Overruled.

25  A.  I don't think so, no.

GBTHSKY7                        De Mey - Cross

1   Q.  Has Skyline ever received letters threatening lawsuits

2   before?

3   A.  Has Skyline ever received letters?

4   Q.  Letters threatening lawsuits previously regarding

5   construction contracts?

6   A.  No, not like this, I don't think.

7   Q.  Could you explain that "not like this."

8   A.  Well, here we deliver the product, and PilePro contacts

9   directly our customer saying that there will be consequences

10  for possibly legal litigation and legal cost if they continue

11  using this product line.  We've never had something like this

12  that we sold or produced, no.

13  Q.  Is Skyline a sophisticated corporation?

14          THE COURT:  Sustained.

15  Q.  How many projects does Skyline install a year?

16  A.  Plenty.  I don't know.  Couple thousand.

17  Q.  A couple thousand?

18  A.  Yes.

19  Q.  And what are the -- how much does each project cost?  I'm

20  sorry.  How much does Skyline make on each project?

21          MR. BANDINI:  Objection.

22          THE COURT:  Sustained.

23  Q.  Skyline is installing thousands of projects a year, and you

24  have never received an infringement letter before?

25  A.  Yes, sure.

1   Q.   Okay.  You never received a letter threatening suit from a

2   contractor, a disgruntled customer?

3   A.   But not -- not patent related, not something --

4   Q.   Any kind?

5   A.   Oh, of course.  Okay.  Maybe I misunderstood your question

6   before, and I apologize for that.

7            In your context that you describe now, contractors

8   will all the time send letters possibly suing you if you

9   deliver late, if you deliver the wrong material, if something

10  happens on the job site you could be involved in, yeah,

11  absolutely, which is why we thought this was very important.

12  If any possible damages would be here, we would be liable for

13  liquidated damages, late delivery would be a huge problem, and

14  with a huge possible legal bill and litigation with our own

15  customer.

16  Q.   Is Skyline familiar with the Miller Act?

17            THE COURT:  Yes or no?

18  A.   I'm not.

19  Q.   You testified that the AZ wall sells in the U.S. ten times

20  more than the HZM; is that correct?

21  A.   Yes.

22  Q.   That -- and I believe I had this -- this is what you said.

23  That the sales without the HZM were 100 to 150 million per year

24  from 2013 to 2015; is that correct?

25  A.   Yes.

GBTHSKY7                          De Mey - Cross

1   Q.  So what were the sales of the HZM during 2013 to 2015?

2   A.  Do the math.  Between 10 and 15 million, depending on the

3   year.  One year could be five; one year could be 15 or 20,

4   depends.  On average between 10 and 15 million per year.

5   Q.  I'm sorry.  I'm not a math person.  So that's the

6   percentage of that in your business, sales of HZM?

7           MR. BANDINI:  Objection.

8           THE COURT:  Sustained.

9   Q.  So isn't it true that to build a typical port, you have to

10  use a combi wall system?

11  A.  No, that's not true.

12  Q.  Why is that not true?

13  A.  Because it's not.

14  Q.  So to build a port to sustain a sea wall, you can use an

15  AZ --

16  A.  Absolutely.

17  Q.  -- wall alone?

18  A.  Yes.

19  Q.  Okay.

20          THE COURT:  Ms. Ghavimi, I assume we can take down

21  Plaintiff's Exhibit 280?

22          MS. GHAVIMI:  Yes.

23          THE COURT:  All right.

24          MS. GHAVIMI:  Your Honor, I have about an hour more.

25  I don't know --

GBTHSKY7                          De Mey - Cross

1          THE COURT:  You have about 12 minutes more today.

2          MS. GHAVIMI:  Okay.

3          THE COURT:  Use that up, please.

4   Q.  Did you ever guarantee lead times in your contracts?

5   A.  Once we sign a contract with a customer, we will deliver on

6   time.

7   Q.  But I think you said that, you know, you work with

8   customers for unforeseen situations that may delay deliveries;

9   isn't that correct?

10  A.  No, I said accelerate deliveries.

11  Q.  What if there is an unforeseen delay?  Do you reimburse the

12  customer for that?

13  A.  Depends on the situation.

14  Q.  Okay.  Isn't it true that projects typically have serial

15  deliveries?

16  A.  Depends on the job.

17  Q.  Okay.  What is the size of a typical project for Skyline?

18         MR. BANDINI:  Objection.

19         THE COURT:  Sustained.

20  Q.  Did the Madonna project have serial deliveries?

21  A.  I think it did, yes.

22  Q.  How long did it take from the beginning to end to deliver

23  the product to Madonna?

24  A.  I don't know.  I'm sure you have the documents.

25  Q.  Didn't it take longer than 16 weeks?

GBTHSKY7                       De Mey - Cross

1    A.  I don't know.

2              THE COURT:  Mr. De Mey, what is your understanding?

3    How are you using the term "serial deliveries"?  Could you just

4    explain what that means.

5              THE WITNESS:  Well, I don't think I was using it, but

6    I think as I understood it is deliveries could be done, if it's

7    by a vessel, could be coming at once, entire thing; it could be

8    coming in parts and pieces, a function of vessel availability

9    or room available or time available or urgency of the job.  So

10   there could be partial shipments possibly.  There could be

11   truck delivery by a very small quantity.

12             So in the function of the job, it could be everything

13   or could be just one-tenth or a 20th of the job.  So there's no

14   black or white.  There's several solutions possible.

15   Q.  So if the timing of a delivery varies so much, how can you

16   say that any one depiction of a lead time is accurate or

17   inaccurate?

18   A.  Because what matters is the starting time.

19   Q.  So your interpretation of lead time as presented on the

20   iSheetPile Web site is what?

21   A.  It would be, one, can you start delivering material that

22   will keep up with the speed in which the contractor will use

23   it.

24   Q.  Is that statement listed anywhere in the iSheetPile Web

25   site?

GBTHSKY7                          De Mey – Cross

1    A.   That's how the entire industry would use it or see it.

2    Q.   The entire industry?  Do you speak for the entire industry?

3    A.   I don't speak for the entire industry.  That's how I would

4    assume everybody understands it, yes.

5    Q.   Isn't it also true that a larger shipment, whether serial

6    deliveries or not, would take a longer time to deliver?

7    A.   Not necessarily, no.  Yeah, if you need one truck, yes, it

8    could be delivered quicker.  But whether you buy 200 ton or 400

9    ton or 500 ton of steel, it could be all arriving at the same

10   time because the production process in the steel mill is almost

11   similar, whether it's 200 tons or 500 tons.

12   Q.   Are those caveats listed on iSheetPile Web site?

13   A.   No, as I said before, there's no volume or any reference to

14   anything.

15   Q.   Are you sure?

16   A.   I believe it is, yes.

17   Q.   Okay.  Can we turn to Plaintiff's Exhibit 574.

18   A.   Yes.

19        MS. GHAVIMI:  If I could publish this to the jury,

20   your Honor?

21        THE COURT:  You may.

22   Q.   Okay.  What is this product shown here?

23   A.   HZM 1180M, etc.

24   Q.   Is this an HZM product?

25   A.   Yes.

1    Q.  If you could turn to the second page --

2    A.  I can.

3    Q.  -- where it's highlighted.

4    A.  Yes.

5    Q.  I think the ArcelorMittal HZM 1180M D-12, AZ 19-700, I

6    believe you said has available 16 weeks.  You previously stated

7    that's incorrect?

8    A.  I did.

9    Q.  Okay.  Do you see there under the column that says weight,

10   and it says 68.41.  Do you see that?

11   A.  I see that, yes.

12   Q.  Up there it says "pounds per feet squared."  What is

13   68.41 pounds per feet squared, I guess, to a layman?

14   A.  It means what is the weight of the steel used to cover a

15   square footage of wall, of barrier wall or wall, you're

16   building.

17   Q.  Okay.  And over on the right-hand side -- well, then the

18   second column says:  Bending moment capacity.  Could you

19   explain that to us.

20   A.  That is the strength of the solution and the capacity that

21   it has or the force or weight it can take.  The load it can

22   carry is probably the better term.  The higher the number, the

23   stronger the solution.

24   Q.  So doesn't this describe for a certain weight and poundage

25   amount of steel, that's how long it will take to deliver on

1    average?

2    A.  No, that's not what it says.

3    Q.  If you could look at this small writing down here where it

4    says, "Sections listed above," I believe it was blown up in the

5    previous questioning.

6    A.  Yes.

7    Q.  Could you read the last two sentences for the jury.

8    A.  "Section displayed are thought to be relevant and available

9    for delivery and use in the U.S. market within the availability

10   stated in sufficient quantities for a typical job.  Please

11   inquire with the manufacturer for actual and specific

12   availability."

13   Q.  So that's telling the person who views it to inquire with

14   the manufacturer; right?

15   A.  In small letters, yes.

16   Q.  But it's still telling them?

17   A.  Yeah, it is.

18   Q.  If you could look right over to the right where you see the

19   words "manufacturer"?

20   A.  Yes.

21   Q.  Who is listed underneath that?

22   A.  ArcelorMittal.

23   Q.  And then it says "distributor."  Who's listed underneath

24   that?

25   A.  Skyline Steel.

GBTHSKY7                          De Mey - Cross

1   Q.  So PilePro is presenting on this Web site that the

2   manufacturer of this product is ArcelorMittal; isn't that

3   correct?

4   A.  It is, yes.

5   Q.  And that the distributor of this product is Skyline Steel;

6   isn't that correct?

7   A.  It is.

8   Q.  Nowhere on here are they claiming that they're affiliated

9   with either ArcelorMittal or Skyline Steel; isn't that correct?

10          MR. BANDINI:  Objection.

11          THE COURT:  Overruled.

12  A.  Correct.

13  Q.  An engineer looking at this would know who ArcelorMittal

14  was or is; right?

15  A.  Some do; some don't, yes.

16  Q.  And an engineer, who you would agree is sophisticated in

17  the industry, would know who Skyline Steel is; isn't that

18  correct?

19  A.  Same answer.  Some do; some don't.

20  Q.  Do you see -- let's go back to the first page -- above the

21  product I.D., who does it -- what is the name that's written

22  there?

23  A.  ArcelorMittal.

24  Q.  It doesn't say PilePro here, does it?

25  A.  Not there.  Just above it says.

1   Q.  Right.  But right above the product it says ArcelorMittal,

2   doesn't it?

3   A.  It does, yes.

4   Q.  So this is identifying the manufacturer of the product?

5   A.  Uh-huh.  Yes.

6   Q.  And under "Top Product Alternatives," what does it say?

7   A.  It gives two alternatives, another HZM solution from

8   ArcelorMittal and then an O-Pile solution 4131.

9   Q.  But the first listed alternative is another ArcelorMittal

10  product, in fact, another HZM system; isn't that correct?

11  A.  It is, yes.

12  Q.  And if you flip back over to the second page, five of the

13  other alternative products listed are ArcelorMittal products?

14  A.  It may have a longer lead time, but yes, on this chart

15  here.

16  Q.  You don't think that's good advertising for your company?

17  A.  No, it's negative advertising.  I don't think it's good

18  advertising, no.

19  Q.  Now, you said you visited --

20          THE COURT:  All right.  Ms. Ghavimi, we'll stop there

21  since it's 4:59.

22          Ladies and gentlemen, we're going to break for the

23  evening.  Let me just remind you that tomorrow please be here

24  no later than, I would say, a couple minutes before 9:00

25  o'clock in the morning.  We will start no later than 9:15.  I

GBTHSKY7                        De Mey - Cross

like to have you guys in the box with Mr. De Mey continuing in

his testimony at that time.

        As I said, I'll do everything in my power to get you

guys out as quickly as I can and certainly within the time I

promised, but I need you to play your part as well, and that

part is to get here on time.  We can't -- counsel, can you

please refrain from talking until I'm done.  Thank you.

        I need you to be here on time because we can't start

until all eight of you are here.  So I know, particularly on

days like today with the weather we had, it can take a little

longer to make your way around the city.  I know plenty of you

are coming from Westchester and elsewhere.  If you could just

cushion the amount of time you need to get here to make sure

you're here on time, it would be really helpful if we could

start here on time.

        Just a reminder, to entice you to be here on time, we

will have some breakfast and coffee in the jury room, assuming

that the cafeteria obliges and delivers what we have ordered.

        And then a couple even more important reminders,

number one, do not discuss the case with each other, with your

friends, your family.  Again, you can tell people that you have

been selected to serve as a juror on a civil case, but please

don't tell anyone anything beyond that.

        Number two, don't communicate about the case in any

way, shape, or form -- telephone, person, e-mail, Twitter,

GBTHSKY7                        De Mey – Cross

 1    anything.  All right.  Again, it can only cause trouble for you

 2    and for all of us.

 3            Third, don't do any research about the case or anyone

 4    involved in the case.

 5            And, finally, please continue to keep an open mind.

 6    You've heard some of the evidence.  You've heard the opening

 7    statements, but there's plenty more evidence to come, and it's

 8    certainly not time for you to form any judgments.

 9            Again, just a reminder, please go directly to the jury

10    room tomorrow morning, and please be there a couple minutes

11    before 9:00 so that we can start promptly.  And with that, I

12    wish you a very pleasant evening.  I thank you for your

13    attention.  And you are excused.  Thank you.

14            (Jury excused)

15            THE COURT:  You may be seated.  Mr. De Mey, you may

16    step down.  All right.

17            (Continued on next page)

18

19

20

21

22

23

24

25

GBT7SKY8

1           (Jury not present)

2           THE COURT:  All right.  Just so you know, plaintiff

3    has 12 hours 41 minutes remaining in its time, and defendant

4    has nine hours and 45 minutes remaining in its time.

5           Two things that I want to raise.  One is -- and this

6    is directed to both sides -- I really prefer that you not sort

7    of invoke the jury in your questioning.  Just ask your question

8    but don't explain to the jury, read to the jury, remind the

9    jury.  It's not necessary, and I would rather you just get to

10   the point and ask your question.

11          Second, I did want to just raise the listing of

12   PilePro in Skyline's catalog, which was obviously subject of

13   some examination as well.  I don't know anything about this

14   issue other than what you mentioned earlier, but I'm struggling

15   to understand what its relevance and significance is, how it's

16   being used, and I don't know how it relates to the settlement

17   agreement that Mr. Badini referred to earlier.  Does anyone

18   want to fill me in here?

19          MR. BADINI:  Yes, your Honor.  First of all, with

20   respect to your first issue, I do that as a matter of habit,

21   and I apologize and I will try to restrain myself.

22          THE COURT:  All right.  I will cure you of the habit

23   by the end of this trial but hopefully before that.  Go ahead.

24          MR. BADINI:  Second, we are very concerned about that.

25   The settlement agreement explicitly provided that Skyline had

1   certain obligations to list PilePro and its products and how

2   folks could get in touch with PilePro to buy its products in

3   the Skyline catalogs.  Defendant is trying to take that

4   contractual obligation and turn it into some type of

5   endorsement of PilePro's statements of lead times and other

6   things, and we think that's prejudicial and it requires at a

7   minimum a curative instruction.

8            THE COURT:  A curative instruction to what effect?

9            MR. BADINI:  To the effect that yesterday you heard

10   that Skyline carried references to PilePro in its catalog.  The

11   jury is instructed that it was required to do so contractually

12   and is not to infer from that that it was somehow endorsing

13   PilePro or PilePro's representations on its website.  Something

14   to that effect.

15            THE COURT:  All right.  Ms. Ghavimi?

16            MS. GHAVIMI:  Your Honor, it's our position that what

17   is good for the goose is good for the gander.  They designated

18   this exhibit.  It's a document that was in circulation at the

19   time.  The infringement warning was present and at the time

20   that they sued PilePro.  We have carefully avoided mentioning

21   this settlement agreement.  Yes, they had a contractual

22   obligation to list the website in their catalog, however, we

23   are not using it for that purpose.  They can't take away the

24   fact that it was there and that customers saw it.  Just as we

25   can't take away the fact that the infringement warning and

1    other actions were on the website.  It is out there and is what

2    people saw.  This case is about the effect on the public,

3    certain members of the public, and the evidence that was out

4    there.  It is our position that it constitutes a waiver of

5    their trademark claims of our use of their name on the

6    trademark, not with respect to the infringement warning, but

7    they have other claims that we infringed -- which we believe

8    are baseless -- by placing their name on the iSheetPile

9    website, simply by identifying the product by its manufacturer

10   that we have infringed their trademark.  It is our position

11   that they have waived that through placing the PilePro website

12   in their catalog presenting it to the public.  Customers could

13   view that.  They could go to the PilePro website, see

14   iSheetPile website and therefore imply a connection between the

15   companies.  We are not saying that the connection was based on

16   a settlement agreement.  We are not going to mention that.

17   Your Honor has ruled on that.  However, if they are claiming

18   that we infringed their trademark and unduly implied that we

19   were associated -- we unduly claimed an association with

20   ArcelorMittal and Skyline vis-a-vis infringing their trademark

21   simply by listing their names on our website, then we have

22   every right to identify for the jury that our website was

23   listed in their catalog.  It doesn't matter how it got there.

24          THE COURT:  Well, there are a lot of things being

25   mushed together and mixed together.  I guess let me start by

GBT7SKY8

```
 1    just saying do you have any authority for the proposition that
 2    listing the PilePro website in the catalog would constitute a
 3    waiver of their trademark claims, let alone where that is done
 4    as a contractual obligation pursuant to a settlement agreement
 5    in an entirely separate dispute?  Do you have any legal
 6    authority for that proposition?
 7              MS. GHAVIMI:  Well, I have not researched it yet, but
 8    I can assure you that I will find some.
 9              THE COURT:  Good.  So why don't you find some.  Until
10    you find some, this argument isn't going to be made.  And if
11    you don't find any, I will instruct the jury that they are not
12    to put any weight on that, that that was done pursuant to a
13    legal obligation, and it has no significance with respect to
14    the claims in this case.
15              Now, separate and apart from that, do you agree that
16    the listing in the catalog was a product of the settlement
17    agreement between the parties, that they were required to do
18    that?
19              MS. GHAVIMI:  Yes.
20              THE COURT:  OK.  Good.  Well, you have a couple days
21    to come up with authority for the proposition that would
22    support the argument you're making.  If you don't come up with
23    it, this argument isn't going anywhere, and I'm going to
24    provide a instruction.  It strikes me as a far fetched one, and
25    I fail to see how it could possibly constitute a waiver
```

GBT7SKY8

1    pursuant to a settlement agreement years before they are

2    contractually obligated to provide that information in their

3    catalog, and that that would somehow give you carte blanche to

4    do whatever you want to do on your website and violate their

5    trademark and falsely accuse them of infringing.  It just

6    strikes me as a completely farfetched argument.

7         MS. GHAVIMI:  Your Honor, it's our position that in

8    the minds of the public, the reason the website is in their

9    catalog is irrelevant because the effect of the presence of the

10   website in the catalog is the same.  It's not as if the catalog

11   says, yeah, we're only required to put this in here because of

12   a settlement agreement.

13        THE COURT:  Well, were you authorized to use the

14   trademark that was registered to ArcelorMittal and that Skyline

15   was licensed to use?

16        MS. GHAVIMI:  It wasn't registered at the time.

17        THE COURT:  It is today, and there is testimony that

18   even as late as last week that trademark was still being used

19   on the website.  So, do you have authorization to use that

20   trademark, and do you have any argument that by listing the

21   PilePro website, which then links to another website, that that

22   would somehow constitute authorization to use their trademark?

23        MS. GHAVIMI:  We don't have authorization.  We have

24   defenses of fair use, license, and may have additional defenses

25   that we will present in our closing on the naked license that

GBT7SKY8

1    came out during testimony today.

2              THE COURT:  All right.  Well, again, I don't -- this

3    strikes me as a real stretch, and I can't imagine that there is

4    any authority out there that would support an argument of

5    waiver.  I'm not going to cross the bridge of the various

6    doctrines that you just invoked, but you should certainly be

7    prepared to support me with authority that would support those

8    arguments as well, because I don't see it based on the listing

9    of the website in their catalog, which again was pursuant to a

10   legal obligation.

11             So, we will table it and see if defendant can come up

12   with any legal authority, and then we will decide what to do

13   from there.

14             Now, anything else we need to discuss other than the

15   remaining deposition designations for the Maake deposition?

16             MR. BROWN:  Yes, your Honor.  On their expert --

17             THE COURT:  Microphone.

18             MR. BROWN:  Mr. Persampieri, their expert witness, I

19   believe that some of his materials are designated attorneys

20   eyes only.  I know that was done in a lot of areas in this

21   case, and I'm wondering if that is still relevant now, or if

22   that no longer applies as I'm preparing for the cross of him,

23   because it will be in court, and I would like to prepare for it

24   using my client.  Am I allowed to give it to my client to

25   prepare for the cross of that particular witness?  That's my

GBT7SKY8

1    question.

2                THE COURT:  For some reason there is a picture of a

3    baby on my screen.  All right.

4                MR. BROWN:  That's not us, your Honor.

5                THE COURT:  Mr. Badini?

6                MR. BADINI:  This has come out of the blue.  I would

7    be happy to discuss it with counsel this evening and see what

8    he has in mind and work out a reasonable accommodation.  I told

9    counsel earlier today that we are likely to call Mr.

10   Persampieri last, so we have some time to make that call.

11               THE COURT:  Great.  Why don't you see if you guys can

12   work it out, and we can revisit it if there is a dispute.  If

13   it doesn't get reraised, I will assume you have resolved it.

14               MR. BROWN:  And a scheduling matter.  Are we certain

15   that we would be on trial Monday if we don't finish Thursday?

16   Or is there a chance we would start on Tuesday?

17               THE COURT:  Why on earth would we?

18               MR. BROWN:  I don't know.  I don't know if there are

19   any other trials that might come up on the criminal docket on

20   Monday.

21               THE COURT:  Nope.  Before we get to Maake, can you

22   tell me who is on tap for tomorrow, Mr. Badini, after

23   Mr. De Mey finishes?

24               MR. BADINI:  There is also another open issue, unless

25   you want to discuss the schedule first.  You're the boss, your

GBT7SKY8

1       Honor.

2                THE COURT:  Why don't you tell me who is on tap for

3       tomorrow and then --

4                MR. BADINI:  Let me check my schedule.  So we will

5       finish De Mey.  We are playing Madonna, and then intend to call

6       Mr. Wendt.  And, depending on how far we get, then we would

7       play McShane, Maake and Wheeler, I believe, in that order.

8                THE COURT:  OK.  And are there depositions coming down

9       the pike after that?  And when do you expect to get me --

10               MR. BADINI:  Yes, there are, your Honor.  The

11      tentative order after that is Messrs. Whitworth, Williams and

12      Mitchell, and then we would probably end with Ms. Gorog and Mr.

13      Persampieri.  And I believe we were shooting for tonight or

14      tomorrow morning -- I don't know; I'm looking at my

15      colleagues -- for the other designations.

16               MS. WESTCOTT:  We had intended to --

17               THE COURT:  Microphone.  Thank you.

18               MS. WESTCOTT:  Sorry.  We had intended to provide the

19      court with the remainder of the designations tonight for

20      discussion tomorrow morning if need be.  I did have one

21      question on that.  We got an order last night to ECF file the

22      designations.  Of course the designated testimony is now going

23      to be public, but if there is confidential information in them,

24      do you want us to redact?  Because we would be filing the whole

25      transcript.

1          THE COURT:  And I assume the confidential portions are

2     not any of the designated portions.

3          MS. WESTCOTT:  Well, certainly at least the ones that

4     are designated will no longer be confidential after they've

5     been read.

6          THE COURT:  So, let me modify what I said.  I didn't

7     take that into account in my order.  I do ultimately want these

8     things to be part of the public record, but why don't you

9     submit them by e-mail, as you did yesterday, and then with the

10    understanding that after I have resolved all the disputes, that

11    you can redact anything that is not going to be played that is

12    subject to a confidentiality agreement, but that certainly the

13    subjects, the testimony that is the subject of those disputes

14    has to be made part of the record so it's clear.  All right?

15         MS. WESTCOTT:  Thank you.

16         THE COURT:  I can't guarantee that I will be prepared

17    to talk about the remaining depositions tomorrow morning, but

18    it doesn't sound like they would likely be played tomorrow, and

19    my hope is I would get those to you if not before tomorrow

20    morning, then tomorrow afternoon.

21         All right.  What else before Maake?

22         MR. BADINI:  Before Maake?  Your Honor, right before

23    the Mr. De Mey cross, I was handed two defendants exhibits, 107

24    and 108.  We are having a hard time, given the way the

25    defendants exhibit list is presented in the pretrial order, and

GBT7SKY8

1    given the fact that these have no Bates numbers, to figure out

2    whether they were produced and whether they are on the exhibit

3    list.  So perhaps counsel can illuminate us, because we can't

4    figure out whether they were on the exhibit list or not.

5         MS. GHAVIMI:  Your Honor, I sent these exhibits to

6    counsel this morning, and we have not had a chance to meet and

7    confer on them.  I don't know what their objections are.  I

8    guess we can discuss it here.

9         THE COURT:  Well, I think their first objection is

10   that they don't know what they are.  But they are not on your

11   exhibit list that was filed in the joint pretrial order?

12        MS. GHAVIMI:  One of these documents, the one that

13   says Exhibit A -- OK, let me pull them out.

14        D 107 are attachments that are referenced in --

15        THE COURT:  It's a yes or no question.  Are these on

16   the exhibit list that you attached to the joint pretrial order?

17        MS. GHAVIMI:  No.  D107 is incorporated by reference

18   to a document that is on our exhibit list.  These are documents

19   that were produced at the deposition of John Madonna by John

20   Madonna.  That's why they do not have Bates numbers.

21        THE COURT:  OK.  And what is the reason that these

22   were not listed on the exhibit list?

23        MS. GHAVIMI:  Because they were not produced

24   electronically, I did not have access to them.  In the

25   preparation for this trial I added them as I was preparing.

GBT7SKY8

1  All I can say is two months ago I did not have them and decided

2  that they were relevant because they were referenced in other

3  documents that are on our exhibit list.

4          THE COURT:  They are not coming into evidence.  I made

5  clear at the final pretrial conference on Wednesday that the

6  exhibit list attached to the pretrial order was final unless

7  good cause could be shown for anything not appearing on that

8  list.  You obviously did have possession of these at least at

9  the time of the Madonna deposition.  You certainly have had

10  ample time in the two months since the joint pretrial order was

11  prepared and the exhibit list was attached to it to propose

12  that they be added without any prejudice or any issue of that

13  sort.  The fact that you didn't have copies in a certain format

14  when your cocounsel obviously did, this is the latest instance

15  of two hands of counsel not talking to each other.  It isn't

16  good cause, and they're not coming into evidence.  Next.

17          All right.  Let's talk about Maake, and then I will

18  let you go for the evening.

19          I think there are four designations that I wanted to

20  talk about.  The first is on page 40.  No, excuse me, 20.  It's

21  a PilePro objection, so does somebody at the back table want to

22  fill me in?  That is you folks.

23          MR. BROWN:  That would be this table?

24          MS. GHAVIMI:  I'm sorry, your Honor.  I need to pull

25  it up.

GBT7SKY8

1          MR. BADINI:  While they're pulling it up, your Honor,

2     I don't want to run afoul of any of the court's practices.

3     Given that Mr. De Mey is still on the stand, is there any rule

4     as to communications with him?  Different courts have done

5     different things in my experience.

6          THE COURT:  Let me put it differently.  Mr. Ramos or

7     Ms. Ghavimi, do you have any views as to whether and to what

8     extent counsel can communicate with Mr. De Mey, who is

9     obviously a corporate representative here but he is on cross?

10          MS. GHAVIMI:  Considering the fact that I'm going to

11     be asking him questions about similar issues that I had just

12     asked questions today, I believe that they should not be

13     allowed to discuss the case since it's intermingled with his

14     testimony.

15          THE COURT:  All right.  Mr. Badini, do you have any

16     objection if I instruct you that you are not to communicate

17     with Mr. De Mey except for logistical and scheduling issues?

18          MR. BADINI:  Well, provided the same rule applies to

19     Mr. Wendt.

20          THE COURT:  It certainly would if we break during his

21     cross-examination.  So what is goose for the goose is good for

22     the gander, as Ms. Ghavimi just put it.

23          MR. BADINI:  Sure.  I have no objection.

24          THE COURT:  Good.  So let's do that and err on the

25     side of caution.

GBT7SKY8

1          All right.  Ms. Ghavimi, are you prepared to walk

2     through the Maake deposition now?

3          MS. GHAVIMI:  Yes, your Honor.

4          THE COURT:  All right.  Can you point me to your

5     objection to page 20 to 21.

6          MS. GHAVIMI:  We don't see how the fact that Ms. Maake

7     bills PilePro on an hourly basis is relevant -- they didn't ask

8     this question of other PilePro employees -- how it's relevant

9     to any of her testimony on this matter.

10         THE COURT:  All right.  Mr. Restagno, are you taking

11    the lead here to too?

12         MR. RESTAGNO:  Yes, your Honor.  Thank you.

13         So, first of all, Ms. Maake is not an employee of

14    PilePro.  She was a contractor employed by PilePro to render

15    services.  It is our position that this time is relevant and

16    goes to foundation for the rest of the testimony establishing

17    the relationship with PilePro and also to her credibility as a

18    witness.

19         THE COURT:  All right.  The objection is overruled.

20         Next is page 63.  It's a Skyline objection.  So, Mr.

21    Restagno, back to you.  63, 64.

22         MR. RESTAGNO:  Thank you, your Honor.  So we object to

23    this testimony on relevance grounds.  What we have here is

24    testimony to the effect that iSheetPile was intended to be a

25    site where customers compare solutions and not an e-commerce

1   site.

2          The specific issues of the case as they pertain to the

3   Request a Quote feature is our allegations that the site misled

4   customers by effectively giving the bait and switch, showing

5   them one product and then directing them to another, on top of

6   other problems with the website being false lead times and the

7   infringement warning and so on.  Whether this site was intended

8   to be an e-commerce site with a shopping cart feature is not

9   relevant to the issues of the case.

10         THE COURT:  Can you just eliminate for me who is

11  Ms. Maake?  What is her role here?

12         MR. RESTAGNO:  Your Honor, Ms. Maake served as a

13  liaison between PilePro and the software engineers that made

14  the website, specialized in marketing and PR.

15         THE COURT:  All right.  Ms. Ghavimi, I certainly think

16  you are entitled to argue that from the evidence that has been

17  admitted, namely the website itself, that there is no shopping

18  cart and it's just an informational tool and so forth.  But

19  what possible relevance does her intentions have?

20         MS. GHAVIMI:  Well, this is not her intentions, your

21  Honor.  She is talking about the intention of the website as

22  she was instructed for it to be created.

23         THE COURT:  But my -- let me rephrase.  What relevance

24  does the intention of the creators of the website have to the

25  issues in this case?  In other words, again, you could make the

GBT7SKY8

argument that there is no shopping cart, this is just providing

information and, therefore, it's not confusing, and it's not

misleading, and it's not going to divert sales and so on and so

forth.  But what relevance does the intention of the folks at

PilePro or elsewhere in setting up the website have?

MS. GHAVIMI:  Because the jurors are going to be

looking at the website.  They don't have the website to

interact and move around and decide for themselves.  They are

going to be looking at screen shots and making a decision based

on what they see and what other people who have used it who are

going to be saying when you go here you get a quote.  And a lot

of this case is about the motivations of what the website is

about.  Skyline is arguing this is a bait and switch.  It is

intended to draw customers in, to select, view the product by

infringing our trademark, advertising this, clicking on it,

requesting a quote, and then they don't actually give you or

sell you a product and switch one of their own.  So, testimony

about how the website was never intended to be that way is

certainly relevant, because that's actually how it is not.  And

that's how we are going to argue it's not.  It just serves that

it was never like that at all and it is not like that, contrary

to how Skyline is going to be arguing and presenting their

testimony.

THE COURT:  All right, the objection is sustained.  I

think you can certainly make the argument from the website

GBT7SKY8

1    itself that it's not a bait and switch and what have you, but I

2    don't see what relevance their intentions have.  And to the

3    extent that the jury is limited to the screen shots, that's a

4    product of counsel's decision to try the case in the manner

5    that you are trying it.  You certainly could have figured out

6    some way to capture in a more dynamic fashion the website short

7    of the proposal made last week to do it on a live basis.

8           Next is page 138, PilePro's objections.  This is

9    really 138 through 140, and part of my problem is I don't know

10   what the exhibits being referenced here are.

11          Ms. Ghavimi?

12          MS. GHAVIMI:  Your Honor, we object to this testimony

13   to the extent that, one, it refers to the placement of the

14   infringement warning on the website, that they're trying to

15   attribute an e-mail exchange between Ms. Maake and Mr. Wendt

16   and imply ownership and some kind of authorization, when we

17   believe Mr. Wendt is here.  They can ask him that question

18   himself.

19          This testimony is irrelevant and will be prejudicial

20   because we do not have the opportunity to cross-examine

21   Ms. Maake or this document.  I don't know if they intend to use

22   these documents or introduce them into evidence with Mr. Wendt.

23   We haven't received their proposed exhibits.

24          And, you know, they are just talking about exhibits.

25   You know, there is no exhibits in front of the jury to look at.

GBT7SKY8

1     So, I mean it's kind of -- it's just going to confuse the jury

2     because they are just talking about e-mails, and it's really

3     nothing relevant to --

4              THE COURT:  All right.  Well, Mr. Restagno, let me

5     turn to you, and let me also pose a broader question, which is

6     to the extent that the portions of the depositions do reference

7     exhibits, is it the parties' intention to offer those in

8     connection with the deposition?

9              MR. RESTAGNO:  It is, your Honor.  And furthermore, I

10    will note that PilePro has not objected to either of those

11    exhibits, despite objecting to this testimony, which is

12    entirely relevant, as it deals with e-mail exchanges concerning

13    the '543 patent.

14             THE COURT:  All right.  And again just as a process

15    matter, is the plan to say we're playing the deposition and

16    pursuant to the deposition we offer the following exhibits?  Is

17    that the way you were planning to proceed?

18             MR. RESTAGNO:  Yes, the exhibits will be shown on the

19    screen, your Honor.

20             THE COURT:  OK.  And I am guessing, as they often are,

21    they are not necessarily going to correspond to the numbers

22    used in the deposition?  Is that a fair assumption?

23             MR. BADINI:  I believe with only one exception --

24    which I believe is Madonna where somebody screwed up -- they do

25    correspond, at least on the plaintiff's side, with the ones

GBT7SKY8

1     that are in the pretrial order.

2              THE COURT:  All right.  The objection to the testimony

3     we are discussing is overruled.  And then more broadly what you

4     should plan to do is when you say we next call by video

5     deposition Ms., you know, Kristin Maake or whatever it is, and

6     pursuant to that deposition offer the following exhibits, and

7     then we can deal with those.  Let's make sure there are no

8     objections before that's done, and that any potential

9     objections outside the presence of the jury.  And then if there

10    is a discrepancy between the number that was used in the

11    deposition and the number that is being used at trial, make a

12    record of that, and I will make sure that the jury understands

13    that issue.

14              All right.  The last designation at issue is pages 161

15    to 162.  This is a Skyline objection.  Mr. Restagno?

16              MR. RESTAGNO:  Yes, thank you, your Honor.  So, this

17    testimony is objectionable.  It deals almost entirely with the

18    circumstances of Mr. McShane leaving PilePro as observed by

19    Ms. Maake.  We think it is entirely irrelevant and potentially

20    prejudicial.

21              THE COURT:  Ms. Ghavimi?

22              MS. GHAVIMI:  Your Honor, as we said before, yesterday

23    or this morning -- I forget -- it is our position that

24    Mr. McShane was a disloyal employee, and it is also our

25    testimony that it was his decision to place the warning and

GBT7SKY8

content of the warning on the website, and he was the person

who interacted with Ms. Maake, and this testimony regarding her

communication and relationship with him "When I first started

at PilePro, Gerry was my go-to person" is highly relevant.

MR. BADINI:  Your Honor, I hate to jump in here, but

Mr. Restagno would not know this, because he has been dealing

with the deposition designations.  But this is precisely why

there is a problem with introducing other litigation into this

case.  PilePro has made precisely this same argument that

Mr. McShane was a disloyal employee in the arbitration between

Mr. McShane and Mr. Wendt, and the arbitrator soundly rejected

that and ruled against Mr. Wendt.  And now they want to

resurface the same theory after it has been adjudicated against

them.  And if they resurface that theory, it would only be fair

for us to introduce the finding in the arbitration that

Mr. McShane was not a disloyal employee.  And that's the

problem with this testimony.

THE COURT:  All right.  I'm going to sustain the

objection.  I don't think this has much probative value with

respect to even making the argument that Mr. McShane was a

disloyal employee.  It just basically says in her opinion that

there were unusual circumstances surrounding his departure, and

it really doesn't have much more to inform it.  And I also

think on Rule 403 grounds, in light of the issues that Mr.

Badini just mentioned, that it would raise all sorts of

GBT7SKY8

1    problems.  So that objection is sustained.

2            All right.  I think that covers all the depositions

3    that have been presented.  Any last issues for tonight?  It's

4    been a long day.  I am happy to let you guys go.

5            Mr. Badini, you are going to prepare a proposed

6    curative instruction with respect to the spoliation issue.

7    Obviously the sooner you can submit that -- and you should do

8    so by ECF -- the better, and we will take it up at some point

9    tomorrow.

10           Please be here a few minutes before nine, and let my

11   staff know if there are issues to discuss, as I'm guessing

12   there will be.  I will plan to be on the bench no later than

13   nine.  And I want Mr. De Mey on the stand and everyone ready to

14   go with the jury at 9:15.

15           All right.  I wish you all a pleasant evening, and I

16   will see you tomorrow morning.

17           MR. BADINI:  Thank you, your Honor.

18           (Trial adjourned to November 30, 2016 at 9:00 a.m.)

19

20

21

22

23

24

25

1                      INDEX OF EXAMINATION

2     Examination  of:                              Page

3     LAURENT DE MEY

4     Direct By Mr. Bandini  . . . . . . . . . . . .82

5     Direct By Mr. Badini . . . . . . . . . . . . 130

6     Cross By Ms. Ghavimi . . . . . . . . . . . . 164

7                      PLAINTIFF EXHIBITS

8     Exhibit No.                               Received

9      584  . . . . . . . . . . . . . . . . . . . .82

10     306  . . . . . . . . . . . . . . . . . . . .96

11     308  . . . . . . . . . . . . . . . . . . . 102

12     11   . . . . . . . . . . . . . . . . . . . 106

13     280  . . . . . . . . . . . . . . . . . . . 134

14     573  . . . . . . . . . . . . . . . . . . . 145

15     574  . . . . . . . . . . . . . . . . . . . 147

16     575  . . . . . . . . . . . . . . . . . . . 151

17     576  . . . . . . . . . . . . . . . . . . . 152

18     577  . . . . . . . . . . . . . . . . . . . 153

19     579  . . . . . . . . . . . . . . . . . . . 154

20     305  . . . . . . . . . . . . . . . . . . . 170

21

22

23

24

25